UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

JOSHUA ROHRER,

Plaintiff,

v.

CITY OF GASTONIA, CIERRA BROOKS,
MAURICE TAYLOR III, RICK GOODALE,
J. DOE,

Defendants.

Case No.: ___3:23-cv-00396_____

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.      On October 13, 2021, Joshua Rohrer—a disabled veteran who was homeless and living in Gastonia, North Carolina—experienced one of the worst days of his life. He was standing on the median of a road with his service dog, Sunshine, smiling and waving to passing drivers because spreading positive energy helps him cope with the post-traumatic stress disorder, anxiety, and depression that beset him after his military service. Even though Mr. Rohrer was not asking drivers for anything, Gastonia police officers Cierra Brooks and Maurice Taylor III approached him and arrested him under the City's plainly unconstitutional anti-panhandling ordinances. During the arrest—and despite knowing of Mr. Rohrer's disabilities—the officers unnecessarily escalated the situation, forcing Mr. Rohrer against their car and then to the ground and tasing the unthreatening Sunshine, who ran off and was later killed by a car. Mr. Rohrer was devastated by the death

1

of his beloved companion Sunshine and attempted to take his own life. He continues to suffer from the injuries the officers inflicted on him.

2.  As much as Mr. Rohrer would like to put that day behind him, he can't: Over the past year and a half, in retaliation for Mr. Rohrer's public calls for accountability for the City and the officers involved, the City has subjected Mr. Rohrer to a relentless campaign of harassment, abuse, and defamation. This campaign has involved hundreds of disparaging, false, and taunting public comments by the City through the official Gastonia Police Department Facebook account, including statements made directly on Mr. Rohrer's personal Facebook profile. The City's comments attack Mr. Rohrer's character, lie about what happened that day, and intentionally mislead the public about the fact that the criminal charges against Mr. Rohrer were dismissed. The City has also encouraged members of the public to harass Mr. Rohrer online, even after Mr. Rohrer left Gastonia to escape the City's abuse. Today, the posts and comments continue, causing Mr. Rohrer immense psychological harm and reputational damage.

3.  The City and the individual Defendants are responsible for violating Mr. Rohrer's rights under federal and state law, and this complaint seeks damages and declaratory relief to remedy the harm they have caused him.

**PARTIES**

4.  Plaintiff Joshua Rohrer is a veteran who, in October 2021, was a homeless resident of Gastonia. He is a person with disabilities and relies on a service dog. In October 2021, Mr. Rohrer's service dog was named Sunshine. Sunshine was trained to accommodate Mr. Rohrer's physical and mental disabilities, and she was Mr. Rohrer's constant and beloved companion.

2

5.	Defendant City of Gastonia (hereinafter "City") is a municipal corporation located in Gaston County and organized under the laws of the State of North Carolina. The City is responsible for the policies, practices, and customs of its Police Department.

6.	Defendant Cierra Brooks is an officer with the Gastonia Police Department. At all times pertinent to the material incidents in this complaint, she was acting within the scope of her employment and under color of law. She is sued in her individual capacity.

7.	Defendant Maurice Taylor III was an officer with the Gastonia Police Department in October 2021. Upon information and belief, he subsequently left the Department. At all times pertinent to the material incidents in this complaint, he was acting within the scope of his employment and under color of law. He is sued in his individual capacity.

8.	Defendant Rick Goodale is an employee of the Gastonia Police Department. Upon information and belief, he has administered the Department's official Facebook page since August 2021 and, under color of law, has posted or authorized posting of statements on behalf of the Department on social media. He is sued in his individual and official capacities.

9.	Defendant J. Doe is an employee or employees of the Gastonia Police Department. Upon information and belief, Defendant Doe posts or authorizes posting of statements on behalf of the Department on social media under color of law. He is sued in his individual and official capacities.

## JURISDICTION AND VENUE

10.	Plaintiff's claims are brought under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as the Americans

with Disabilities Act, 42 U.S.C. § 12131 (ADA), and the Rehabilitation Act, 29 U.S.C. § 794(a).

11.     This Court has jurisdiction to hear Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

12.     Venue is proper in the U.S. District Court for the Western District of North Carolina under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts that gave rise to this lawsuit occurred in this judicial district. This district is also an appropriate venue under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district.

## FACTS

13.     Mr. Rohrer enlisted in the U.S. Army in 2002, just a few months after he graduated high school. Mr. Rohrer completed a tour in both Iraq and Kuwait in 2004 and 2005, during which time he saw combat.

14.     Mr. Rohrer was grateful for the opportunity to serve his country, but the trauma he experienced during his military service has had long-lasting effects on his health and wellbeing. Mr. Rohrer lives with post-traumatic stress disorder (PTSD), depression, anxiety, and a panic attack disorder.

15.     Mr. Rohrer also has a hiatal hernia that causes severe acid reflux when he leans forward or bends over.

16.     The U.S. Department of Veterans Affairs (VA) prescribed a service dog to Mr. Rohrer to help him manage his service-related conditions.

17.     In October 2021, Mr. Rohrer's service dog was Sunshine. At that time, Mr. Rohrer had spent almost three years with Sunshine.

4

18.     Sunshine was extremely well trained to support Mr. Rohrer, and Mr. Rohrer relied heavily on her. Her skills included providing Mr. Rohrer deep pressure therapy, hugging him, and licking his face during his panic attacks; creating a physical barrier between Mr. Rohrer and others to prevent PTSD episodes triggered by people approaching him; alerting Mr. Rohrer when people were approaching him from behind or the side; retrieving items at the ground level that Mr. Rohrer could not reach without triggering his acid reflux; opening and closing doors; turning lights on and off; reminding Mr. Rohrer to take his medications because his PTSD impairs his memory; reminding Mr. Rohrer to feed Sunshine and himself; waking Mr. Rohrer out of nightmares; and crossing the street safely on her own.

19.     Per the VA prescription and applicable state and federal laws, rules, and regulations, Sunshine was to remain with Mr. Rohrer at all times and never be separated from him.

20.     Sunshine was not required to be leashed in public. *See* Gaston Cty. Ordinance § 3.8(a)(1) (2023).

21.     Sunshine wore a vest prominently indicating that she was a service animal. The vest contained two patches expressly identifying her as a service dog and one stating "do not separate from handler."



22.     Mr. Rohrer was unable to work because of his disability, but he found solace in walking around the City with Sunshine while interacting with members of the Gastonia community.

23.     Mr. Rohrer often would smile and wave at drivers to convey a message of positivity and combat negative stereotypes about people experiencing homelessness. Community members were often kind, smiling back and waving at Mr. Rohrer, and people would chat with him. Sometimes people would bring him or Sunshine food or water and, occasionally, money. Mr. Rohrer never asked for money or any other donation during these interactions.

24.     He sometimes would stand or walk in the medians of streets, but Mr. Rohrer did not obstruct traffic.

25.     Although Mr. Rohrer caused no problems, a number of Gastonia Police Department officers were abusive and cruel to Mr. Rohrer, viewing him as a problem, an eyesore, or a blemish on the community, and they routinely harassed and mistreated him.

26.     For example, on October 9, 2021, Defendant Taylor approached Mr. Rohrer while Mr. Rohrer was standing on a median and told Mr. Rohrer he was not allowed to stand there.

27.     While they were talking, a car stopped and the driver offered Mr. Rohrer food for Sunshine and some money, which Mr. Rohrer accepted.

28.     Taylor said, "If you don't move right now, I'm going to take you to jail." Taylor again told Mr. Rohrer that he was not permitted to stand there, even though he was not blocking traffic. But Taylor repeatedly refused to identify any law that prohibited Mr. Rohrer's activity, instead saying, "If you want me to show you a statute, cool; but I'm going to show you a statute taking you to jail."

29.     Taylor explained that officers had "received directions that we're not supposed to have people in medians, like at the intersections of the highways" and asserted "I'm doing what I'm being told to do."

30.     After Mr. Rohrer said that other police officers would smile at him or offer him money, Taylor responded, "We're not even supposed to do that, because that's against policy."

31.     During this encounter, Taylor inquired about the extent and nature of Mr. Rohrer's disability. Mr. Rohrer explained that he is nearly 100-percent disabled on a

permanent basis and that his "PTSD is so severe that [he] can't function without a service dog." (BWC Part One at 12:21).[1]

32.      The only obstruction of traffic during that encounter was created by Taylor, who parked his car in the middle of an intersection and blocked an entire lane of traffic. On Taylor's way back to his car, another car stopped, blocking the only other lane, and Officer Taylor talked with the driver about job opportunities with the Police Department, never once telling the driver they were not permitted to obstruct traffic by stopping a vehicle in the middle of the street.

**Defendants Detain Mr. Rohrer for Allegedly Panhandling on October 13, 2021**

33.      On October 13, 2021, only four days after the incident with Defendant Taylor described above, an anonymous caller contacted 911 to complain that one or more people were standing at intersections "using dog[s] to make people feel sorry for them to give them money." The dispatcher could not determine whether what the caller was describing was a crime but agreed to send officers to the scene.

34.      The incident and what followed was captured by multiple police body-worn cameras.

---

[1] In July 2022, acting on Mr. Rohrer's petition, a judge ordered the City to release the body-worn camera videos from officers' interactions with Mr. Rohrer on October 9 and 13 of 2021. Those videos are available on the City's website at https://www.cityofgastonia.com/police-news-release/1876-october-9-and-october-13,-2021,-body-worn-camera-video-related-to-joshua-rohrer-released.html (also at https://perma.cc/GS5J-LLQY). The video from October 9, 2021, and October 13, 2021, marked as "Body-worn camera video – Part One" will be referred to as "BWC Part One," and the video from October 13, 2021, marked as "Body-worn camera video – Part Two" will be referred to as "BWC Part Two."

