UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

JOSHUA ROHRER,

        *Plaintiff*,

v.

CITY OF GASTONIA, *et al.*,

        *Defendants*.

Case No. 3:23-cv-00396-RJC-SCR

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS CITY OF GASTONIA, CIERRA BROOKS, AND MAURICE
TAYLOR III'S PARTIAL MOTION TO DISMISS**

David G. Guidry (No. 38675)
GUIDRY LAW FIRM
338 S. Sharon Amity Rd., #337
Charlotte, NC 28211
(917) 376-6098
david@guidrylawfirm.com

Elizabeth R. Cruikshank*
Joseph W. Mead*
Shelby Calambokidis*
Amy Marshak*
Seth Wayne*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY &
    PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
(202) 661-6728
erc56@georgetown.edu
jm3468@georgetown.edu
*Admitted *pro hac vice*

Dated: October 12, 2023

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF THE CASE........................................................................................ 1

I.  Factual Background ............................................................................................. 1

II.  Procedural History ............................................................................................. 5

LEGAL STANDARD.................................................................................................... 6

ARGUMENT ................................................................................................................ 7

I.  Brooks and Taylor Are Not Entitled to Qualified Immunity.................................. 7

    A.  Brooks and Taylor violated Rohrer's clearly established rights under the First
    Amendment (Count I)................................................................................... 7

    B.  Brooks and Taylor violated Rohrer's clearly established rights under the Fourth
    Amendment. ............................................................................................... 11

        1.  Excessive force against Rohrer (Count II) .................................................. 11

        2.  Unreasonable seizure of Sunshine (Count III) ............................................ 15

II.  Rohrer Has Stated Claims for Municipal Liability Against the City.................................... 18

    A.  Rohrer has valid Fourth Amendment claims under *Monell* (Counts II and III)............. 19

    B.  Rohrer has a valid First Amendment retaliation claim under *Monell* (Count VIII)....... 21

III.  *Cummings* Is Inapplicable to Rohrer's Disability Discrimination Claims (Counts IV, V, VI
    & VII). ...................................................................................................... 23

CONCLUSION............................................................................................................ 25

CERTIFICATE OF SERVICE ..................................................................................... 27

**Pages**

**Cases**

*A.G. v. Fattaleh,*
614 F. Supp. 3d 204 (W.D.N.C. 2022) ........................................................ 22

*ACLU of Nev. v. City of Las Vegas,*
466 F.3d 784 (9th Cir. 2006) ....................................................................... 10

*Altman v. City of High Point,*
330 F.3d 194 (4th Cir. 2003) ........................................................... 16, 17, 18

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
564 U.S. 721 (2011) ....................................................................................... 9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................................... 6

*Barnes v. Gorman,*
536 U.S. 181 (2002) ..................................................................................... 24

*Bell v. Dawson,*
144 F. Supp. 2d 454 (W.D.N.C. 2001) ....................................................... 14

*Billups v. City of Charleston,*
961 F.3d 673 (4th Cir. 2020) ....................................................................... 10

*Booker v. S.C. Dep't of Corr.,*
855 F.3d 533 (4th Cir. 2017) ......................................................................... 7

*Brewer v. City of Albuquerque,*
18 F.4th 1205 (10th Cir. 2021) .................................................................... 11

*Brown v. Gilmore,*
278 F.3d 362 (4th Cir. 2002) ....................................................................... 14

*Brown v. Muhlenberg Twp.,*
269 F.3d 205 (3d Cir. 2001) ........................................................................ 17

*Cent. Radio Co. Inc. v. City of Norfolk,*
811 F.3d 625 (4th Cir. 2016) ......................................................................... 9

*Ciolino v. Gikas,*
861 F.3d 296 (1st Cir. 2017) ....................................................................... 15

*Clipper v. Takoma Park,*
876 F.2d 17 (4th Cir. 1989) ......................................................................... 22

*Cummings v. Premier Rehab Keller,*
142 S. Ct. 1562 (2022) ........................................................................... 23, 25

*Cutting v. City of Portland,*
802 F.3d 79 (1st Cir. 2015) ......................................................................... 11

*Davis v. Passman*,
442 U.S. 228 (1979) ........................................................................................... 25

*Dumiak v. Vill. of Downers Grove*,
475 F. Supp. 3d 851 (N.D. Ill. 2020) ............................................................... 11

*El v. City of Pittsburgh*,
975 F.3d 327 (3d Cir. 2020) .............................................................................. 15

*Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*,
810 F.3d 892 (4th Cir. 2016) ............................................................................ 17

*Est. of LeRoux v. Montgomery Cty.*,
No. 22-CV-856, 2023 WL 2571518 (D. Md. Mar. 20, 2023) ...................... 12, 13

*Est. of Osuna v. Cty. of Stanislaus*,
392 F. Supp. 3d 1162 (E.D. Cal. 2019) ............................................................ 21

*Fernandez v. St. Louis Cty.*,
538 F. Supp. 3d 888 (E.D. Mo. 2021) ................................................................ 9

*Franklin v. City of Charlotte*,
64 F.4th 519 (4th Cir. 2023) ............................................................................. 19

*Franklin v. Gwinnett Cty. Pub. Schs.*,
503 U.S. 60 (1992) ........................................................................................... 25

*Groden v. City of Dallas*,
826 F.3d 280 (5th Cir. 2016) ............................................................................ 23

*Henagan v. City of Lafayette*,
No. 21-CV-03946, 2022 WL 4553055 (W.D. La. Aug. 16, 2022) ................... 11

*Hunter v. Town of Mocksville*,
897 F.3d 538 (4th Cir. 2018) ............................................................................ 23

*Hupp v. Cook*,
931 F.3d 307 (4th Cir. 2019) ............................................................................ 14

*Johnson v. Baltimore Police Dep't*,
No. 19-CV-0698, 2020 WL 1169739 (D. Md. Mar. 10, 2020) ........................ 21

*LeMay v. Mays*,
18 F.4th 283 (8th Cir. 2021) ............................................................................ 17

*Lloyd v. City of Streetsboro*,
No. 18-3485, 2018 WL 11298664 (6th Cir. Dec. 20, 2018) ............................ 23

*Lozman v. City of Riviera Beach*,
138 S. Ct. 1945 (2018) ..................................................................................... 22

*Lunneen ex rel. Lunneen v. Vill. of Berrien Springs*,
No. 22-2044, 2023 WL 6162876 (6th Cir. Sept. 21, 2023) ............................. 16

*McCullen v. Coakley*,
573 U.S. 464 (2014) ......................................................................................... 10

*Messina v. City of Fort Lauderdale*,
  546 F. Supp. 3d 1227 (S.D. Fla. 2021) ..................................................................... 9

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978) ........................................................................................... 18, 19

*Norton v. City of Springfield*,
  806 F.3d 411 (7th Cir. 2015) ............................................................................... 9, 10

*Owens v. Baltimore City State's Att'ys Off.*,
  767 F.3d 379 (4th Cir. 2014) ............................................................................. 20, 22

*Pandazides v. Va. Bd. of Educ.*,
  13 F.3d 823 (4th Cir. 1994) ...................................................................................... 25

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986) ................................................................................................. 19

*Petrello v. City of Manchester*,
  No. 16-CV-008, 2017 WL 1080932 (D.N.H. Mar. 21, 2017) ................................... 11

*Planet Aid v. City of St. Johns*,
  782 F.3d 318 (6th Cir. 2015) ...................................................................................... 9

*Ray v. Roane*,
  948 F.3d 222 (4th Cir. 2020) ............................................................... 6, 16, 17, 18