35.     Within minutes of the call, Defendant Brooks approached Mr. Rohrer at the intersection of Cox Road and Gaston Mall Drive and stated that she had received calls claiming that Mr. Rohrer was panhandling.

36.     After seeing Mr. Rohrer accept a donation from a passing vehicle, Defendant Brooks decided to write him up for violating Gastonia's anti-panhandling ordinances.

37.     Mr. Rohrer disagreed with that characterization of his activity. He argued that he had not solicited donations from anyone but instead that someone had offered him a donation without him asking for it.

38.     Mr. Rohrer asked Defendant Brooks if she was really going to issue a citation to a "disabled veteran who's living in the woods," to which she responded in the affirmative.

39.     Defendant Brooks then called in Defendant Taylor. Defendant Taylor arrived on the scene and told Mr. Rohrer that if he continued to insist that he did nothing wrong, Taylor would separate Mr. Rohrer and Sunshine and give Sunshine to animal control. Taylor made this threat despite his knowledge that Mr. Rohrer was a disabled veteran and that Mr. Rohrer's PTSD was "so severe [he] c[ouldn't] function without a service dog." (BWC Part One at 12:21).

40.     Defendants Brooks and Taylor both demanded that Mr. Rohrer provide his identification but did not specify any particular form of identification. Brooks told Mr. Rohrer that if he did not hand over his identification he would go to jail for "RDO," a reference to a state law that makes it a misdemeanor to "willfully and unlawfully resist, delay or obstruct" a police officer. N.C. Gen. Stat. Ann. § 14-223(a) (2014). A person who

9

refuses to comply with an order they reasonably believe to be unlawful without engaging in behavior that is "aggressive or suggestive of violence" is not guilty of this crime. *State v. Humphreys*, 853 S.E.2d 789, 796 (N.C. Ct. App. 2020).

41. In response to these demands, Mr. Rohrer handed over his federal veteran identification card ("veteran ID"), which clearly identifies him.

42. Defendants Brooks and Taylor could have readily determined Mr. Rohrer's identity from his veteran ID.

43. Even though Defendant Taylor would later explain that they were simply trying to identify Mr. Rohrer, Defendants refused to accept Mr. Rohrer's valid veteran ID and demanded that Mr. Rohrer produce his state identification ("state ID") instead.

44. Mr. Rohrer's state ID was expired and did not contain his correct address.

45. There is no obligation under North Carolina law for a pedestrian to have state identification.

46. There is no obligation under state law to provide any particular type of identification in response to a request from an officer.

47. Indeed, the U.S. Supreme Court highlighted the risk of arbitrary enforcement when it held unconstitutional a statute that vested authority in police officers to determine whether an individual's identification is "credible and reliable." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). And North Carolina law favors veterans' identifications to state identifications in some instances. *E.g.*, N.C. Gen. Stat. Ann. § 163-166.16(a)(2) (providing that electors can use an expired veterans' identification but not an expired state identification to vote).

10

48.     Despite having no obligation to provide his state ID, Mr. Rohrer attempted to comply with the new demand. He opened his wallet, grabbed his state ID, and started to proffer it to Defendants, while explaining that the state ID was not currently valid.

49.     However, Defendants Brooks and Taylor did not wait for Mr. Rohrer to provide his state ID. After only a few seconds, and while Mr. Rohrer was attempting to comply, Taylor grabbed Mr. Rohrer, told him he was under arrest for resisting an officer, and, with Brooks, forced Mr. Rohrer against the patrol car.

50.     Defendant Brooks then took over effectuating the arrest, first pressing Mr. Rohrer into the car and then, after about a minute, throwing him onto the pavement.

51.     At no point did Mr. Rohrer physically resist Defendants' restraints, although he begged witnesses to help: "Somebody help me. Hey! What are you doing? What are you doing? Mama! What are you doing? I'm not doing anything. Somebody help me! What are you doing to me? Why are you all hurting me?" As Defendants restrained him, Mr. Rohrer continued to sob: "What are you all doing to me? Help me. What are you doing? What are you doing? I haven't done anything! I am cooperating. Somebody help me, record this." A few minutes later, he exclaimed, "Somebody please help me—they're trying to kidnap me."

52.     While this was happening, Sunshine stayed close to Mr. Rohrer but did not interfere with Defendants. Sensing Mr. Rohrer's distress, Sunshine paced calmly around Mr. Rohrer's feet and then jumped onto the car to be closer to his face, in keeping with her training.

53.     Although Sunshine did not pose any threat to anyone, Defendant Taylor drew his taser gun and pointed it at Sunshine.

54.     Defendant Brooks, having observed that Sunshine was well-behaved, well-trained, and nonthreatening, said, "I don't think he's [sic] going to bite me. I don't think he's [sic] going to bite me."

55.     In response, Defendant Taylor stated, for the first time and with Sunshine visibly several feet away and facing away from Taylor, "He just bit me."

56.     This was false. Sunshine was nonaggressive throughout the encounter and did not bite Defendant Taylor or anyone else.[2] Instead, Sunshine exhibited nonthreatening posture; did not growl, lower her ears, snap, lunge, or give any other indication that she might be dangerous; and merely walked calmly back and forth in Mr. Rohrer's vicinity. In fact, later in the day when discussing the incident with a supervisor, Defendant Taylor admitted that Sunshine was "a very well-trained dog." (BWC Part Two at 48:18).

57.     While Defendant Taylor continued to point his taser gun at Sunshine, Sunshine jumped off the car and began to walk away from Taylor on the median.

58.     At this point, even though Sunshine posed no threat to anyone, Defendant Taylor fired the taser at Sunshine and hit her.

59.     Injured and in distress from the tasing, Sunshine ran away.

60.     Defendant Taylor's use of the taser to shoot Sunshine destroyed her ability to execute her training and thus to act as a service animal.

61.     Mr. Rohrer howled in terror: "Why did you taser my dog? Hey ... Someone help me! What did you do to her? Somebody help me, record this! Help me. No! What did you do to her?"

---

[2] Although the BWC footage does not show Sunshine at all times during the encounter, at no time does it show Sunshine biting anyone.

62. As Mr. Rohrer screamed for help, he remained completely compliant with Defendants, while Defendant Brooks continued to hold his face against the pavement and handcuff him and Defendant Taylor kneeled on Mr. Rohrer's body.

63. Despite Mr. Rohrer's terror, Defendants Brooks apparently found the incident funny. When later asked by a supervisor whether Taylor tased Sunshine, Brooks smiled and laughed while saying, "Yeah, he did." (BWC Part Two at 45:26).

64. Without Sunshine, Mr. Rohrer became despondent: "I don't know what they did with Sunshine. Where's my dog Sunshine Rae? I need my dog, she's my medical device. Where's my dog? Where's my dog? Where's my dog? Where's my dog? Where's my dog? What did y'all do with my dog? Where's my dog? Why are you doing this to me?"

65. He further explained: "I need my dog. I need my dog, man, she's my medical device. It's my service dog, man, I need my dog." (BWC Part Two at 7:02). Mr. Rohrer reiterated that Sunshine was his medical device and said, "You can't separate me from my service dog." (BWC Part Two at 57:44).

66. Upon overhearing Defendants discussing their use of force against Sunshine, Mr. Rohrer cried out: "My dog was running away and you shot her when she was running away."

67. Defendants ignored Mr. Rohrer's pleas to find, protect, or care for Sunshine and dismissed Mr. Rohrer's critical need to have access to his service dog in the very situation in which he required Sunshine the most, i.e., during an extreme event exacerbating the severe medical conditions caused by his time in the military.

13

68.     Nothing that Mr. Rohrer did obstructed traffic or caused a disturbance. Nevertheless, to respond to Mr. Rohrer's arrest, more than a dozen police cars arrived on the scene, completely blocking all lanes of traffic in one direction and most of the traffic in another and disrupting the flow of traffic in the nearby intersection.

69.     Mr. Rohrer continued to weep, sob for help, and beg for Sunshine as the officers milled around.

70.     The force used during the arrest caused Mr. Rohrer physical injuries, including a torn meniscus in his knee, a severely sprained lateral collateral ligament, a blood clot in his leg, and bleeding and contusions on his face. Mr. Rohrer needed to use a wheelchair and a walker for months after the incident, and Mr. Rohrer continues to suffer from lasting mobility issues and ongoing leg pain that interfere with his daily life and make it difficult for him to walk for long distances. Mr. Rohrer's doctors have recommended that he undergo surgery to address his unresolved injuries and leg pain.

71.     The violent arrest also caused Mr. Rohrer severe mental and emotional injuries. For instance, he is now afraid of police officers, and begins sweating and shaking uncontrollably out of fear for his life when he sees officers, blue lights, police cars, badges, or anything to do with the police. On one occasion when he was a passenger in a car on a highway, he saw a police car pull up behind the car he was in and he nearly jumped out of the moving car in fear.

72.     The incident also forced Mr. Rohrer to move out of Gastonia and start his life over in a new community. He avoids Gastonia and anywhere in its vicinity whenever possible because he does not feel safe there.

**The Attempted Cover-up**

73.    People who witnessed the incident were outraged. Civilian eyewitnesses disputed the false claim made by Defendants Brooks and Taylor that Sunshine attacked them or that Mr. Rohrer had done anything that would justify his arrest.

74.    For example, two witnesses approached, saying that they watched the incident and asking why Defendants attacked Sunshine and Mr. Rohrer. One witness explained, "This guy's been out here for months—his dog never attacked anyone." Another driver exclaimed, "All these police for this one guy, that's a little ridiculous," to which one officer falsely claimed that the overwhelming display of force was justified by "that one guy who's attacking officers and having his dog bite officers." (BWC Part Two at 51:00).

75.    Rather than seek out information from eyewitnesses to the event, additional officers who arrived on the scene immediately sought to cover up the incident by pushing the witnesses away. (BWC Part Two at 31:25).