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................................................... 8

*Reynolds v. Middleton*,
  779 F.3d 222 (4th Cir. 2015) ............................................................................... 8, 10

*Rodgers v. Bryant*,
  942 F.3d 451 (8th Cir. 2019) ...................................................................................... 9

*Scott v. Harris*,
  550 U.S. 372 (2007) ........................................................................................... 12, 15

*Smith v. City of Greensboro*,
  No. 19-CV-386, 2020 WL 1452114 (M.D.N.C. Mar. 25, 2020) .............................. 12

*Smith v. Ray*,
  781 F.3d 95 (4th Cir. 2015) ...................................................................................... 14

*Spell v. McDaniel*,
  824 F.2d 1380 (4th Cir. 1987) ............................................................................. 22, 23

*Starbuck v. Williamsburg James City Cty. Sch. Bd.*,
  28 F.4th 529 (4th Cir. 2022) ..................................................................................... 19

*Thayer v. City of Worcester*,
  144 F. Supp. 3d 218 (D. Mass. 2015) ........................................................................ 9

*Thomas v. City of Galveston*,
  800 F. Supp. 2d 826 (S.D. Tex. 2011) ................................................................. 20, 21

*Thompson v. Badgujar*,
No. 20-CV-1272, 2021 WL 3472130 (D. Md. Aug. 6, 2021)..................................................12

*Thorpe v. Clarke*,
37 F.4th 926 (4th Cir. 2022)........................................................................................7

*Vaduva v. City of Xenia*,
780 F. App'x 331 (6th Cir. 2019)..............................................................................11

*Vista-Graphics, Inc. v. Va. Dep't of Transp.*,
682 F. App'x 231 (4th Cir. 2017)..............................................................................10

*Wall v. Wade*,
741 F.3d 492 (4th Cir. 2014)........................................................................................8

*Young v. Prince George's Cty.*,
355 F.3d 751 (4th Cir. 2004)......................................................................................14

**Statutes**

Gastonia Cty. Ord. § 5-17 .............................................................................................8
Gastonia Cty. Ord. § 6-228(b) .....................................................................................8

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)....................................................................24
Restatement (Second) of Torts § 46 cmt. j (1965) ....................................................24

**INTRODUCTION**

Joshua Rohrer—a disabled and homeless veteran—sued the City of Gastonia, North Carolina; Gastonia police officers Cierra Brooks and Maurice Taylor III; and Gastonia Police Department (GPD) employees Rick Goodale and John Doe. Rohrer alleged that his rights under the Constitution and federal and state law were violated when he was arrested pursuant to two unconstitutional anti-panhandling ordinances and subjected to unreasonable force during the arrest; when his nonthreatening service dog, Sunshine, was unnecessarily tased; and when the City engaged in a relentless campaign of harassment and defamation on GPD's Facebook page in retaliation for Rohrer's public calls for accountability.

The City and Officers Brooks and Taylor moved to dismiss the complaint in part. Defendants argue that: (1) the arresting officers are entitled to qualified immunity; (2) the complaint fails to state *Monell* claims; and (3) emotional distress damages are barred under the Rehabilitation Act and the Americans with Disabilities Act (ADA). Defendants are incorrect: Brooks and Taylor violated clearly established law in arresting Rohrer under blatantly unconstitutional ordinances, using unreasonable force, and tasing a nonthreatening service animal; the complaint adequately pleads that the City's policies or customs caused Rohrer's constitutional injuries; and any restrictions on the damages available on Rohrer's disability discrimination claims should be carefully circumscribed. Defendants' partial motion to dismiss should be denied.

**STATEMENT OF THE CASE**

## I. Factual Background

Rohrer is a military veteran with service-related disabilities, including post-traumatic stress disorder (PTSD), depression, anxiety, and panic attack disorder. Compl., ECF No. 1, ¶¶ 4, 13-17. In October 2021, he was a homeless resident of Gastonia, North Carolina, where he lived with his highly trained service dog Sunshine, on whom he relied heavily for day-to-day functions. *Id.* ¶¶ 4,

18. Rohrer's disability rendered him unable to work, but he found solace in interacting with the Gastonia community, smiling and waving at drivers to convey positivity and combat negative stereotypes about people experiencing homelessness. *Id.* ¶¶ 22-23. Community members often showed kindness in return by smiling, waving, stopping to chat, or offering Rohrer or Sunshine food or water and, in some cases, money. *Id.* ¶ 23. Rohrer never solicited donations. *Id.*

Although Rohrer caused no problems, GPD officers harassed him. *Id.* ¶ 25. For example, on October 9, 2021, Taylor approached Rohrer while Rohrer was on a median and told Rohrer he was not allowed to be there. *Id.* ¶ 26. After a driver offered food for Sunshine and money, which Rohrer accepted, Taylor threatened to take Rohrer to jail. *Id.* ¶¶ 27-28. Taylor repeatedly refused to identify any law that prohibited Rohrer's activity, instead explaining that he was "doing what [he was] being told." *Id.* ¶¶ 28-29. When Rohrer said other police officers would smile at him or offer him money, Taylor responded, "We're not even supposed to do that, because that's against policy." *Id.* ¶ 30. During this encounter, Rohrer told Taylor that he was nearly 100-percent disabled on a permanent basis and could not function without his service dog. *Id.* ¶ 31.

A.    **Defendants arrest Rohrer and tase Sunshine on October 13, 2021.**

Four days later, on October 13, 2021, Brooks approached Rohrer and stated that she had received calls that Rohrer was panhandling. *Id.* ¶¶ 33, 35. After seeing him accept a donation from a passing car, she decided to write him up for violating Gastonia's anti-panhandling ordinances. *Id.* ¶ 36. Rohrer explained that he was not panhandling and had not solicited any donations. *Id.* ¶ 37. Brooks demanded that Rohrer provide identification and, when he did not, threatened to take him to jail for "RDO," a reference to a state law that makes it a misdemeanor to "'willfully and unlawfully resist, delay or obstruct'" a police officer. *Id.* ¶ 40 (quoting N.C. Gen. Stat. Ann. § 14-223(a) (2014)). Rohrer asked Brooks if she was really going to cite a "disabled veteran who's living in the woods," to which she responded in the affirmative. *Id.* ¶ 38.

2

Brooks called in Taylor. *Id.* ¶ 39. When Taylor arrived, he told Rohrer that if Rohrer continued insisting he did nothing wrong, Taylor would separate Rohrer from Sunshine and give Sunshine to animal control, despite knowing Rohrer was a disabled veteran who could not function without his service dog. *Id.* Taylor demanded that Rohrer provide identification but did not specify the form of identification. *Id.* ¶ 40. Rohrer handed over his federal veteran identification card (veteran ID). *Id.* ¶ 41. Although the officers could have readily determined Rohrer's identity from that ID, Taylor refused to accept it and demanded that Rohrer produce a state identification (state ID) instead. *Id.* ¶¶ 41-43. Despite there being no requirement under North Carolina law that pedestrians have state identification or provide any particular type of identification to police, *id.* ¶¶ 45-46, Rohrer attempted to comply with this new demand. *Id.* ¶ 48. He opened his wallet, grabbed his state ID, and proffered it to Defendants, while explaining that the ID was not valid. *Id.*; *see also id.* ¶ 44 (explaining Rohrer's state ID was expired and lacked his correct address).