76.    Other officers threatened witnesses that if they did not leave the area they would "put [them] in handcuffs." As officers bore down on one witness and forced her to leave, another witness said, "We support you guys, but I might second guess that now." (BWC Part Two at 36:57).

77.    Another woman called the police department to complain about the mistreatment of Mr. Rohrer and Sunshine. Defendant Taylor called the number back and threatened to charge her with the crime of misuse of 911.

78.    Upon information and belief, other individuals who witnessed the event and expressed their concerns were ignored or threatened by officers.

79.     Defendant Brooks also promptly changed her story: Even though she had told Defendant Taylor immediately before the tasing that she did not think Sunshine was going to bite her, when recounting the incident to another officer, she claimed instead that Sunshine "was about to bite [her], and Taylor tased it [sic]." (BWC Part Two at 45:23).

### The Aftermath

80.     Mr. Rohrer was transported to the jail. Upon information and belief, he was charged with soliciting alms, soliciting from a highway, and two misdemeanor counts of resisting arrest.

81.     During the booking process, Defendants Brooks and Taylor belittled Mr. Rohrer and questioned his disability.

82.     Taylor at one point said to Mr. Rohrer, "You walk up and down the street all the time. You're not disabled; your legs work fine."

83.     Taylor also asserted, "I have a disability rating and I still work; my [acquaintance] has a rating and he still works. You should have just listened to us and complied."

84.     At the subsequent bond hearing, Defendants Taylor and Brooks insisted that Mr. Rohrer's bond should be increased by claiming that Mr. Rohrer—a homeless individual with few resources—was a flight risk.

85.     The assigned magistrate judge, Magistrate Mark Oakes, set a $3,000 bond for these minor offenses and imposed a condition that Mr. Rohrer could not use a bondsperson or support from the community but instead was required to pay the entire bond amount himself or with funds from immediate family. A bondsman who attempted to post bail on Mr. Rohrer's behalf was prohibited from doing so.

16

86.     Mr. Rohrer's mother, outraged by the unjust treatment of her son, sent money to pay the bond.

87.     In July 2022, the District Attorney dismissed all charges arising out of the October 13 incident.

88.     Mr. Rohrer pleaded guilty to an unrelated charge of driving with a suspended license that had occurred on a different day.

**The Death of Sunshine**

89.     Although the police failed to secure Sunshine, they brought Sunshine's service jacket to Mr. Rohrer in jail. One of the taser darts was still stuck through the back end of the vest. However, a patch stating that Sunshine was not to be removed from her owner was missing.

90.     When Mr. Rohrer was finally released from jail, he—along with many members of the community—searched for Sunshine.

91.     But Sunshine would never be reunited with Mr. Rohrer. As a result of being separated from Mr. Rohrer and the trauma inflicted by the tasing, Sunshine—who, prior to the tasing, was trained to cross the street safely on her own—ran into traffic and was struck and killed by a vehicle.

92.     Upon learning of Sunshine's death, Mr. Rohrer experienced a severe mental health episode and ran head-on into traffic, attempting to end his life.

93.     After Mr. Rohrer's arrest and Sunshine's death, Mr. Rohrer began seeing a therapist twice a week and began taking a range of psychiatric medications to address the mental health repercussions—including depression and suicidality—he suffered because of the arrest and the loss of Sunshine.

17

**Government Officials Disparage Mr. Rohrer on Social Media**

94.     While Mr. Rohrer's criminal charges were still pending, Defendant Brooks and Magistrate Oakes disparaged Mr. Rohrer on social media.

95.     On October 23, 2021, Defendant Brooks publicly stated on Facebook, "Gaston County people in such an uproar about that damn dog getting tased without knowing the facts but where was the same energy for the Gastonia officers that were attacked a couple of days ago and almost lost their lives??? I'll wait."

96.     On October 23, 2021, Defendant Brooks once again discussed the issue on Facebook, stating that anyone defending Mr. Rohrer and criticizing her sounded "dumb as hell still talking about that dog incident supporting him," before stating that Mr. Rohrer was "clearly in the wrong," and concluding, "But whatever … Y'all still bothered and I'm still living, counting down the days until I'm at Mardi Gras."

97.     On October 29, 2021, Magistrate Oakes made a series of public statements on Facebook in response to the growing outrage over what the police had done to Mr. Rohrer and Sunshine, implying that he had non-public evidence about the case. His statements read:

> you weren't even there so what make your opinion worth anything? You are low information loud mouth too I see
>
> low information loud mouths are always a problem in society. You just regurgitate what one or two people who weren't even there are saying. Sheep
>
> you weren't even there so I'm going to dismiss your lack of knowledge. Veterans are also required to follow law and ordinances. They don't get a free pass. In fact they should be in the front of the line of law abiding citizens
>
> sir I know more about this case than you. I promise. Vets are not above the law. They must abide by it too. You refuse to acknowledge it I see but the truth still remains. Play in your own sandbox romper room

18

you are what is skewed about society – low information loud mouths

again low information loud mouth is what you are. You're too young to understand the romper room comment obviously. Go change your diaper

98.    Magistrate Oakes made these inappropriate comments publicly even though the criminal case against Mr. Rohrer over which Oakes had presided was still pending, and he might have been required to preside over additional proceedings in the case in the future. Upon information and belief, Magistrate Oakes has faced no discipline for the posts and remains a magistrate to this day.

### Mr. Rohrer Engages in First Amendment-Protected Activity Regarding His Arrest and the Tasing of Sunshine

99.    Following his arrest, Mr. Rohrer engaged in a number of First Amendment-protected activities meant to draw attention to the unconstitutional conduct of the City and its officers.

100.    Mr. Rohrer attended several rallies organized to support him and oppose the City's mistreatment of its unhoused population more generally. Mr. Rohrer gave speeches at nearly all of them.

101.    Mr. Rohrer spoke repeatedly before the Gastonia City Council about his arrest and the tasing of Sunshine, seeking to draw attention to his mistreatment.

102.    Mr. Rohrer gave numerous press interviews about his arrest and the tasing of Sunshine. *See, e.g.*, *'They Brutalized Me': Disabled North Carolina Veteran Calls on Police to Release Video of His Arrest* (July 11, 2022), ABC11 Eyewitness News, https://abc11.com/disabled-veteran-police-brutality-body-cam-nc/12043399;    Brandon Goldner, *'They Lied': Gastonia Homeless Veteran Describes Bodycam Video of His Arrest*, WCNC    Charlotte    (Dec.    30,    2021),

https://www.wcnc.com/article/news/investigations/gastonia-homeless-veteran-views-bodycam-arrest-joshua-rohrer/275-b2a2bd21-c506-4352-9113-bab3ceebc5e6.

103.     Mr. Rohrer filed a petition for the release of the body-worn camera footage of the October 13 incident, which was opposed by the City but was ultimately granted by a state trial court.

104.     After the footage was released, Mr. Rohrer shared the footage of his arrest via various platforms, including YouTube and Facebook. The footage shocked and angered many members of the public, who offered further support for Mr. Rohrer's cause.

105.     On the day Mr. Rohrer was arrested, one of his supporters established a campaign on GoFundMe.com to raise money for Mr. Rohrer to help with his court costs, spread awareness that Sunshine was missing, and garner support for Mr. Rohrer and Sunshine. After Sunshine was killed, the purpose of the campaign changed to help Mr. Rohrer afford legal fees, housing costs, groceries, mental health expenses, and a new service dog.

106.     Mr. Rohrer maintains a personal profile on Facebook.[3] After his arrest, he began to use his personal profile to speak out about the abuse to which he was subjected and the tasing of Sunshine and to garner support for his cause.

---

[3] Facebook allows users to create several kinds of webpages. Each Facebook user may create one "personal profile" for their individual use. The owner of the personal profile may make "posts" on that profile, and other users with access to those posts can append "comments" to those posts and reply to comments on those posts. Owners of personal profiles can choose to make their posts available to the general public or accessible only to their Facebook "friends," Facebook members with whom they have established connections. For simplicity, posts, comments, and replies collectively are referred to herein as "statements."

107.    Following Mr. Rohrer's arrest, a member of the community created a Facebook group titled "Support Joshua Rohrer and Sunshine Rae" as "a place to gather to show support for Joshua and Sunshine."[4] After the support group was created, Mr. Rohrer was added as an administrator of the group. The administrators, moderators, and members of this group (including Mr. Rohrer) use this page to speak out about Mr. Rohrer's arrest and the tasing of Sunshine and to post information about events, including in-person rallies outside the Gaston County Courthouse followed by participants speaking at the Gastonia City Council. For instance, the support group has shared information about at least nine "Rallies for Justice and Compassion" organized by the Libertarian Party of North Carolina and Pastor Moses Colbert, which were organized to request that the government "show justice and compassion for [Gastonia's] homeless population" and to demand justice and accountability for Mr. Rohrer's arrest and Sunshine's tasing.

108.    All of these activities are protected by the First Amendment.

---

[4] Facebook users can also create Facebook "groups" to connect with other users over a topic. Groups can be public or private. Facebook groups are run by "administrators" and "moderators" who can set rules for the group and moderate the content permitted to be posted or commented. Group members can post to the group, which may require administrator or moderator approval, and can comment on posts and reply to comments in the group. Facebook groups can create dedicated landing pages for "events," on which they can share details about in-person or virtual events and collect RSVPs from other Facebook users.

### The Police Department Undertakes a Retaliatory Campaign of Harassment, Bullying, and Defamation

109.     The City has created a Facebook page for the Gastonia Police Department and has obtained recognition from Facebook that this profile is authentic.[5] This Facebook page purports to represent the City's position on matters related to the police department.

110.     In response to Mr. Rohrer's arrest, his First Amendment-protected activities following the arrest, and the public support Mr. Rohrer received after his arrest, the City used Gastonia Police Department's official Facebook page to harass, bully, and defame Mr. Rohrer.