While Rohrer was attempting to comply, Taylor grabbed Rohrer, told him that he was under arrest for resisting an officer, and, with Brooks, forced Rohrer against the patrol car. *Id.* ¶ 49. Brooks took over effectuating the arrest, first pressing Rohrer into the car and then throwing him onto the pavement. *Id.* ¶ 50. At no point did Rohrer physically resist Defendants' restraints, although he begged witnesses to help and sobbed throughout his arrest. *Id.* ¶ 51.

During the arrest, Sunshine stayed close to Rohrer but did not interfere. *Id.* ¶ 52. Sensing Rohrer's distress, Sunshine paced calmly around Rohrer's feet and jumped onto the car to be closer to his face, in keeping with her training. *Id.* Although Sunshine did not pose any threat to anyone, Taylor drew his taser gun and pointed it at Sunshine. *Id.* ¶ 53. Brooks, having observed that Sunshine was well-behaved, well-trained, and nonthreatening, said twice, "I don't think he's [sic] going to bite me." *Id.* ¶ 54. In response, Taylor stated, for the first time and with Sunshine visibly several feet away and facing away from Taylor, "He just bit me." *Id.* ¶ 55. But Sunshine was

nonaggressive throughout the encounter and did not bite Taylor or anyone else. *Id.* ¶ 56; *see also id.* ¶ 73 (civilian witnesses disputed the claim that Sunshine bit anyone). Instead, Sunshine exhibited nonthreatening posture; did not growl, lower her ears, snap, lunge, or give any other indication that she might be dangerous; and merely walked calmly back and forth in Rohrer's vicinity. *Id.* ¶ 56. Later in the day when discussing the incident with a supervisor, Taylor admitted Sunshine was "a very well-trained dog." *Id.* (quoting BWC Part Two at 48:18).

While Taylor pointed his taser at Sunshine, Sunshine jumped off the car and began to walk away from Taylor on the median. *Id.* ¶ 57. Taylor fired the taser at Sunshine and hit her. *Id.* ¶ 58. Injured and in distress from the tasing, Sunshine ran away. *Id.* ¶ 59. Taylor's use of the taser to shoot Sunshine destroyed her ability to execute her training and thus to act as a service animal, and Sunshine later ran into traffic, was struck by a car, and died. *Id.* ¶¶ 60, 91.

Rohrer screamed for help but remained compliant while Brooks held his face against the pavement and handcuffed him and Taylor knelt on his body. *Id.* ¶ 62. As Defendants and other officers milled around, Rohrer cried out that Taylor had "shot [Sunshine] when she was running away" and continued to weep, sob for help, and ask for Sunshine. *Id.* ¶¶ 64, 66-67, 69. He reiterated that Sunshine was his medical device. *Id.* ¶ 65. No officer attempted to secure Sunshine after she ran toward a populated shopping center. *Id.* ¶¶ 67, 195.

Rohrer was transported to the jail, where Brooks and Taylor belittled his disability, and he was charged with soliciting alms, soliciting from a highway, and resisting arrest. *Id.* ¶¶ 80-81. These charges were dropped in July 2022. *Id.* ¶ 87. Rohrer pleaded guilty to an unrelated charge of driving with a suspended license that arose on a different day. *Id.* ¶ 88.

The force used during the arrest caused Rohrer serious physical injuries that required him to use a wheelchair and walker for months and have caused lasting mobility issues and ongoing leg pain. *Id.* ¶ 70. The arrest also exacerbated Rohrer's PTSD, caused him severe psychiatric

4

injuries, and forced him to move out of Gastonia. *See id.* ¶¶ 71-72. Upon learning of Sunshine's death, Rohrer experienced a severe mental health episode and ran into traffic, attempting to end his life. *Id.* ¶ 92. He began new treatment to address the mental health repercussions he suffered because of the arrest and the loss of Sunshine. *Id.* ¶ 93.

> **B.** **Rohrer engages in First Amendment-protected activity regarding his arrest and the tasing of Sunshine, and GPD retaliates.**

Following his arrest, Rohrer engaged in a number of First Amendment-protected activities to draw attention to the unconstitutional conduct of the City and its officers. *Id.* ¶ 99. He gave speeches at rallies organized to support him and oppose the City's mistreatment of its unhoused population; he spoke about his arrest and the tasing of Sunshine to the press and in Gastonia City Council meetings; and he spoke out on Facebook. *Id.* ¶¶ 100-07.

In response, the City used GPD's official Facebook page to harass, bully, and defame Rohrer. *Id.* ¶¶ 109-10. For nearly a year, GPD's Facebook page posted hundreds of publicly available statements belittling and disparaging Rohrer and spreading false and misleading information about the incident, often in response to comments by visitors to the page. *Id.* ¶ 111. These statements were made or approved by Defendant Goodale, who was authorized to speak on behalf of the City through GPD's official Facebook page. *Id.* ¶ 112.

## II. Procedural History

Rohrer filed this suit in June 2023. He alleges that Defendants Taylor, Brooks, and the City of Gastonia violated his free-speech rights under the First Amendment (Count I) as well as his right to be free from excessive force and unreasonable seizures of his effects under the Fourth Amendment (Counts II and III). Compl. ¶¶ 176-98. He also alleges that the City violated his rights under the ADA and Rehabilitation Act by failing to accommodate his disabilities and discriminating against him on the basis of disability during his arrest (Counts IV-VII). *Id.* ¶¶ 199-

228. Finally, Rohrer asserts that the City and Defendants Goodale and Doe violated his right to be free from retaliation for First Amendment-protected conduct (Count VIII), *id.* ¶¶ 229-33, and various state laws, *id.* ¶¶ 234-241 (Count IX); *id.* ¶¶ 242-45 (Count X).

Defendant Goodale answered the complaint on September 11, 2023. *See* ECF No. 14. On September 14, 2023, the City and Defendants Brooks and Taylor filed the instant motion, asking this Court to dismiss some of Rohrer's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Defs.' Partial Mot. to Dismiss, ECF No. 15. In particular, they urge the Court to dismiss Counts I-III against Defendants Brooks and Taylor on the basis of qualified immunity; Counts II, III, and VIII against the City for failure to state a claim under *Monell*; and Counts IV-VII against the City to the extent those claims seek emotional distress damages or related medical expenses. *See* Mem. in Supp. of Defs.' Partial Mot. to Dismiss, ECF No. 15-1 [hereinafter MTD].[1]

### LEGAL STANDARD

When reviewing a motion to dismiss under Rule 12(b)(6), the court accepts all factual allegations in the complaint as true and views them in the light most favorable to the plaintiff. *See Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). To survive a motion to dismiss, the complaint need only set forth enough factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

---

[1] In addition to Rohrer's request for declaratory relief, which underlies all of his claims, the following claims are unaffected by Defendants' motion: Count I, as asserted against the City; Counts IV-VII, to the extent Rohrer seeks damages other than emotional distress damages; Count VIII, as asserted against Goodale and Doe; and Counts IX and X.

**ARGUMENT**

## I. Brooks and Taylor Are Not Entitled to Qualified Immunity.

Defendants Brooks and Taylor have moved to dismiss Rohrer's damages claims for violations of his constitutional rights during his arrest on the ground that they are entitled to qualified immunity. In deciding whether to grant qualified immunity to a law enforcement officer, a court must conduct a two-pronged analysis: (1) "whether a constitutional right was violated on the facts alleged," and (2) "whether 'the unconstitutionality of the officers' conduct was clearly established.'" *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022) (quoting *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)). "[Q]ualified immunity is lost when plaintiffs point either to cases of controlling authority in their jurisdiction at the time of the incident or to a consensus of cases of persuasive authority" that show that the officers' conduct was clearly unlawful at the time it occurred. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 539 (4th Cir. 2017) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Defendants' motion to dismiss should be denied because their actions were clearly unlawful at the time of Rohrer's arrest.