111.     Over the past year and a half, the Department's Facebook page has posted hundreds of statements that belittle and disparage Mr. Rohrer and spread false and misleading information about the incident, often in response to comments by visitors to the Department's page. The City's false, misleading, and disparaging statements are visible to the public and anyone can read them.

112.     These statements are made or approved by Defendant Goodale, an employee of the City who, upon information and belief, is authorized to speak on behalf of the City and its Police Department through the Department's official Facebook page.

113.     These statements are also made or approved by Defendant J. Doe, an employee or employees of the City who, upon information and belief, is authorized to speak on behalf of the City and its Police Department through the Department's official Facebook page.

---

[5] Facebook users who want to use the platform to represent businesses or organizations can create Facebook "pages." Other users can follow a page by "liking" the page. Any Facebook user may publish posts on a publicly accessible Facebook page and comment on the page's posts.

22

114.    This relentless campaign involves near-daily criticism of Mr. Rohrer, which continues to the time of filing this complaint. Representative examples of the City's statements are excerpted below, and Exhibit A provides additional examples, although it remains a partial sample of the City's statements.[6]

115.    Many of these statements are false and defamatory. For example, even though the October 13 charges against Mr. Rohrer were dismissed without conditions and Mr. Rohrer pleaded guilty only to unrelated charges that occurred on a different day, the City and Defendants Goodale and Doe have repeatedly and falsely implied that Mr. Rohrer pleaded guilty to the charges arising out of the October 13 incident.

116.    The City and Defendants Goodale and Doe have repeatedly and falsely argued that Mr. Rohrer must be guilty because he "accept[ed] a plea deal" relating to the October 13 incident rather than going to trial. For example, the City wrote: "Why did Mr Rohrer accept the plea deal he was offered if he felt so strongly about his innocence instead of going to trial and potentially being found not guilty?" (Comment to January 31, 2023 Facebook post).[7]

---

[6] Exhibit A contains accurate screenshots reflecting a sample of statements made by the City through its official Gastonia Police Department Facebook page relating to this case. Information relating to third parties has been redacted. Statements marked with a "p" or "*" indicate that the entire statement has not been included. The City was instructed over a year ago to preserve all evidence related to this incident, and it has publicly stated that it has software that preserves all Facebook statements.

[7] This complaint includes images of statements by Defendants. The name at the top of the statement belongs to the author of the statement (here, the City through the official Gastonia Police Department Facebook page). The blue check mark next to the Department's name indicates that the Department's page has been verified as official by Facebook. The name at the beginning of the statement belongs to the author of the post or comment to which the City is replying or to a person the City is tagging in its statement. In all instances, private individuals' names have been redacted to protect their privacy,



117.    In another, the City wrote: "[Y]ou also know that two grand juries supported

the charges and that Mr Rohrer and his private legal team could have challenged the

charges in court but that's not what they chose to do now was it? Instead they accepted the

plea deal that was offered to him. Perhaps to avoid having an actual court date where

evidence and testimony would have been presented. Who knows why they chose to accept

the deal offered." (Comment to January 31, 2023 Facebook post). Again, Mr. Rohrer's did

not plead guilty to *any* charges arising out of the October 13 encounter with Defendants

Brooks and Taylor.

> **Gastonia Police Department** ✔
> ████████ you also know that two grand juries supported the charges
> and that Mr Rohrer and his private legal team could have challenged the
> charges in court but that's not what they chose to do now was it? Instead
> they accepted the plea deal that was offered to him. Perhaps to avoid
> having an actual court date where evidence and testimony would have
> been presented. Who knows why they chose to accept the deal offered.

118.    The City and Defendants Goodale and Doe have posted hundreds of

comments substantially similar to the following on the Department's Facebook page:

> "the facts say he broke the law and he agreed to a plea deal so apparently
> he believes he broke the law as well." (Comment to November 22, 2022
> Facebook post).

except when the original author or tagged Facebook user is Mr. Rohrer and the City is
replying to or tagging him in a statement. The small digital icons that appear at the
bottom right corner of some of these statements are Facebook "reactions," which allow
readers of those statements to append their reaction to the statement; these reactions
include "like," "love," and "haha." The author of the statement typically does not add a
reaction to their own statement. The citation indicates the time and date of the original
Facebook post under which the screenshotted statement appeared.

24

> **Author**
> **Gastonia Police Department** ✓
> ▓▓▓▓▓▓▓▓ the facts say he broke the law and he agreed to a plea deal so apparently he believes he broke the law as well.

"then perhaps he shouldn't had [sic] agreed to the plea deal involving those charges." (Comment to August 17, 2022, 3:26 p.m. Facebook post).

> **Gastonia Police Department** ✓
> ▓▓▓▓▓▓▓▓ then perhaps he shouldn't had agreed to the plea deal involving those charges.

"Joshua Rohrer you could have had your day in court but accepted the plea offered." (Comment to August 17, 2022, 3:26 p.m. Facebook post).

> **Gastonia Police Department** ✓
> Joshua Rohrer you could have had your day in court but accepted the plea offered.

"he was charged with a crime and agreed to a plea deal related to these charges." (Comment to August 9, 2022, 9:20 a.m. Facebook post).

> **Gastonia Police Department** ✓
> ▓▓▓▓▓▓▓▓ he was charged with a crime and agreed to a plea deal related to these charges.

"Actually a crime was committed, TWICE, by Mr. Rohrer on two separate occasions even after repeated warnings, hence why he was arrested and ultimately agreed to a plea deal related to his charges from that event." (Comment to November 10, 2022, 1:43 p.m. Facebook post).

> **Gastonia Police Department** ✓
> ▓▓▓▓▓▓▓▓ r. Actually a crime was committed, TWICE, by Mr. Rohrer on two separate occasions even after repeated warnings, hence why he was arrested and ultimately agreed to a plea deal related to his charges from that event.

"don't forget that he and his private legal team agreed to the terms of the plea deal he was offered." (Comment to April 3, 2023, 9:00 a.m. Facebook post).

> **Gastonia Police Department** ✓
> ▓▓▓▓▓▓▓▓ don't forget that he and his private legal team agreed to the terms of the plea deal he was offered.

119.     Turning the presumption of innocence on its head, the City and Defendants Goodale and Doe have repeatedly cited the fact that Mr. Rohrer was arrested and charged as evidence of his guilt and have implied that he was in fact convicted of criminal offenses arising out of the October 13 incident.

120.     For example, in a comment to a post on June 21, 2022, which it has repeated numerous times in the months since, the City wrote: "[H]e was charged with a crime, upheld by two grand juries and agreed to a plea deal related to these charges."

Gastonia Police Department ✓
██████████ he was charged with a crime, upheld by
two grand juries and agreed to a plea deal related
to these charges.

121.     In another, the City wrote: "[H]e was charged with a crime in NC, a magistrate agreed with the charges. Two grand juries concurred with the charges. He agreed to a plea deal to get into a veterans treatment court. He could have had his day in court and possibly been found not guilty on all the charges but he chose to accept the deal that was offered to him and he agreed to go to veterans court." (Comment to June 21, 2022 Facebook post).

Gastonia Police Department ✓
██████████ he was charged with a crime in NC, a
magistrate agreed with the charges. Two grand
juries concurred with the charges. He agreed to a
plea deal to get into a veterans treatment court. He
could have had his day in court and possibly been
found not guilty on all the charges but he chose to
accept the deal that was offered to him and he
agreed to go to veterans court. When the first
judge did not allow the body cam to be released
you knew video would not be coming out until at
least the criminal charges were adjudicated one
way or another. Josh's plea deal actually
accelerated the release of the video (which the City
did not oppose) because had he not agreed to the
plea and not gone to court yet on these charges,
you know the video would still not be out.

122.     Similarly, in a comment to a post on August 9, 2022, the City wrote: "[T]he NC law he was charged with, the magistrate who set bond, and two grand juries disagree with your assessment on if he was breaking the law or not. He agreed to a plea deal so as

to go to veterans treatment court. He could have had his day in court and maybe get found

not guilty on all charges, instead he agreed to accept the offer given to him."



> **Gastonia Police Department** ✓
> ████████ the NC law he was charged with, the magistrate who set
> bond, and two grand juries disagree with your assessment on if he was
> breaking the law or not. He agreed to a plea deal so as to go to veterans
> treatment court. He could have had his day in court and maybe get found
> not guilty on all charges, instead he agreed to accept the offer given to him.

123.    In still other statements, the City and Defendants Goodale and Doe have

repeatedly and falsely stated that the charges against Mr. Rohrer arising out of the incidents

in this complaint were "adjudicated," even though the charges were dismissed and not

resolved by the court. For example, in a comment the City wrote: "[T]he case that we

assume you are referring to is almost 11 months old now, has been adjudicated through the

court process via a plea arrangement, and the officers have been cleared of any wrong

doing." (Comment to September 7, 2022, 8:51 a.m. Facebook post).



> **Gastonia Police Department** ✓
> ████ the case that we assume you are referring to is almost 11 months
> old now, has been adjudicated through the court process via a plea
> arrangement, and the officers have been cleared of any wrong doing.

124.    In another, the City wrote: "[A]s we have said multiple times. It's an 18-

month-old closed case where the officers were cleared and charges adjudicated after a plea

deal. The facts are the facts." (Comment to March 25, 2023, 4:54 p.m. Facebook post).



> **Gastonia Police Department** ✓
> ████████ as we have said multiple times. It's an 18-month-old closed
> case where the officers were cleared and charges adjudicated after a plea
> deal. The facts are the facts.

125.    In another, the City wrote: "[One of Mr. Rohrer's supporters] knew the body

cam wouldn't be coming out until the charges had been adjudicated one way or the other.