### A. Brooks and Taylor violated Rohrer's clearly established rights under the First Amendment (Count I).

Count I alleges that the City, Brooks, and Taylor violated Rohrer's First Amendment rights by arresting him for violating two unconstitutional anti-panhandling ordinances. Brooks and Taylor argue that they are entitled to qualified immunity because these particular ordinances had not "been declared unconstitutional" at the time, nor were they "so grossly unconstitutional" that the officers should have known they were enforcing an unconstitutional law. MTD 8.

As an initial matter, Defendants make no serious attempt at this stage to dispute the first prong of the qualified immunity analysis—that Gastonia's ordinances violate the First

Amendment. Indeed, the City has not moved to dismiss Count I.[2] Defendants also correctly concede that "there is no question that panhandling and solicitation of charitable contributions are protected speech." MTD 8. "There is likewise no question that public streets and medians qualify as 'traditional public forum[s].'" *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) (alteration in original) (quoting *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 555 (4th Cir. 2013)). But Brooks and Taylor are incorrect that they are entitled to qualified immunity on prong two: Precedent at the time of the arrest clearly established that the anti-panhandling ordinances are restrictions on speech in a traditional public forum that cannot survive constitutional scrutiny.

Prior to Rohrer's arrest, the Supreme Court held that any law that draws distinctions on its face based on the "communicative content" of speech is content-based and thus "presumptively unconstitutional" unless the government satisfies strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). Gastonia's ordinances do just that: Section 6-228(b) makes it a crime "for any person to stand, sit or loiter in any street or highway, including the shoulders or median strip but excluding sidewalks, *and to solicit or accept contributions* from the occupants of any stopped vehicle," while section 5-17 makes it a crime "to *ask, beg, solicit, or offer to work for money* or any other thing having value" in specific situations (emphases added). Whether the ordinances' criminal prohibitions apply to a speaker depends on the content of the person's speech: Speech asking for a donation is treated differently than any other type of speech. The ordinances criminalize asking for a donation, but not asking motorists to vote for a particular candidate, cheer for a sports team, or attend a religious service. *Reed* considers ordinances that distinguish between types of speech to be content-based. *See* 576 U.S. at 169.

---

[2] Because qualified immunity "has no application to suits for declaratory or injunctive relief," *Wall v. Wade*, 741 F.3d 492, 498 n.9 (4th Cir. 2014) (quoting *S.C. State Bd. of Dentistry v. FTC*, 455 F.3d 436, 446-47 (4th Cir. 2006)), the motion to dismiss Count I should be denied with respect to Rohrer's claim for declaratory relief.

Defendants are simply incorrect in claiming that *Reed* is inapplicable because Gastonia's ordinances are not content-based but rather restrict only "the time, place and manner" in which speech can occur. MTD 9-10. Every court post-*Reed* to consider laws that facially single out solicitation, like Gastonia's ordinances, has determined that those laws are content-based and subject to strict scrutiny. *E.g.*, *Rodgers v. Bryant*, 942 F.3d 451, 457 (8th Cir. 2019) (affirming preliminary injunction against law similar to Gastonia Ordinance § 5-17, noting that "because the law targets only a *subset* of the speech that meets these criteria—specifically, asking for charity or a gift—it is a content-based restriction"); *Norton v. City of Springfield*, 806 F.3d 411, 412-13 (7th Cir. 2015) (striking down, as content-based, ordinance prohibiting panhandling within downtown area); *Planet Aid v. City of St. Johns*, 782 F.3d 318, 328 (6th Cir. 2015) (holding restriction on "charitable solicitation and giving" was content-based); *Messina v. City of Fort Lauderdale*, 546 F. Supp. 3d 1227, 1238-39 (S.D. Fla. 2021) (collecting cases); *Thayer v. City of Worcester*, 144 F. Supp. 3d 218, 233 (D. Mass. 2015) ("[S]ubstantially all of the Courts which have addressed similar laws since *Reed* have found them to be content based and therefore, subject to strict scrutiny.").

Defendants make no effort to defend the ordinances against strict scrutiny review, which would be futile. Strict scrutiny is satisfied only where a speech restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). Though Defendants point to an interest in traffic flow, "neither [the Fourth Circuit] nor the Supreme Court" has ever held that "traffic safety" constitutes a "compelling government interest[]." *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016). In any event, anti-panhandling restrictions are not narrowly tailored to further that interest. *E.g.*, *Rodgers*, 942 F.3d at 457; *Fernandez v. St. Louis Cty.*, 538 F. Supp. 3d 888, 901 (E.D. Mo. 2021) (striking down law prohibiting standing in roadway to solicit contributions on ground that provision "singling out … speech on just … four topics" is "not narrowly tailored");

9

*cf., e.g.*, *Norton*, 806 F.3d at 413 (anti-panhandling laws cannot survive strict scrutiny); *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 797 (9th Cir. 2006) (same).

Defendants instead suggest (at MTD 10) that they are entitled to qualified immunity because it is unclear whether the City's interests are sufficient to meet the intermediate scrutiny analysis for content-*neutral* laws, under which the government must show that a speech restriction is "narrowly tailored to serve a significant governmental interest," *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989)). Not only is it clearly established that the ordinances are content-based restrictions on speech, but the Fourth Circuit's decision in *Reynolds* leaves no doubt that Gastonia's anti-panhandling ordinances do not survive even intermediate scrutiny.[3] *Reynolds* involved a law very similar to Gastonia's that prohibited soliciting donations in a highway or from motorists. *See* 779 F.3d at 225. The Fourth Circuit rejected the argument that a ban on roadside solicitation was narrowly tailored to further an interest in traffic safety.[4] *See id.* at 230-31 (noting that the law applied "regardless of location or traffic volume, and includes all medians, even wide medians and those beside traffic lights and stop signs" and that the government had other options, such as "enforcing existing traffic laws … against any roadway solicitors who in fact obstruct traffic or otherwise cause problems"). *Reynolds* therefore demonstrates that, even *if* considered content-neutral, anti-soliciting laws are constitutionally suspect. *See also, e.g.*, *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1209, 1211

---

[3] Defendants incorrectly suggest (at MTD 10 n.3) that Rohrer conceded that intermediate scrutiny applies. The fact that these ordinances fail *even under* intermediate scrutiny demonstrates that qualified immunity should be denied because it is clear the ordinances are unconstitutional. *Cf. Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020) (declining to decide whether strict or intermediate scrutiny applied because government could not satisfy either standard).

[4] *Reed* abrogated *Reynolds*'s suggestion that restrictions on panhandling are content-neutral. *See Vista-Graphics, Inc. v. Va. Dep't of Transp.*, 682 F. App'x 231, 234 (4th Cir. 2017). *Reynolds's* articulation of the intermediate scrutiny test—and its indication that anti-panhandling laws do not meet it—remains good law. *E.g.*, *Billups*, 961 F.3d at 685.

(10th Cir. 2021) (striking down content-neutral ordinance that prohibited pedestrians from (1) congregating within six feet of a highway entrance or exit ramp, and (2) occupying any median less than 6 feet across on street with >30 MPH limit); *Cutting v. City of Portland*, 802 F.3d 79, 81-82 (1st Cir. 2015) (striking down content-neutral law prohibiting sitting or standing on medians).