Had Josh[ua] not pled, and had he not had his day in court yet, the video still wouldn't be

out." (Comment to August 9, 2022, 9:20 a.m. Facebook post).



not sure how we were stretched. ▮▮▮▮▮ knew the body cam wouldn't be coming out until the charges had been adjudicated one way or the other. Had Josh not pled, and had he not had his day in court yet, the video still wouldn't be out.

126.     In another, the City responded to a critic of the incident by stating "the legal system disagrees with your assessment." (Comment to April 17, 2022, 10:26 a.m. Facebook post).

> **Gastonia Police Department** ✓
> ▮▮▮▮▮▮ the legal system disagrees with your assessment.

127.     Through these and other statements, the City and Defendants Goodale and Doe have falsely stated that the legal system has determined both Mr. Rohrer's guilt and the lawfulness of the City's conduct.

128.     These false statements would lead a reasonable observer to incorrectly conclude that the legal system had determined that Mr. Rohrer was guilty of the charges arising out of the October 13 incident and/or that Mr. Rohrer agreed to his guilt by pleading guilty to charges arising out of this incident.

129.     But the charges against Mr. Rohrer were dismissed without conditions. No court has looked at the conduct described in this Complaint and determined that Mr. Rohrer is guilty. Nor has any court determined whether Defendants acted lawfully.

130.     When commenters attempt to correct the City's false assertions, the City and Defendants Goodale and Doe double down on their false statements. For example, when a community member attempted to correct the City by writing, "He didn't plea In December regarding those charges and he didn't plea this time regarding those charges … he pled to the July charges! So stop trying to claim he took a plea in regards to the 2021 case! He DID NOT!! You dropped THE CHARGES!! There was NOTHING TO PLEA TO!! He ONLY pled to the July charges. I cannot believe you guys keep twisting this.…"

28

the City responded: "[H]ow were the October 13 charges disposed of then?" (Comment to Sept. 12, 2022, 11:58 a.m. Facebook post.) This question implied that the charges must have been resolved by a plea and was misleading.



Gastonia Police Department is turn it down too!! Because he DID NOT WANT TO PLEA TO ANYTHING RELATED TO THOSE CHARGES. He pled to the July charges and agreed to probation and veterans court regarding the JULY charges!! You all decided to lump the other charges in with that hearing and dropped them!
He didn't plea In December regarding those charges and he didn't plea this time regarding those charges... he pled to the July charges! So stop trying to claim he took a plea in regards to the 2021 case! He DID NOT!! You dropped THE CHARGES!! There was NOTHING TO PLEA TO!! He ONLY pled to the July charges.
I cannot believe you guys keep twisting this...

Author
Gastonia Police Department ✓
how were the October 13 charges disposed of then?

131.     As a result of Defendants' false and misleading statements, many readers have incorrectly concluded that Mr. Rohrer pleaded guilty or was found guilty by a court for charges arising out of the October 13 incident. When commenters express this misunderstanding, the City does not correct them, even as it assures the public that it is correcting all false statements regarding Mr. Rohrer's case.

132.     Throughout these statements, the City and Defendants Goodale and Doe often demean or disparage Mr. Rohrer while stating or implying that the Department has access to confidential or non-public information about Mr. Rohrer. For example, the City and Defendants Goodale and Doe have purported to know and share information about plea negotiations and the details of confidential legal advice that Mr. Rohrer's attorney provided to Mr. Rohrer, implying Mr. Rohrer's guilt. In a comment to a Facebook post of January 31, 2023, the Department wrote: "Mr Rohrer was offered a plea deal in December of '21, he turned down that offer. As trial preparations were being made, that initial plea

offer was still on the table and in July of '22, his legal team convinced him to take the offer, and avoid a trial."



133. In another comment, the City assured the public that the author was "in the same courtroom," implying that the author had particular knowledge that the public should trust. (Comment to August 17, 2022, 3:26 p.m. Facebook post).

134. By routinely sharing information about the dismissed criminal court proceedings, the City and Defendants Goodale and Doe have disclosed and continue to repeatedly and improperly disclose what they claim are the contents of Mr. Rohrer's court file, which has been sealed by operation of law because the charges against him were dismissed. *See* N.C. Gen. Stat. Ann. § 15A-146(a4)(2) (2021).

135. In other posts, the City and Defendants Goodale and Doe share information they have obtained about Mr. Rohrer's unrelated court dates and urge the public to look up court records for Mr. Rohrer in an attempt to discredit him. For example, in one comment the City wrote: "[P]erhaps you should ask him about his pending court date in 11 days which can be found by entering his name in the open source portal below: https://www.nccourts.gov/court-dates[.]" (Comment to January 31, 2023 Facebook post).

30



136.     The City has also ratified defamatory statements made by others on the Police Department Facebook page.

137.     The City and Defendants Goodale and Doe have taunted Mr. Rohrer dozens of times for not yet filing this civil rights lawsuit, at one point commenting: "If this is such a clear violation against the Constitution and civil rights, there should have been several attorneys willing to take this case pro-bono right? But yet, that hasn't happened. Perhaps you should ask Mr. Rohrer why [he] hasn't pursued anything further." (Comment to January 31, 2023 Facebook post).

138.     Similarly, the City urged a supporter of Mr. Rohrer: "Perhaps you should ask yourself why no private attorney has taken the case to a civil lawsuit." (Comment to April 17, 2023, 10:26 a.m. Facebook post).

139.     The City and Defendants Goodale and Doe also post what they claim are "facts" about the case, but these "facts" are refuted by the video evidence. For example, the City and Defendants Goodale and Doe have repeatedly claimed that Mr. Rohrer refused

to provide a state ID to the officers, when the video demonstrates that mere seconds elapsed from the first time the officers requested a state ID to Mr. Rohrer's arrest, during which time he displayed his state ID while preparing to hand it over.

140.    Other statements made by Defendants are simply cruel, arguing that Mr. Rohrer should feel responsible for Sunshine's death, blaming him for failing to "control" Sunshine while he was being forcefully arrested, or blaming him for "forcing" a resident to call the police to complain about him.

141.    For example, ignoring that Mr. Rohrer had complete control over Sunshine until Defendants Brooks and Taylor forced Mr. Rohrer against the patrol car and tased Sunshine, the City tagged Mr. Rohrer to comment: "Joshua Rohrer and we've asked you multiple times what form of control you had over Sunshine. The ADA requires leash/harness or some other form of control." (Comment to January 31, 2023, 3:02 p.m. Facebook post).



142.    These posts are all publicly visible. More than 30,000 people follow Gastonia Police Department's Facebook page, and thousands of people have seen Defendants' statements.

143.    In fact, Defendant Goodale has bragged that he has increased engagement for the City's Police Department Facebook page over the past two years, *see* Rick Goodale, Linkedin, https://www.linkedin.com/in/rick-goodale-503b80a2 (last visited June 30, 2023), an increase in engagement that appears to be driven largely by the unceasing tirade

of disparaging comments made about Mr. Rohrer. The City explained that making provocative posts that trigger responses is an intentional social media strategy to increase views: "The Facebook algorithm prioritizes comments, likes, and shares on posts and shows posts that have higher engagement to more people. So every comment (like yours), every like, and every share helps our posts get seen by more people! On to 40,000!" (Comment on November 17, 2022, 3:00 p.m. post).



144.     In many of these statements, the City and Defendants Goodale and Doe tag Mr. Rohrer, notifying Mr. Rohrer that Defendants are writing about him.[8]

145.     The City and Defendants Goodale and Doe also posted comments directly on Mr. Rohrer's personal Facebook profile and the "Support Joshua Rohrer and Sunshine Rae" Facebook group.

146.     This campaign of harassment and misinformation serves no legitimate governmental or law enforcement function. It serves only to demean a citizen who voiced a legitimate grievance against the City and to deflect responsibility for the officers' and the City's misconduct.

---

[8] A Facebook user can "tag" another user by using the @ symbol followed by the user's Facebook account name in a post, comment, or reply. A tag creates a link to the account of the tagged user. The tagged user also receives a notification that they have been tagged; the notification comes in the form of a link to navigate to the Facebook statement in which they were mentioned.

147.    This campaign of harassment was a direct response to Mr. Rohrer's First Amendment activities, including petitioning for the release of the body-worn camera footage, speaking with news media, fundraising to help with his expenses, speaking at rallies, and sharing his own Facebook posts about the incident.

148.    In fact, the City and Defendants Goodale and Doe have expressly noted their dissatisfaction and annoyance with Mr. Rohrer's and his supporters' constitutionally protected activities. The City and Defendants Goodale and Doe have repeatedly suggested that Mr. Rohrer's public expressions of grief over the loss of Sunshine are fabricated to make money. Other times, the City and Defendants Goodale and Doe have complained that Mr. Rohrer and his supporters have held rallies to support his cause: "[T]his will be their 7th rally they have held at City Council meeting isn't that correct? This alomst [sic] year old case is closed and has been for a while." (Comment to September 14, 2022, 9:28 a.m. Facebook post).

> **Gastonia Police Department** ✓
> ████████ and this will be their 7th rally they have held at City Council meeting isn't that correct? This alomst year old case is closed and has been for a while.

149.    And still further statements explicitly complain about Mr. Rohrer's speech on his personal Facebook profile and the support Facebook group and lament that the City and Defendants Goodale and Doe are no longer able to antagonize Mr. Rohrer directly on his support group. For example, in a string of comments to a June 21, 2022 Facebook post, the City repeatedly complained that it was not able to post directly on Mr. Rohrer's support page:

> "Joshua Rohrer seems a bit one sided that you and/or your supporters tag us on a post on your private support page and then disable comments so that we can't respond back to you."



Gastonia Police Department ✔
Joshua Rohrer seems a bit one sided that you
and/or your supporters tag us on a post on your
private support page and then disable comments
so that we can't respond back to you.

"Joshua Rohrer why won't you let us respond to comments that you tag us in on your support page?"

Gastonia Police Department ✔
Joshua Rohrer why won't you let us respond to
comments that you tag us in on your support
page?