Although Defendants are correct that, in the absence of precedent to the contrary, they may rely on "a presumptively valid ordinance," MTD 9 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)), that is not the situation here. *Reed*, *Reynolds*, and numerous other cases clearly established the unconstitutionality of these ordinances under the First Amendment at the time of Rohrer's arrest, defeating the qualified immunity defense. Other courts have denied qualified immunity in similar circumstances. *See Dumiak v. Vill. of Downers Grove*, 475 F. Supp. 3d 851, 855 (N.D. Ill. 2020) (denying qualified immunity to officers who enforced law prohibiting panhandling near roadway); *Henagan v. City of Lafayette*, No. 21-CV-03946, 2022 WL 4553055, at *10 (W.D. La. Aug. 16, 2022) (same), *objections overruled*, 2022 WL 4546721 (W.D. La. Sept. 27, 2022).[5] This Court should do the same.

**B. Brooks and Taylor violated Rohrer's clearly established rights under the Fourth Amendment.**

**1. Excessive force against Rohrer (Count II)**

Count II alleges that Brooks and Taylor used excessive force in arresting Rohrer. Defendants Brooks and Taylor argue that they are entitled to qualified immunity with respect to Count II because the force they used was reasonable under the circumstances and, as such, did not violate the Fourth Amendment. MTD 11-13. In so arguing, Defendants rely on their own version

---

[5] Two unpublished decisions granted qualified immunity when the officers' conduct occurred before *Reed* and its progeny clarified the unconstitutionality of anti-panhandling laws. *Vaduva v. City of Xenia*, 780 F. App'x 331, 337-38 & n.6 (6th Cir. 2019); *Petrello v. City of Manchester*, No. 16-CV-008, 2017 WL 1080932, at *6 (D.N.H. Mar. 21, 2017).

of the facts, defying the well-known standard for reviewing the sufficiency of a complaint. Because their entire argument is premised on these factual distortions, *see id.* at 12-13, which must be disregarded at the motion-to-dismiss stage, the Court should deny the motion as to Count II.

The crux of Defendants' argument is that Brooks and Taylor were entitled to use "verbal commands and hands" to detain Rohrer in light of his "resistance." *Id.* at 12. But the purported "fact" of Rohrer's resistance, *id.*, is hotly disputed. And the factual allegations in the complaint—which must be accepted as true and viewed in the light most favorable to Rohrer—state that Rohrer was attempting to comply with Taylor's demand to provide identification when Taylor first grabbed him and that Rohrer never physically resisted Defendants' restraints. Compl. ¶¶ 49, 51.

In urging this Court to adopt their factual framing, Defendants point to the body-worn-camera footage, which they claim "supports the Officers' perception of resistance." MTD 12. But the video does not help Defendants, and it certainly does not "blatantly contradict[]" the complaint. *Scott v. Harris*, 550 U.S. 372, 380 (2007).[6] For example, far from showing that Rohrer "never, at any time, gave any indication that he was going to voluntarily comply with the arrest," MTD 12, the video shows that moments before Taylor grabbed Rohrer's arm, Rohrer was attempting to provide his identification to Defendants, BWC Part One at 18:51-19:23. Although Rohrer initially

---

[6] *Scott* concerned competing summary judgment evidence and held that no reasonable jury could have believed a version of events that was blatantly contradicted by video evidence. 550 U.S. at 380-81. Some district courts in this Circuit have refused to consider contradictory video footage at the motion-to-dismiss stage, *see, e.g.*, *Smith v. City of Greensboro*, No. 19-CV-386, 2020 WL 1452114, at *3-4 (M.D.N.C. Mar. 25, 2020); others have relied on similar logic to *Scott* to conclude that when the allegations in the complaint are "flatly contradict[ed]" by video evidence that is integral to the complaint, disputes should be resolved in favor of the video, *see Thompson v. Badgujar*, No. 20-CV-1272, 2021 WL 3472130, at *3 (D. Md. Aug. 6, 2021). For reasons explained herein, the latter standard is not met here. Thus, even if this Court accepts Defendants' invitation to treat the body-worn-camera footage as integral to the complaint, the Court must still assume the truth of Rohrer's allegations and draw all reasonable inferences in his favor. *See Est. of LeRoux v. Montgomery Cty.*, No. 22-CV-856, 2023 WL 2571518, at *6 (D. Md. Mar. 20, 2023) (finding "no direct contradiction" between the allegations and extrinsic materials).

refused to produce his ID because he did not commit any crime, he subsequently proffered his veteran ID. *See id.* at 14:55-19:13. When Taylor then demanded Rohrer's state ID, Rohrer explained that his state ID was not valid. *Id.* at 19:14-23. He was offering that explanation, state ID and wallet in hand, when Taylor grabbed him—mere seconds after Taylor's request. *Id.*; *see also id.* at 31:39-49. The video supports, not contradicts, the complaint's allegations.

The video also does not "blatantly contradict" Rohrer's allegations that he never physically resisted. Contrary to Defendants' telling, the video does not show that Rohrer "struggled against the Officers and resisted until he was handcuffed," that it "took two officers in order to restrain him," or that "Defendant Brooks and [Rohrer] went to the ground ... only after [he] attempted to escape from Defendant Brooks'[s] hold in further resistance," MTD 12. *See* BWC Part One at 19:22-20:40, 31:36-32:55. Rohrer did not actively resist the officers, threaten them, or push back against being slammed onto the car and to the ground. Even if the video were subject to multiple interpretations, Defendants' interpretation is not compelled by it. In other words, this is not a case in which the plaintiff's version of events is "so utterly discredited by the record" that it can be disregarded as a "visible fiction." *Scott*, 550 U.S. at 380-81. Accordingly, the Court must "accept the facts as asserted in [the] Complaint." *Est. of LeRoux*, 2023 WL 2571518, at *6.

The facts alleged show a clear Fourth Amendment violation. As Defendants acknowledge, determining whether police officers used reasonable force requires courts to look at the totality of the circumstances, including "'the severity of the crime at issue,' whether the 'suspect pose[d] an immediate threat to the safety of the officers or others,' and whether the suspect was 'actively resisting arrest or attempting to evade arrest by flight.'" MTD 11 (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Rohrer was suspected of only minor misdemeanors; posed no threat to anyone; and, as explained above, was neither actively resisting arrest nor attempting to flee. In fact, he was complying with the officers' command to hand over

his ID at the moment he was arrested. It was therefore unreasonable for Brooks and Taylor to force Rohrer into the hood of the patrol car and for Brooks to push Rohrer into the pavement.

The Fourth Circuit has held that this kind of gratuitous force during the arrest of a nonthreatening individual gives rise to a Fourth Amendment violation. For example, in *Smith v. Ray*, 781 F.3d 95, 102-03 (4th Cir. 2015), the court affirmed the denial of qualified immunity on an excessive force claim where a plaintiff was suspected of only a misdemeanor and gave no indication she would harm the officer; the officer grabbed her arm without warning and then threw her to the ground; and the plaintiff did not strike at the officer or attempt to flee and had complied with his orders before instinctively pulling her arm back after being grabbed without explanation. Similarly, in *Young v. Prince George's County*, 355 F.3d 751, 757-58 (4th Cir. 2004), the court held that a jury could find an officer used excessive force when he threw a nonthreatening, though armed, plaintiff "head-first to the ground." And in *Hupp v. Cook*, 931 F.3d 307, 321-23 (4th Cir. 2019), the court reversed a grant of summary judgment for an officer in an excessive force case where the officer grabbed the plaintiff, threw her down, and then pushed her into a police car during a misdemeanor arrest, because there was insufficient evidence that the plaintiff posed a threat to the officer and disputed evidence of the plaintiff's resistance to arrest.[7]