"Joshua Rohrer or why not let people you and your supporters tag in that private group allow for the tagged agency to respond to correct inaccurate statements?"

"Joshua Rohrer yes, members of your private group are commenting but those outside the group that you or someone else tags in a post from that group are unable to respond to the tags."

Gastonia Police Department ✔
Joshua Rohrer or why not let people you and your
supporters tag in that private group allow for the
tagged agency to respond to correct inaccurate
statements?

32w

✎ Author
Gastonia Police Department ✔
Joshua Rohrer yes, members of your private group
are commenting but those outside the group that
you or someone else tags in a post from that group
are unable to respond to the tags.

150.     Months later, the City remained agitated that it was not able to harass Mr.

Rohrer on his support page, writing, "[S]o in other words, the people who run his page

(which he is also one correct) are also avoiding answering any legitimate questions people

may have about Mr. Rohrer's actions? Why would that be?" (Comment to January 31, 2023

Facebook post).



151.     The City and Defendants Goodale and Doe urge others to take up their campaign of harassment as well. For example, in one post the City exhorted its supporters to "ask Mr. Rohrer what form of control he had over Sunshine ... and ask him why he never pursued any further action. Hopefully you won't get blocked from his personal page or support page like others have when they have asked him questions he doesn't want to answer." (Comment to January 31, 2023 Facebook post).[9]

> **Gastonia Police Department** ☑
> ███████████ ask Mr. Rohrer what form of control he had over Sunshine and ask him how Sunshine got to his friend Dave's house, and ask him why he never pursued any further action. Hopefully you won't get blocked from his personal page or support page like others have when they have asked him questions he doesn't want to answer.

152.     These comments are intended to cause, and have the effect of causing, supporters of the City to try to access Mr. Rohrer's Facebook pages and post harassing, abusive, and defamatory content. The City sometimes thanks its supporters for "helping to get the correct narrative out there," as it did in response to one commenter who harassed Mr. Rohrer on Mr. Rohrer's pages and has posted numerous maliciously false statements

---

[9] As private individuals, Mr. Rohrer and the other administrators and moderators of the Support Joshua Rohrer and Sunshine Rae Facebook group have no obligation to allow all viewpoints to post on their personal profiles and pages and are legally entitled to block any users from interacting with those webpages. By contrast, government-run Facebook webpages, such as the Gastonia Police Department page, are public forums and may not block other Facebook users. *See Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019), *as amended* (Jan. 9, 2019).

about Mr. Rohrer in other places. (Comment to September 16, 2022, 8:59 a.m. Facebook post).



153. The City and Defendants Goodale and Doe's campaign of harassment and defamation have prolonged and exacerbated Mr. Rohrer's emotional distress arising out of the October 13 attack and caused him severe emotional distress and psychological injuries. The relentless campaign was so upsetting to Mr. Rohrer that he became unable to sleep for extended periods, instead spending a disproportionate amount of his time compulsively monitoring the City's harassing and defamatory Facebook activity. He became obsessed with correcting the record and protecting his own name from the Defendants' defamation, as well as defending Sunshine from the Defendants' attacks and lies.

154. Defendants' campaign triggered depressive episodes and suicidal ideation. Mr. Rohrer also gained 100 pounds during this time from overeating due to the stress and trauma of being forced to relive the event and defend himself and Sunshine from Defendants' constant attacks and lies.

155. These statements, as well as the October 13 attack, made Mr. Rohrer fearful of further mistreatment from the City if he stayed in Gastonia. Even after moving out of Gastonia, Mr. Rohrer still fears the City, which continues to target him through online posts, and he makes it a priority to stay away from Gastonia.

156. This campaign continues to this day.

### Gastonia's Longstanding Policy, Practice, or Custom of Mistreatment of People Experiencing Homelessness

157.     The attack on Mr. Rohrer is just one example of a longstanding campaign by the City against people experiencing homelessness.

158.     In 1990, federal investigators uncovered horrifying abuse inflicted by members of the Department's "Eagle Team." *See Police Abuse of Homeless Splits North Carolina City*, N.Y. Times (Nov. 5, 1992), https://www.nytimes.com/1992/11/05/us/police-abuse-of-homeless-splits-north-carolina-city.html.

159.     Acting on complaints forwarded from the mayor's office about the presence of people experiencing homelessness in the City, the Police Department made it its mission to drive these people away.

160.     Officers would drive around town looking for people experiencing homelessness to terrorize. Once they found a person sleeping without shelter, they would douse them with cooking oil, hot coffee, paint, urine, and other substances.

161.     The officers would also beat people experiencing homelessness, jokingly referring to the beatings as taking them to "ride on Space Mountain." *Id.* (internal quotation marks omitted). The officers gave themselves the nickname "Space Mountain Boys" and even made "Space Mountain" T-shirts. *Id.*

162.     When these allegations came to light, the Police Department declined to bring in outside investigators. Instead, the Department relied only on its internal affairs unit, which attempted to cover up the misconduct by offering hush money to victims.

163.     Ultimately, the U.S. Department of Justice investigated and convicted several officers of federal civil rights offenses.

164.     Gastonia's hostility towards people experiencing homelessness persists to this day.

165.     For example, the City of Gastonia does not have a single homeless shelter for a population of more than 80,000 people. The only available shelter is run by the Salvation Army, and then only when the temperature drops below freezing. Indeed, the City has said in a statement: "Due to city zoning regulations, shelters are not permitted by right in the city." *See Gastonia Homeless Shelter Operating Out of Church Forced to Shut Down*, Queen City News (Feb. 1, 2022), https://www.qcnews.com/news/local-news/gastonia-homeless-shelter-operating-out-of-church-forced-to-shut-down.

166.     In 2022, the City, citing zoning regulations, prohibited a local church—which also provides daily meals to people experiencing homelessness—from acting as a homeless shelter by providing overnight housing. The church had been providing shelter to dozens of unhoused people, and the City's prohibition forced those former residents to live outdoors.

167.     The situation for unhoused people in Gastonia deteriorated because they had nowhere to sleep after the church shelter closed, and several of these unhoused individuals died.

168.     After public outcry and many rallies, the City allowed the shelter to reopen. Upon information and belief, the church allows about 100 people to reside in tents on its property. Members of the community raised money to purchase two trailers for the church to use on-site for substance-abuse education and other educational purposes and emergency housing. Those trailers remained empty and unused while the pastor worked with the City to get permits for the trailers. Despite these efforts, the City recently fined the church

39

approximately $60,000 for having empty trailers on its property in an attempt to get the shelter shut down again.

169.     Upon information and belief, it is a priority for the City and for the Police Department to run the homeless population out of Gastonia.

170.     For instance, it was one of the Police Department's goals for the 2022 fiscal year to "find a solution that would deter the homeless from congregating in open areas that are visible" to passing motorists and businesses throughout the entire city and especially in the downtown business areas. *See* Kara Fohner, *Panhandling Charges Against Joshua Rohrer Dismissed*, The Gaston Gazette (July 6, 2022), https://www.gastongazette.com/story/news/crime/2022/07/06/gastonia-panhandling-charges-against-homeless-veteran-dismissed/7819050001.

171.     And, upon information and belief, the Police Department aggressively arrests and seeks prolonged detention of people experiencing homelessness for trivial or fabricated offenses.

172.     Indeed, just two months after Mr. Rohrer's arrest, at the request of the Police Department, *see* Gastonia City Council Meeting Minutes (Dec. 7, 2021), at 92, https://perma.cc/WF9W-85CJ, Gastonia amended its anti-panhandling law to increase the penalty for panhandling, *see* Gastonia Ordinance § 6-228(c), even though every court since 2015 to have considered similar restrictions has found them unconstitutional.

173.     The Police Department regularly cracks down on individuals accused of panhandling. For example, according to Gastonia Arrest Inquiry, an apparently City-affiliated Facebook page that posts mug shots of people arrested, at least 15 different people were arrested and charged with soliciting alms in January 2023 alone.

40

174. Indeed, the City has stated on the Department's Facebook page that the City is still robustly enforcing the City's anti-panhandling laws.

175. This is consistent with Defendant Taylor's statement to Mr. Rohrer that officers had "received directions" and had been "told" to prohibit homeless people from panhandling and that officers offering kindness to homeless people like Mr. Rohrer was "against policy."

## COUNT I – VIOLATION OF FREE SPEECH
### 42 U.S.C. § 1983; U.S. Const. amend. I
#### (Defendants City, Brooks, Taylor)

176. Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

177. On their face and as applied to Mr. Rohrer, Gastonia's anti-panhandling ordinances are an unconstitutional infringement on freedom of speech under the federal and state constitutions.

178. Mr. Rohrer's presence on the median, his smiling and waving at vehicles, and engaging in conversations with passersby is constitutionally protected activity. Moreover, asking for help and seeking a donation is constitutionally protected speech.

179. Gastonia Ordinance § 5-17 makes it a crime to "to ask, beg, solicit, or offer to work for money or any other thing having value," in a variety of situations, including by blocking the passage of a person in a motor vehicle.

180. Gastonia Ordinance § 6-228(b) makes it a crime to "stand, sit or loiter in any street or highway, including the shoulders or median strip but excluding sidewalks, and to solicit or accept contributions from the occupants of any stopped vehicle."

41

181.     By targeting a particular type of speech—soliciting donations—these laws are content-based and are presumptively unconstitutional. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). In fact, since *Reed*, every court to have considered laws that on their face target panhandling or soliciting donations has found them to be content-based and unconstitutional. *E.g.*, *Rodgers v. Bryant*, 942 F.3d 451, 454, 457 (8th Cir. 2019) (enjoining as an underinclusive content-based restriction a state law making it a crime to linger "for the purpose of asking for anything as charity or a gift"); *Norton v. City of Springfield*, 806 F.3d 411, 413 (7th Cir. 2015) (concluding that anti-panhandling ordinance violated the Constitution); *Mass. Coal. for the Homeless v. City of Fall River*, 158 N.E.3d 856, 859, 867 (Mass. 2020) (striking down state law criminalizing signaling a vehicle "for the purpose of soliciting any alms, contribution or subscription or of selling any merchandise" (internal quotation marks omitted)); *Champion v. Commonwealth*, 520 S.W.3d 331, 333 (Ky. 2017) (striking down law prohibiting begging or soliciting).