There is also a "consensus … of persuasive authority" from other circuits establishing "that an unarmed individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the police—has the right not to be subjected to physical force

---

[7] Defendants' cases to the contrary merely support the proposition that active resistance—which was not present here—can justify some force. *See Brown v. Gilmore*, 278 F.3d 362, 369-70 (4th Cir. 2002) (handcuffing plaintiff and pulling her into police vehicle were reasonable "minimal" force where officer confronted tense crowd, plaintiff was yelling and disobeying officer, and officer reasonably perceived physical resistance); *Bell v. Dawson*, 144 F. Supp. 2d 454, 462-63 (W.D.N.C. 2001) (rejecting excessive force claim from "intoxicated and belligerent" plaintiff who was taken to the ground without injury after he threatened to assault officers).

such as being grabbed, dragged, or taken down." *El v. City of Pittsburgh*, 975 F.3d 327, 339-40 (3d Cir. 2020) (alteration in original) (quoting *al-Kidd*, 563 U.S. at 742) (collecting cases); *see also, e.g.*, *Ciolino v. Gikas*, 861 F.3d 296, 303-04 (1st Cir. 2017) (holding that, as of 2013, it was clearly established that forcibly throwing person to the ground to effectuate arrest constitutes excessive force where person disobeys police order but shows no inclination to resist arrest or attempt to flee, is not dangerous, and is not given chance to submit to arrest peacefully before significant force is used). In light of both the Fourth Circuit's precedent and the consensus of other circuits, Defendants are not entitled to qualified immunity on the excessive force claim.

### 2. Unreasonable seizure of Sunshine (Count III)

Taylor also seeks dismissal of Count III on qualified immunity grounds. Count III alleges that Taylor violated Rohrer's Fourth Amendment right to be secure in his effects against unreasonable seizure when he tased Rohrer's service animal, Sunshine.

As with Count II, however, Taylor fights the factual allegations. In framing the issue, he claims that "Plaintiff alleges that Defendant Taylor ... deployed his taser on Plaintiff's unrestrained service [animal] as it had bit his boot and [he was] concern[ed] that it would bite Defendant Brooks." MTD 13. But the complaint alleges the exact opposite. It says that "Sunshine was nonaggressive throughout the encounter and *did not bite Defendant Taylor* or anyone else." Compl. ¶ 56 (emphasis added). Nothing in the video "blatantly contradicts" this allegation. *Scott*, 550 U.S. at 380. Although the footage does not show Sunshine at all times during the encounter, at no time does it show Sunshine biting anyone. Compl. 12 n.2. The complaint also alleges that any purported concern Taylor might have had for Brooks "was not reasonable" because (1) Sunshine "was not behaving in a threatening manner or acting aggressively"; (2) "Taylor knew Sunshine was a well-trained service dog that frequently interacted with the public"; (3) "Taylor could observe that Sunshine was exhibiting calm and nonthreatening posture throughout Rohrer's arrest"; (4) "right

15

before Taylor tased Sunshine, Brooks could be heard calmly observing: 'I don't think he's [sic] gonna bite me'"; and (5) "neither they nor any other officers made any attempt to secure Sunshine after she was tased and ran away toward a populated shopping center," indicating they did not think she posed a threat to others. *Id.* ¶ 195; *see also id.* ¶¶ 39, 52-59, 67, 69. The video directly supports many of these allegations, and in no instance contradicts them.[8]

Taylor may ultimately argue that he reasonably perceived Sunshine as a threat. But the court "cannot accept [Taylor's] version of the facts at this stage of the proceedings," in which Rohrer's factual allegations must be taken "as true" and all "reasonable inferences" must be drawn in his favor. *Ray*, 948 F.3d at 228, 230; *cf. Lunneen ex rel. Lunneen v. Vill. of Berrien Springs*, No. 22-2044, 2023 WL 6162876, at *9 (6th Cir. Sept. 21, 2023) ("The Officers' arguments that the law was not clearly established ... suffer from the same fatal flaw: they require the court to disregard its directive to view the facts in the light most favorable to the plaintiff."). Once the facts surrounding Sunshine's tasing are properly construed, Taylor's qualified immunity argument fails.

In *Ray v. Roane*, the Fourth Circuit held that it is clearly established that it is unreasonable under the Fourth Amendment "for a police officer to shoot a privately owned animal when it does not pose an immediate threat to the officer or others." 948 F.3d at 229; *see also id.* at 230 (citing *Altman v. City of High Point*, 330 F.3d 194, 203-05 (4th Cir. 2003), for proposition that "the reasonableness of the seizure of a dog depends on whether the governmental interest in safety outweighs the private interest in a particular case"). Here, like in *Ray*, a reasonable officer could not have believed that there was a threat to officer or public safety, because Sunshine was entirely

---

[8] Taylor argues that "body camera footage reveals" he deployed his taser when Sunshine was "unrestrained" and "approache[d] Defendant Brooks," purportedly threatening her safety. MTD 14-15. But the video shows only that Sunshine was not physically restrained, not that she threatened Brooks, and does not contradict Rohrer's allegation that Taylor tased Sunshine when she was "walk[ing] away from" him and Brooks. Compl. ¶ 57; *see* BWC Part One at 19:52-59. The Court should disregard Taylor's contrary assertions in considering the tasing's reasonableness.

nonthreatening. Viewing the allegations in the complaint and the reasonable inferences arising therefrom in Rohrer's favor, Taylor tased Sunshine "at a time when he could not have held a reasonable belief that the dog posed a threat to himself or others." *Id.* at 229; *see also LeMay v. Mays*, 18 F.4th 283, 288 (8th Cir. 2021) (concluding seizure would be unreasonable if officers shot and injured two service dogs who "presented no imminent danger and were not acting aggressively"). Together with the Fourth Circuit's recognition that a "taser, like 'a gun,'" represents a "serious use of force" that can be justified only by an "immediate safety risk," *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 902, 909 (4th Cir. 2016) (quoting *Meyers v. Baltimore Cty.*, 713 F.3d 723, 735 (4th Cir. 2013)), *Ray* and *Altman* made it "manifestly apparent" to a reasonable officer in Taylor's position that it was unlawful to tase Sunshine, *Ray*, 948 F.3d at 230 (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)).

Taylor argues that *Ray* and *Altman* are inapplicable because (1) the reasonableness of the officers' actions centered on whether the dogs were "restrained or otherwise controlled by [their] owner[s] so as to not be a threat," and (2) both cases involved officers shooting and killing the dogs in question. MTD 14. Taylor is wrong on both fronts.

First, neither *Altman* nor *Ray* made restraint the dispositive factor in determining whether force used against a dog is reasonable. In *Altman*, the court held that the officers used reasonable force in light of the threat posed by the dogs, many of whom had previously attacked neighbors or the officers themselves and all of whom had behaved aggressively. 330 F.3d at 206-07. "The fact that all the dogs ... were running at large, uncontrolled and with no owner looking on" was relevant only in distinguishing *Altman* from other cases that had found seizures to be unreasonable. *Id.* at 206-07; *see, e.g.*, *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 (3d Cir. 2001) (denying qualified immunity where officer shot a pet dog when it was roaming unrestrained outside of its yard because "it pose[d] no immediate danger and the owner [was] looking on" from a distance, "obviously

desirous of retaining custody"). Unlike the aggressive, unsupervised dogs in *Altman*, Sunshine stayed close to Rohrer throughout the arrest to comfort him, as she was trained to do, Compl. ¶¶ 52, 195. *Cf. Altman*, 330 F.3d at 207 (suggesting that force is least justified "when, although the dog is unleashed, the owner is nearby and attempting to assert control over the dog").[9] And in *Ray*, the restraint question was dispositive only because the dog *was* restrained and thus definitionally not a threat. *See* 948 F.3d at 227-28 (finding also relevant whether dogs were "barking or advancing toward an officer" such that they posed "an immediate danger"). In other words, the Fourth Circuit has not held that every dog that is not currently restrained poses a threat that justifies a significant use of force.