182.     Even if treated as content-neutral restrictions on speech, Gastonia Ordinance §§ 5-17 and 6-228 do not withstand intermediate scrutiny, as pre-*Reed* Fourth Circuit precedent makes clear. *E.g.*, *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) (holding, pre-*Reed*, that city law making it a crime to "[s]olicit contributions of any nature from the drivers of motor vehicles or passengers therein on highways located within the county" did not satisfy intermediate scrutiny); *accord, e.g.*, *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1210–11, 1217, 1245 (10th Cir. 2021) (finding unconstitutional under intermediate scrutiny a city law that prohibited pedestrians from (1) congregating within six feet of a highway entrance or exit ramp; (2) occupying a median less than 6 feet across on a street with a speed limit over 30 miles per hour; and

42

(3) exchanging objects with occupants of a vehicle in a travel lane); *Cutting v. City of Portland*, 802 F.3d 79, 92–93 (1st Cir. 2015) (upholding permanent injunction against law prohibiting sitting or standing on all medians).

183.     If it were not for Defendants' enforcement of these unconstitutional anti-panhandling laws, Mr. Rohrer would have been free to stay on the median; he would not have been subject to the unlawful force that he encountered; and Sunshine would still be alive.

184.     As Defendant Taylor told Mr. Rohrer, the City instructed its officers to aggressively enforce anti-panhandling laws. And the City recently stated that it is continuing to arrest and charge people with violating its unconstitutional anti-panhandling laws.

### COUNT II – EXCESSIVE FORCE AGAINST MR. ROHRER
### 42 U.S.C. § 1983; U.S. Const. amend. IV
### Defendants City, Brooks, and Taylor

185.     Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

186.     Defendants Brooks and Taylor violated Mr. Rohrer's Fourth Amendment right to be secure in his person against unreasonable seizure when they used objectively unreasonable and excessive force during the course of his arrest.

187.     The body-worn camera footage shows that Defendants Brooks and Taylor forced Mr. Rohrer into the hood of the patrol car and that Brooks subsequently pushed Mr. Rohrer to the pavement. In doing so, Defendants used more force than was reasonably necessary to arrest Mr. Rohrer, who was suspected only of minor misdemeanors, was not posing a threat to anyone, and was neither forcefully resisting arrest nor attempting to flee.

43

*See Graham v. Connor*, 490 U.S. 386, 396 (1989) (explaining that Fourth Amendment reasonableness analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight").

188.     The Fourth Circuit has held that this kind of gratuitous force during the arrest of a nonthreatening individual gives rise to a Fourth Amendment violation. *See, e.g.*, *Young v. Prince George's County*, 355 F.3d 751, 757–58 (4th Cir. 2004) (holding that a jury could find force used during arrest excessive in violation of the Fourth Amendment where officer threw the nonthreatening, though armed, plaintiff "head-first to the ground").

189.     Defendants' excessive force directly and proximately caused bodily injury to Mr. Rohrer—including damage to his face, a torn meniscus, a severely sprained lateral collateral ligament, and a blood clot in his knee—as well as pain, suffering, and mental distress. The physical injuries that Mr. Rohrer incurred have led to lasting mobility issues and ongoing leg pain that make it difficult for him to walk for long distances and interfere with his daily life.

190.     Upon information and belief, Defendants used excessive force pursuant to the City's policy or custom of hostility and unwarranted force during interactions with homeless individuals.

191.     Further, the City has ratified the officers' actions by endorsing and defending them on the Gastonia Police Department's official Facebook page and confirming that their actions were taken pursuant to Police Department policy. *See Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534 (4th Cir. 2022)

44

("Imposing liability on a municipality for its ratification of the acts of subordinates accords with the purpose of municipal liability under Section 1983" because "it holds the municipality liable for *its own decision* to uphold the actions of subordinates.").

**COUNT III – UNREASONABLE SEIZURE OF SUNSHINE**
**42 U.S.C. § 1983; U.S. Const. amend. IV**
**Defendants City and Taylor**

192.    Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

193.    Defendant Taylor violated Mr. Rohrer's Fourth Amendment right to be secure in his effects against unreasonable seizure when he unreasonably seized Mr. Rohrer's service animal, Sunshine, by tasing her.

194.    The Fourth Circuit, like other circuits to have considered the question, has held that privately owned dogs are "effects" within the meaning of the Fourth Amendment. *See Altman v. City of High Point*, 330 F.3d 194, 203–04 (4th Cir. 2003). And they are "seized" when there is "some meaningful interference with [the owner's] possessory interests." *Id.* at 204 (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). To determine whether a seizure of an individual's dog is reasonable, the Court considers whether the amount of force used on the dog was necessary under the circumstances. *See Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020).

195.    The body-worn camera footage demonstrates that tasing Sunshine was not necessary. She was not behaving in a threatening manner or acting aggressively. *Cf. Altman*, 330 F.3d at 205 (explaining that an interest in protecting citizens from truly dangerous dogs may justify officers' force). Rather, she was trying to comfort Mr. Rohrer, as she was trained to do. Contrary to Defendant Taylor's false claims on the body-worn

camera footage, Sunshine did not nip at or bite Defendant Taylor, and even Taylor admits that she did not break through his boot or cause him any harm. While Taylor claimed he was concerned for Defendant Brooks's safety when he tased Sunshine, that concern was not reasonable. Taylor knew Sunshine was a well-trained service dog that frequently interacted with the public; Taylor could observe that Sunshine was exhibiting calm and nonthreatening posture throughout Mr. Rohrer's arrest; and, right before Taylor tased Sunshine, Brooks could be heard calmly observing: "I don't think he's [sic] gonna bite me." Moreover, Defendants' subsequent behavior belies any suggestion that they viewed Sunshine as dangerous, because, upon information and belief, neither they nor any other officers made any attempt to secure Sunshine after she was tased and ran away toward a populated shopping center.

196.     Defendant Taylor's seizure of Sunshine in these circumstances was unreasonable. *See LeMay v. Mays*, 18 F.4th 283, 288 (8th Cir. 2021) (concluding that it would be an unreasonable seizure under the Fourth Amendment if officers shot and injured two service dogs who "presented no imminent danger and were not acting aggressively").

197.     Defendant Taylor's unreasonable seizure of Sunshine meaningfully interfered with Mr. Rohrer's possession of Sunshine and directly and proximately caused Mr. Rohrer severe pain, suffering, and mental distress. Moreover, Taylor's actions ultimately resulted in Sunshine's death: If not for the damage and trauma caused by the tasing, Sunshine, who was exceptionally well trained and knew how to cross streets safely, never would have run into oncoming traffic and been killed. This tragedy was a foreseeable result of Officer Taylor's unreasonable decision to tase Sunshine. To this day, Mr. Rohrer

has not been able to obtain a service dog that is able to do most or all of what Sunshine did for him, and this contributes to his mental distress.

198.     The City has ratified Defendant Taylor's unreasonable seizure of Sunshine by repeatedly endorsing and defending the tasing on the Gastonia Police Department's official Facebook page. *See Starbuck*, 28 F.4th at 534. For example, in response to a comment from a member of the community that the City could not "justify tasing a dog because your officer lied about getting bit," the City responded that "the court and department policy felt it was justified." (Comment to January 31, 2023, 3:02 p.m. Facebook post).



## COUNTS IV & V – FAILURE TO ACCOMMODATE
### Title II of the ADA (42 U.S.C. § 12131); Section 504 of the Rehabilitation Act; 28 C.F.R. § 35.130(b)(7)
### Defendant City of Gastonia

199.     Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

200.     The actions of the Defendants described herein violate Title II of the Americans with Disabilities Act (ADA). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can

47

demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (2023).

201.    The actions of the Defendants likewise violate Section 504 of the Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

202.    The City of Gastonia receives federal funds, bringing it within the ambit of the Rehabilitation Act. For example, in fiscal year 2020, the City of Gastonia received $48,645 in direct funding from the Edward Byrne Memorial Justice Assistance Grant program.[10]

203.    The ADA defines "disability" as either "a physical or mental impairment that substantially limits one or more major life activities of such individual"; "a record of such an impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). This definition of disability must "be construed in favor of broad coverage of individuals under this [Act], to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A). The Attorney General's implementing regulations reinforce that an impairment constitutes a qualifying disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," and it need not "prevent," or even "significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially

---

[10] *See* Bureau of Justice Assistance, U.S. Dep't of Justice, *2020 North Carolina Local JAG Allocations*, https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/fy20-jag-local-allocations-nc.pdf.

limiting." 28 C.F.R. § 35.108(d)(v); *see also J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019).

204.     Mr. Rohrer's PTSD, panic attack disorder, and hiatal hernia are impairments that substantially limit his ability to perform numerous major life activities, including working, caring for himself, performing manual tasks, bending, sleeping, concentrating, and thinking. *See* 42 U.S.C. § 12102(2)(A). Indeed, PTSD is explicitly listed under the ADA implementing regulations as a disability that "substantially limits brain function." 28 C.F.R. § 35.108(d)(2)(iii)(K). He is thus a qualified individual with a disability under the ADA. *See* 42 U.S.C. § 12131(2).

205.     Mr. Rohrer is also a qualified individual with a disability because he has a record of having such an impairment, *see* 42 U.S.C. § 12102(1)(B): He has been formally diagnosed with service-connected PTSD, he has an official rating of being nearly 100 percent disabled on a permanent basis, and the VA prescribed him a service dog, Sunshine, to accommodate his conditions.