Second, there is no reason for *Altman* and *Ray* to apply only to fatal shootings and not other significant uses of force. In *Ray*, the Fourth Circuit held that it should have been "'manifestly apparent' to a reasonable officer ... that shooting a privately owned dog, *in the absence of any safety rationale at all*, is unreasonable." 948 F.3d at 230 (quoting *Owens*, 372 F.3d 279). The same principle applies to Taylor's unreasonable decision to tase an nonthreatening service animal.

## II.     Rohrer Has Stated Claims for Municipal Liability Against the City.

The City has moved to dismiss three counts of Rohrer's complaint (Count II, excessive force; Count III, unreasonable seizure; and Count VIII, First Amendment retaliation), arguing that the complaint fails to state a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court held that a municipality can be sued under § 1983 for a constitutional violation caused by an "official policy" or governmental "'custom or usage,'" including a custom that "has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-

---

[9] Sunshine, as a service animal, was not required to be leashed in public in Gastonia. *See* Compl. ¶ 20 (citing Gaston Cty. Ord. § 3.8(a)(1)).

68 (1970)). Such a policy or custom "can arise in four ways": through (1) "an express policy, such as a written ordinance or regulation"; (2) "the decisions of a person with final policymaking authority"; (3) "an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'"; or (4) "a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Starbuck v. Williamsburg James City Cty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). Here, Rohrer has sufficiently asserted municipal liability for both his Fourth Amendment claims and his First Amendment retaliation claim.

## A. Rohrer has valid Fourth Amendment claims under *Monell* (Counts II and III).

The City argues it is not liable for Rohrer's Fourth Amendment claims for excessive force and unreasonable seizure (Counts II and III) solely on the ground that its after-the-fact ratification is not sufficient to establish *Monell* liability because any such ratification cannot have caused the violation of Rohrer's constitutional rights. MTD 16-18. This argument is beside the point, as the complaint alleges not only that the City ratified Brooks's and Taylor's conduct, but also that the officers acted pursuant to an official policy that caused the constitutional violations. *See* Compl. ¶¶ 190-91, 198; *Monell*, 436 U.S. at 690-91. Specifically, the complaint alleges that the City has a policy or custom of hostility and unwarranted force during interactions with people experiencing homelessness and that Defendants' use of excessive force and the unreasonable seizure of Sunshine were undertaken pursuant to that policy or custom. Compl. ¶ 190. Because the City's policy "directly caused the violation of [Rohrer's] Fourth Amendment rights," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 (1986), the City's references to *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023), are wholly irrelevant.

The complaint describes a longstanding campaign by the City to drive homeless people out of Gastonia, including through the use of beatings and other horrifying physical abuse. Compl.

¶¶ 157-63. Though this campaign originated in the 1980s and was uncovered in a 1990 federal investigation, the City's "hostility towards people experiencing homelessness persists to this day," and it remains "a priority for the City and for the Police Department to run the homeless population out of Gastonia." *Id.* ¶¶ 164, 169. The complaint substantiates these allegations by pointing to a GPD priority of "find[ing] a solution that would deter the homeless from congregating" in areas visible to passing motorists and businesses, *id.* ¶ 170; alleging that GPD aggressively arrests and seeks prolonged detention of people experiencing homelessness for trivial or fabricated offenses, *id.* ¶ 171; noting that GPD has successfully advocated for an increase of the criminal penalty for the anti-panhandling ordinance under which Rohrer was arrested, *id.* ¶ 172; and describing efforts by the City to close the only homeless shelter in Gastonia, which has led to the deaths of people experiencing homelessness, *id.* ¶¶ 165-68. The complaint also makes clear that this broader policy caused Rohrer's arrest: Taylor stated that in seeking to remove Rohrer from the vicinity of passing motorists on October 9, he was "doing what [he was] being told to do" and that even small kindnesses by police officers toward homeless people were "against policy." *Id.* ¶¶ 29-30.

These allegations collectively support the inference that Defendants' Fourth Amendment violations were undertaken pursuant to City policy to drive out the Gastonia homeless population, including by force. At the complaint stage, only "minimal factual allegations" that provide a "general" statement of the policy and "fair notice" to the municipality of the nature of the claim are required to support a *Monell* claim. *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43, 845 (S.D. Tex. 2011); *see also Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 403 (4th Cir. 2014) (explaining that the "recitation of facts" on a *Monell* claim "need not be particularly detailed, and the chance of success need not be particularly high"). The complaint's allegations here provide "the specific topic of the challenged policy" and detail "past incidents of misconduct to others," "misconduct that occurred in the open," and "the involvement of multiple officials in

20

the misconduct." *Thomas*, 800 F. Supp. 2d at 843-44. At this stage, it is a rare plaintiff who "possess[es] a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers," *Johnson v. Baltimore Police Dep't*, No. 19-CV-0698, 2020 WL 1169739, at *34 (D. Md. Mar. 10, 2020), and "the details of the alleged policy or custom" are "properly left to development through discovery," *Est. of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019). Here, because the complaint alleges a specific policy of hostility toward homeless individuals and how that policy caused the violation of Rohrer's rights, the City's motion to dismiss Rohrer's Fourth Amendment *Monell* claims should be denied.

> **B.      Rohrer has a valid First Amendment retaliation claim under *Monell* (Count VIII).**

The City also seeks dismissal of the First Amendment retaliation claim against it,[10] arguing that it is not responsible for the hundreds of pronouncements made on GPD's official, verified Facebook account. This argument fails for several reasons.

First, the City recognizes that *Monell* liability may be imposed for a custom or practice of violating constitutional rights, but nevertheless argues that "a custom may not arise out of a single incident." MTD 18. But the City fails to acknowledge that Rohrer does not allege "a single incident" of retaliation or even "scattershot accusations of unrelated constitutional violations." *Id.* at 20. He alleges a "pattern of harassment," Compl. ¶ 232, involving *several hundred* incidents, *id.* ¶ 111, conducted over nearly a year and continuing until the complaint in this case was filed, consisting of comments made publicly through the official GPD Facebook page bearing its imprimatur on a topic that garnered significant public attention, *id.* ¶¶ 111, 142, without anyone putting a stop to it, *id.* ¶ 156. *See also, e.g., id*. ¶¶ 116-152 & Ex. A (giving concrete examples of

---

[10] Neither the City nor Goodale moved to dismiss this count on the ground that it does not state a claim for violation of constitutional rights. Moreover, the City has not moved to dismiss the state law claims, Counts IX and X, that arise out of the same pattern of misconduct.

false, disparaging, and taunting comments). The Fourth Circuit has recognized that merely alleging that there are multiple or "numerous" similar incidents is enough at the pleading stage. *Owens*, 767 F.3d at 403; *see also Spell v. McDaniel*, 824 F.2d 1380, 1393-94 (4th Cir. 1987) (holding municipal liability attached when evidence showed "a number" of similar acts and describing just three such acts); *cf. Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1950-51 (2018) (assuming without deciding that "a number of alleged incidents" of harassment against a single plaintiff "formed an official policy to retaliate against him"). Here, the complaint is far more specific and extensive than those previously blessed by the Fourth Circuit, allowing for the inference that they were made pursuant to a custom or practice of the City.[11]