206.     Moreover, Defendant Taylor was aware of Mr. Rohrer's disabilities and regarded Mr. Rohrer as disabled, *see* 42 U.S.C. 12102(1)(C), because Mr. Rohrer had told him on October 9, 2021, that he was nearly 100 percent disabled on a permanent basis and that his "PTSD is so severe that [he] can't function without a service dog."

207.     Defendant Brooks was aware of Mr. Rohrer's disabilities and regarded Mr. Rohrer as disabled because she responded affirmatively when Mr. Rohrer asked her if she was going to write a ticket to a "disabled veteran who's living in the woods."

208.    Defendants Taylor and Brooks further were aware of Mr. Rohrer's disabilities and regarded Mr. Rohrer as disabled because Mr. Rohrer was accompanied by a service dog with a vest prominently identifying her as a service animal.

209.    The City of Gastonia is a "public entity" under the ADA, defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)–(B). Under the ADA, public entities are responsible for the discriminatory actions of their employees.

210.    Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, or activities within the meaning of Title II. *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 338 (4th Cir. 2012) (applying Title II of the ADA to a police encounter).

211.    There are three ways to violate Title II of the ADA: "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362 (4th Cir. 2008). Defendants committed both the first and third of these violations.

212.    First, Defendants violated Title II by failing to provide reasonable accommodations during the provision of law enforcement services in light of Mr. Rohrer's disabilities and Defendants' knowledge of those disabilities.

213.    Reasonable accommodations are "modifications that would make accommodations accessible to the disabled without causing an undue burden to the program." *Koon v. North Carolina*, 50 F.4th 398, 406 (4th Cir. 2022). Reasonable accommodations under the circumstances could have included proceeding slowly,

avoiding loud noises and sudden movements, following de-escalation tactics, conducting the arrest without any use of force, using crisis intervention techniques, declining to handcuff Mr. Rohrer, and ensuring that Mr. Rohrer had access to Sunshine throughout the course of the arrest.

214. The arrest involved no exigent circumstances, such as threats to the officers' or others' lives or safety.

215. Defendants failed to provide reasonable accommodations to Mr. Rohrer during his arrest. Instead, Defendants offered *no* accommodations, much less reasonable ones, when they abruptly decided to arrest Mr. Rohrer, shouted at him continuously throughout the arrest, forced him into the hood of the patrol car, pushed him to the pavement, and handcuffed him. These aggressive tactics instead exacerbated his disability.

216. Defendants further failed to offer reasonable accommodations when they separated Mr. Rohrer from Sunshine—whom they knew Mr. Rohrer required to "function" in light of his PTSD—and tased her, causing her to run away and become permanently unable to perform her training as Mr. Rohrer's service animal.

217. Defendants acted intentionally or with deliberate indifference to the substantial risk that their failure to accommodate Mr. Rohrer's disabilities during his arrest would violate Mr. Rohrer's rights under the ADA. They had been directly told that Mr. Rohrer was disabled, that his PTSD was so severe that he could not function without his service dog, and that he had been deemed nearly 100 percent disabled on a permanent basis, and he was accompanied by a service animal with visible patches identifying her as such. *See*, *e.g.*, *Koon*, 50 F.4th at 404–05.

218.     Defendant City is liable for Defendants Brooks and Taylor's failure to accommodate Mr. Rohrer's disabilities in effectuating his arrest.

219.     Defendant City's violations of Title II of the ADA caused Mr. Rohrer to suffer physical pain and suffering, physical injuries, mental pain and suffering, and the loss of his service animal.

### COUNTS VI & VII – DISABILITY-BASED DISCRIMINATION
### Title II of the ADA (42 U.S.C. § 12131); Section 504 of the Rehabilitation Act;
### 28 C.F.R. § 35.130(b)(3)
### Defendant City of Gastonia

220.     Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

221.     In addition to failing to accommodate Mr. Rohrer's disabilities in the course of his arrest, Defendants also subjected him to intentional discrimination or disparate treatment on account of his disability. *See A Helping Hand*, 515 F.3d at 362.

222.     Defendants Brooks and Taylor exhibited animus toward Mr. Rohrer on account of his disability.

223.     For example, one of Defendant Brooks's first actions upon arriving at the scene was to threaten to separate Mr. Rohrer from his service animal and call animal control on him if he did not comply with her orders.

224.     Later, while Mr. Rohrer was handcuffed on the ground and crying for Sunshine, Defendant Brooks laughed when she recounted how Defendant Taylor had tased the service animal.

225.     While Mr. Rohrer was being booked at the jail, Defendants Brooks and Taylor both belittled Mr. Rohrer for his disability and for being unable to work on account of his disability.

226.     Defendants' anti-disability animus motivated them to arrest Mr. Rohrer unnecessarily and to do so violently.

227.     Defendant City is liable for Defendant Brooks and Taylor's disparate treatment of Mr. Rohrer on account of his disabilities.

228.     Defendant City's violations of Title II of the ADA caused Mr. Rohrer to suffer physical pain and suffering, physical injuries, mental pain and suffering, and the loss of his service animal.

## COUNT VIII – RETALIATION FOR PROTECTED SPEECH & PETITIONING
## 42 U.S.C. § 1983; U.S. Const. amend. I
## Defendants City, Goodale, and Doe

229.     Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

230.     The Constitution prohibits the government from taking adverse action against a person for the exercise of their First Amendment rights. *E.g.*, *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

231.     Mr. Rohrer's media appearances, social media posts, and petition for the release of body-worn camera footage are all constitutionally protected under the First Amendment.

232.     In response to and in retaliation for Mr. Rohrer's protected speech, Defendants City, Goodale, and Doe have intentionally or recklessly made many false, confidential, cruel, and demeaning statements about Mr. Rohrer on the official Gastonia Police Department Facebook page. Among other things, the daily barrage and high volume of these posts, the specific targeting of Mr. Rohrer, and the fact that they reveal confidential

information demonstrate a pattern of harassment that would chill a reasonable person from exercising their First Amendment rights.

233.     These statements are widely read and have harmed Mr. Rohrer's reputation, and they have caused him emotional distress.

**COUNT IX – DEFAMATION**
**Defendants City, Goodale, and Doe**

234.     Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

235.     North Carolina's Declaration of Rights provides that "every person shall be held responsible for" abusive speech, § 14, and that "every person for an injury done him in his ... reputation shall have remedy by due course of law," *id* § 18. Under North Carolina law, there are three types of defamation: "(1) publications obviously defamatory which are called libel Per se; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels Per quod." *Arnold v. Sharpe*, 251 S.E.2d 452, 455 (N.C. 1979).

236.     Using the official, public Gastonia Police Department Facebook page, Defendants City, Goodale, and Doe have published numerous false and defamatory statements about Mr. Rohrer, including false claims of criminality, false claims that he pleaded guilty to conduct arising out of the October 13 incident, and false statements about the October 13 incident that are refuted by the video footage. Defendants knew these obviously defamatory posts were false when they posted them.

237.     In addition, or in the alternative, Defendants have made numerous publications that, in context, were intended to be, and were, reasonably interpreted by viewers as asserting false information about Mr. Rohrer.

238.     Defendants further declined to correct public posts presenting false information about Mr. Rohrer based on misconceptions that Defendants had propagated, even as Defendants simultaneously expressed an intention to correct all "misinformation" about Mr. Rohrer's case.

239.     All of the Department's posts were made or approved by Defendant Goodale and/or Doe pursuant to their official job duties for the City.

240.     Defendants have no governmental immunity for these social media posts.

241.     Because of these statements, Mr. Rohrer suffered emotional distress, loss of standing in the community, and harm to his reputation.

## COUNT X – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Defendants City, Goodale, and Doe

242.     Plaintiff restates and re-alleges all preceding paragraphs as if fully set forth herein.

243.     North Carolina provides a cause of action for "(1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress to another." *Clark v. Clark*, 867 S.E.2d 704, 715 (N.C. Ct. App. 2021).

244.     By posting hundreds of cruel, disparaging, defamatory, and mocking posts about Mr. Rohrer, and encouraging their followers to target Mr. Rohrer with similar messages, Defendants' extreme campaign of harassment falls outside the bounds tolerated by a decent society.

245.    These posts have harmed Mr. Rohrer's mental health and caused him severe emotional distress, including triggering a depressive episode with suicidal ideation and causing him to gain 100 pounds.

## JURY TRIAL DEMANDED

246.    Plaintiff demands a jury trial on each and every claim related to which a jury trial is available.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in his favor and:

1) Declare that Defendants' conduct as alleged in this Complaint violates Plaintiffs' rights under:

   a. The First Amendment to the United States Constitution

   b. The Fourth Amendment to the United States Constitution

   c. The Fourteenth Amendment to the United States Constitution

   d. The Americans with Disabilities Act

   e. The Rehabilitation Act

   f. North Carolina Law

2) Declare that Gastonia Ordinances § 5-17 and § 6-228 are facially unconstitutional and unconstitutional as applied to Mr. Rohrer's behavior;

3) Award compensatory damages;

4) Award punitive damages against each individual capacity Defendant for Defendants' outrageous conduct and reckless disregard of Plaintiff's rights;

5) Award Plaintiff's reasonable attorney's fees and costs; and

6) Grant any further such relief that the Court may deem just and proper.

56

Respectfully submitted,

/s/     *David G. Guidry*

David G. Guidry
GUIDRY LAW FIRM
338 S. Sharon Amity Road, #337
Charlotte, N.C. 28211
(917) 376-6098
david@guidrylawfirm.com

Shelby Calambokidis*
Elizabeth R. Cruikshank*
Amy Marshak*
Joseph W. Mead*
Seth Wayne*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND
  PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 661-6728
jm3468@georgetown.edu
erc56@georgetown.edu

*Application for admission pro hac vice forthcoming