Second, although the sheer volume of public comments is enough for liability, the City ignores other allegations that allow for an inference that a final policymaker made the choice to retaliate against Rohrer. The complaint alleges that the statements made through GPD's Facebook account "represent the City's position on matters related to the police department." Compl. ¶ 109. Further, the posts themselves acknowledge a policy of "correcting" information "about [Rohrer's] case." *Id.*, Ex. A at 11 ("we will be here correcting every one of your posts"); *id*. at 14 ("we cannot allow people to continue to spread the misleading and false information about this case"); *id*. at 34 ("we see what is being said about us, and if it is false or misleading, we will correct it"); *id.* at 49 ("We respond to the comments for the benefit of the new people who see a 'you beat a homeless veteran and killed his dog' comment and think this is what happened…."). An "allegation that an official city spokesperson announced an official city policy allows for a reasonable pleading inference that this [challenged] policy was attributable to an official policy made by the

---

[11] The pervasive but uninterrupted nature of the Facebook posts also suggests deliberate indifference on the part of any other City policymakers who allowed the campaign to continue for so long without attempting to stop it. *See, e.g.*, *Clipper v. Takoma Park*, 876 F.2d 17, 20 (4th Cir. 1989); *A.G. v. Fattaleh*, 614 F. Supp. 3d 204, 232 (W.D.N.C. 2022).

policymaker of the city." *Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016).

Third, the allegations support the inference that Goodale, the public information officer who ran GPD's Facebook page, acted as a final policymaker for that page. The complaint alleges he was "authorized to speak on behalf of the City and its Police Department through the Department's official Facebook page." Compl. ¶ 112. Nothing in the complaint or the City's motion suggests the posts were subject to "formal review" by another policymaker. *Hunter v. Town of Mocksville*, 897 F.3d 538, 557 (4th Cir. 2018). That Goodale made hundreds of public posts over almost a year without intervention suggests he had policymaking authority to do so. *See Spell*, 824 F.2d at 1387 (delegation of policymaking authority may be "implied from a continued course of knowing acquiescence by the governing body"). As the Sixth Circuit held, municipal employees who make content decisions for an official Facebook page either "exercis[e] their discretion" or act based on a "formal or informal policy," and "[e]ither structure could give rise to a *Monell* claim": "If employees exercise discretion, they may have 'final decision making authority,'" while "[i]f employees enforce set rules, those rules may amount to actionable policies or customs." *Lloyd v. City of Streetsboro*, No. 18-3485, 2018 WL 11298664, at *4 (6th Cir. Dec. 20, 2018).

**III.    *Cummings* Is Inapplicable to Rohrer's Disability Discrimination Claims (Counts IV, V, VI & VII).**

Defendants argue that any "emotional distress damages or related medical expenses sought by" Rohrer for his disability discrimination claims under the Rehabilitation Act and the ADA are barred by *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562 (2022). MTD 20-24. Defendants are correct that *Cummings* held that such damages are unavailable under the Rehabilitation Act. But that limitation should be circumscribed in three important ways.

First, Defendants have not moved to dismiss Rohrer's disability-related claims on the merits, and Rohrer has alleged that Defendants' failure to accommodate his disabilities and their

23

disparate treatment of him on account of his disability caused him "physical pain and suffering," "physical injuries," and "the loss of his service animal," all compensable injuries under *Cummings*. Compl. ¶¶ 219, 228. Thus, even if the Court agrees that emotional distress damages are unavailable, Counts IV-VII will proceed regardless of the resolution of this motion to dismiss.

Second, to the extent emotional distress damages are excluded for Rohrer's disability-related claims, that exclusion should not extend to damages for the exacerbation of Rohrer's disability, which in his case is a severe psychiatric illness. Emotional distress is a "highly unpleasant mental reaction (such as anguish, grief, fright, humiliation, or fury) that results from another person's conduct," Black's Law Dictionary (11th ed. 2019), and includes such "highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea," Restatement (Second) of Torts § 46 cmt. j (1965). In a discrimination claim, emotional distress damages typically relate to humiliation and frustration stemming from the experience of suffering discrimination. PTSD, by contrast, is a diagnosable psychiatric condition; in Rohrer's case, it has left him 100 percent disabled on a permanent basis, and Defendants' conduct in failing to accommodate and treating him disparately on account of his disability exacerbated that condition. If Rohrer had a physical disability that required him to use a wheelchair and Defendants removed his wheelchair, causing him to fall and worsening his disability, there would be no question he would be entitled to compensatory damages to remedy the harm. *Cf. Barnes v. Gorman*, 536 U.S. 181 (2002) (compensatory damages awarded to wheelchair user whose disability was exacerbated by police failure to secure him properly during transport). There is no difference simply because Rohrer's disability is psychiatric, and he should be entitled to seek damages for the exacerbation of his disability.

Third, this Court should not import *Cummings*'s holding to Rohrer's ADA claims. The *Cummings* analysis was predicated on the fact that the Rehabilitation Act was enacted pursuant to

24

the Spending Clause, leading the Supreme Court to analogize the available damages to those traditionally available in contract. 142 S. Ct. at 1565. The ADA was enacted pursuant to Congress's power under Section 5 of the Fourteenth Amendment, making any such analogy inapt. Defendants are correct (at MTD 22-24) that Title II of the ADA provides that the "remedies … set forth in [the Rehabilitation Act] shall be the remedies … this subchapter provides to any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133. At the time the ADA's remedies provision was enacted, however, it was well established that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Davis v. Passman*, 442 U.S. 228, 245 (1979) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); *see also Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 66 (1992) ("[W]e presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise."). That is, when Congress tied the ADA's remedies provision to that of the Rehabilitation Act, it did so in a context in which the Supreme Court had made clear that the "full panoply of legal remedies [were] available." *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 (4th Cir. 1994) (citing *Franklin*, 503 U.S. at 60). There is no reason to think Congress in 1990 would have anticipated, much less intended, that a novel contract-based limitation on Rehabilitation Act damages would subsequently curtail emotional distress damages under the ADA, especially because anti-disability discrimination is "particularly likely to cause serious emotional disturbance." *Cummings*, 142 S. Ct. at 1577 (Breyer, J., dissenting).

**CONCLUSION**

For the foregoing reasons, Defendants' partial motion to dismiss should be denied.

Dated: October 12, 2023                    Respectfully submitted,

                                           */s/ Elizabeth R. Cruikshank*
David G. Guidry (No. 38675)                Elizabeth R. Cruikshank*
GUIDRY LAW FIRM                            Joseph W. Mead*
338 S. Sharon Amity Rd., #337              Shelby Calambokidis*
Charlotte, NC 28211                        Amy Marshak*
(917) 376-6098                             Seth Wayne*
david@guidrylawfirm.com                    INSTITUTE FOR CONSTITUTIONAL ADVOCACY &
                                               PROTECTION
                                           GEORGETOWN UNIVERSITY LAW CENTER
                                           600 New Jersey Avenue NW
                                           Washington, DC 20001
                                           (202) 661-6728
                                           erc56@georgetown.edu
                                           jm3468@georgetown.edu
                                           *Admitted *pro hac vice*

                                           *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2023, I electronically filed the foregoing brief with the U.S. District Court for the Western District of North Carolina by using the Court's CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the Court's CM/ECF system.

> */s/ Elizabeth R. Cruikshank*
> Elizabeth R. Cruikshank