IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

Case No. 3:23-cv-00396

JOSHUA ROHRER,

              Plaintiff,

          v.

CITY OF GASTONIA, CIERRA
BROOKS, MAURICE TAYLOR III,
RICK GOODALE, J. DOE,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**DEFENDANTS CITY OF GASTONIA,
CIERRA BROOKS AND MAURICE
TAYLOR III'S REPLY TO PLAINTIFF'S
MEMORANDUM IN OPPOSITION
TO DEFENDANTS' PARTIAL
MOTION TO DISMISS**

      **NOW COME** Defendants City of Gastonia, Cierra Brooks and Maurice Taylor III (hereinafter "Defendants"), by and through the undersigned counsel and, pursuant to Federal Rules of Civil Procedure, and hereby submit this Reply to Plaintiff's memorandum in opposition to Defendants' partial motion to dismiss Plaintiff's complaint *in lieu* of answer. In support thereof, Defendants state the following:

<u>**ARGUMENT**</u>

      Plaintiff, within his memorandum in opposition to Defendants' partial motion to dismiss, assert that "Defendants' partial Motion to Dismiss should be denied." *See* DE 19 at pg. 1. Plaintiff's arguments in support of this contention, as found within his opposition, can be summarized as follows:

        1. Defendants Brooks and Taylor are not entitled to qualified immunity as they violated Plaintiff's "clearly established" rights under the First and Fourth Amendments. *See* DE 19 at pg. 7-15;

2. Plaintiff has valid First and Fourth Amendment claims for municipal liability Against the City pursuant to *Monell*. *See* DE 19 at pg. 18-21; and

3. *Cummings* is inapplicable to Rohrer's Disability Discrimination Claims. *See* DE 19 at pg. 23-25.

As detailed below, closer inspection reveals that none of these arguments hold water. Accordingly, Defendants request that this Court dismiss the Plaintiff's causes of action as provided within their initial motion.

## I. Defendants Brooks and Taylor are entitled to qualified immunity in this matter.

### a. Defendants Brooks and Taylor did not violate Plaintiff's First Amendment Rights.

#### i. Pursuant to relevant case law, the Officers had probable cause to arrest Plaintiff pursuant to Pursuant to N.C. Gen. Stat. § 14-223.

Plaintiff, within his opposition, argues that Defendants Brooks and Taylor are not entitled to qualified immunity as they "violated [Plaintiff's] First Amendment rights by arresting him for violating two unconstitutional anti-panhandling ordinances." DE at pg. 13. However, nothing in Plaintiff's Complaint nor the attachments thereto point to that being the reason of his arrest. Rather, by his own allegations, Plaintiff was arrested only after he refused the Officers' multiple commands to provide his state identification. *See* DE 1 at ¶40 ("Brooks told Mr. Rohrer that if he did not hand over his identification he would go to jail for "RDO," a reference to a state law that makes it a misdemeanor to "willfully and unlawfully resist, delay or obstruct" a police officer. N.C. Gen. Stat. Ann. § 14-223(a) (2014)."); *see also* DE 1 at ¶49 ("while Mr. Rohrer was attempting to comply, Taylor grabbed Mr. Rohrer, told him he was under arrest for resisting an officer, and, with Brooks, forced Mr. Rohrer against the patrol car.").

That Plaintiff was arrested for "willfully and unlawfully resist, delay or obstruct" a police officer pursuant to N.C. Gen. Stat. Ann. § 14-223(a) is further substantiated via the body-camera

footage ("BWC") from the officers: Defendant Brooks requested Mr. Rohrer's identification, which Plaintiff refused to provided; rather, he affirmatively stated "You can't ask for my I.D." (BWC Part One at 14:54). In response to his refusals, Brooks provided that "You can give me your I.D. or you can go to jail for R.D.O." (BWC Part One at 15:05-15:30). Given Plaintiff's continued non-compliance with her directives and refusal to provide identification, Brooks requested a Sergeant. (BWC Part One at 16:15).

Thereafter, Defendant Taylor arrived at the scene. Upon his arrival, Plaintiff continued to argue with both Defendants Brooks and Taylor. (BWC Part One at 16:59). Defendant Taylor attempted to explain to Plaintiff that "if you continue to argue with officers, you are going to go to jail." (BWC Part One at 18:05). During this portion of the interaction, both officers continue to request Plaintiff's identification. (BWC Part One at 18:29). Plaintiff takes out his veteran identification card, and Defendant Taylor clarifies his request, stating that he requires the Plaintiff's state identification. (BWC Part One at 19:12; 31:38). Plaintiff refuses to provide his state identification, at which point Defendant Taylor places the Plaintiff under arrest. (BWC Part One at 19:20; 31:45).

In analyzing the officers' actions, "***the issue is not whether probable cause actually exists but whether a reasonable officer in the officer's position would have believed he had probable cause to arrest***." *Sowers v. City of Charlotte*, 659 F. App'x 738, 740 (4th Cir. 2016) (emphasis added) (citing *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998)). Courts consider all of the circumstances known to the officer at the time to determine whether probable cause existed. *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996). The arresting officer's belief need not be correct or even more likely true than false, so long as it is reasonable. *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

Here, Defendants Taylor and Brooks detained Plaintiff pursuant to N.C. Gen. Stat. § 14-223 by refusing to follow multiple commands. Pursuant to N.C. Gen. Stat. § 14-223, "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 14-223 (2019). It is irrelevant whether an officer makes a mistake of fact or law in determining that an offense has been committed. The Fourth Amendment requires only that an officer act reasonably, not perfectly, and that an officer has "fair leeway" in enforcing the law even if the officer is mistaken as to the facts or mistaken as to the law. *See Heien v. North Carolina*, 574 U.S. 54, 60-61, 135 S. Ct. 530, 536 (2014). As qualified immunity turns entirely on objective reasonableness, an officer's subjective intent or state of mind is not relevant to the analysis. *Park v. Shiflett*, 250 F.3d 843, 853 (4th Cir. 2001).

Based upon the allegations in the Complaint as well as what is demonstrated in the BWC, it cannot be said that Plaintiff's arrest pursuant to N.C. Gen. Stat. § 14-223 lacked probable cause. When the officers arrived and attempted to assess the situation, Plaintiff refused to comply with the directions from both Officers Brooks and Taylor.[1] Despite multiple commands by both Brooks and Taylor, Plaintiff steadfastly refused to cooperate. Given that they were in the middle of a street median and Plaintiff's confrontational behavior, this information could lead a reasonable officer to conclude that Plaintiff was impeding or delaying the officers, in violation of the statute. *See e.g., Sowers*, 659 F. App'x at 741.

---

[1] Plaintiff's bald assertion within his memorandum that "Brooks and Taylor violated clearly established law in arresting Rohrer under blatantly unconstitutional ordinances," DE 19 at pg. 7, is not only directly refuted by the record, but is the archetypal example of such "unwarranted inferences, unreasonable conclusions, or arguments" that courts need not accept as true for purposes of their analyses on a motion to dismiss. *See Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019).

Despite Plaintiff's arguments to the contrary, he did not have a right to refuse Officers' instructions during this encounter. Refusing to follow the lawful directions of Officers Brooks and Taylor constitute willful and unlawful resistance against a police officer pursuant to N.C. Gen. Stat. Ann. § 14-223(a), to which Plaintiff directly references within his Complaint. State case law demonstrates resistance to such instructions from police officers can lead to charges under to N.C. Gen. Stat. § 14-223. *See generally State v. Steele*, 858 S.E.2d 325, 277 N.C. App. 124 (2021). *State v. Eagle*, 879 S.E.2d 377 (N.C. App. 2022); *see also State v. Hoque*, 269 N.C. App. 347, 349-50, 837 S.E.2d 464, 468-69 (2020) (In which the Court held that a violation of N.C. Gen. Stat. § 14-223 occurred when officers approached a defendant in his improperly stopped vehicle, but the defendant wouldn't roll down his window, refused to speak with them, and acted uncooperatively). Accordingly, as Officers Brooks and Taylor possessed probable cause to arrest Plaintiff pursuant to N.C. Gen. Stat. Ann. § 14-223(a), it cannot be said they violated his First Amendment rights in doing so.

ii. **Pursuant to the binding precedent set by *Sharpe v. Winterville Police Dept*., 59 F.4th 674 (2023), the claims against Defendant Brooks and Taylor for violating Plaintiff's First Amendment rights fail.**

Even assuming *arguendo* that Plaintiff's arrest at the hands of Defendants Brooks and Taylor was because of the City's alleged "anti-panhandling" ordinance, Plaintiff fails to establish that he had a clearly established right for purposes of qualified immunity. A right can be clearly established either by cases of controlling authority in this jurisdiction or by a consensus of persuasive authority from other jurisdictions. *See Owens ex rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004). However – whether inadvertently or by choice – Plaintiff fails to cite to *Sharpe v. Winterville Police Dept*., 59 F.4th 674 (2023), which is not only binding precedent upon this Court,

but also directly undercuts Plaintiff's claims against Defendants Brooks and Taylor regarding the alleged First Amendment violations.

With regards to the doctrine of qualified immunity, the Fourth Circuit within *Sharpe*, explicitly provided the following:

> Plaintiffs seeking redress under § 1983 for a violation of their constitutional rights must walk through a narrow gate. The doctrines of qualified immunity and *Monell* liability for local governments substantially diminish their chances. Both doctrines are controversial. They have been criticized for being atextual, ahistorical, and driven by policy considerations. ***But they are also binding***.

*Sharpe*, 59 F.4th at 684 (emphasis added). While Plaintiff may take issue with the current standing of the doctrine of qualified immunity, that doctrine, as it stands in *Sharpe*, is binding upon this Court and this matter. Review of the criteria set forth within the *Sharpe* case leave no doubt that the operative facts of this case should lead to dismissal of Plaintiff's First Amendment claims against Defendants Brooks and Taylor.

As clearly provided by the *Sharpe* Court, when a government official is sued in their individual capacity, qualified immunity protects them "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharpe*, 59 F.4th at 682 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). To determine whether qualified immunity applies, a Court must ask "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *See id. (*citing *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010).[2]

---

[2] Plaintiff, within his memorandum in opposition, provides that "As an initial matter, Defendants make no serious attempt at this stage to dispute the first prong of the qualified immunity analysis—that Gastonia's ordinances violate the First Amendment. Indeed, the City has not moved to dismiss Count I." DE 19 at pg. 13-14. This commentary should be ignored for two reasons: 1) whether or not the City's ordinances in question violate the First Amendment has no bearing on qualified immunity for Defendants Brooks and Taylor, as the Court is to review the officer's conduct. *See Sharpe*, 59 F.4th at 682; and 2) the page-limit for briefs pursuant to local rule 7.1(e) limited Defendants' ability to make any additional arguments Defendants may have regarding Plaintiff's additional claims. Nothing more

Based upon Plaintiff's own allegations, it cannot be said a constitutional violation occurred as a result of the officers' arrest of Plaintiff pursuant to N.C. Gen. Stat. § 14-223 given the existence of probable cause at the time of the arrest. *See* the facts and arguments set for in Section I(a)(i), *supra*. Furthermore, *Sharpe* provided that the constitutional right in question must be clearly established by cases of controlling authority in this jurisdiction or by a consensus of persuasive authority from other jurisdictions such that the sources put "the statutory or constitutional question **beyond debate**." *See Sharpe*, 59 F.4th at 683 (emphasis added). While this standard does not require "a case directly on point," the right's contours must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018)). On this point, courts have stated that if judges "disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999); *see also Harris v. Young*, 718 F.2d 620, 625 (4th Cir. 1983) ("[t]he official cannot be expected to predict the future course of constitutional law").

The Plaintiff has failed to provide the requisite controlling or persuasive authority that establishes "beyond debate" any constitutional right upon which he relies within his complaint. As was the case in *Sharpe,* the cases to which Plaintiff cites in his opposition, offer "no concrete direction to the reasonable officer tasked with . . . the situation [Officers Brooks and Taylor] confronted." *Sharpe*, 59 F.4th at 683. They do not clearly establish the specific right at issue. *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)). As such, even if the Court finds that there is evidence of a constitutional violation, dismissal is proper

---

should be inferred by what arguments were included and Defendants explicitly reserve the rights to make additional or subsequent dispositive motions regarding any remaining claims against them in this matter.

because the there is no law in support of the contention that the rights allegedly violated were "clearly established".

The Fourth Circuit's decision in *Sharpe* is particularly difficult to square with Plaintiff's arguments against qualified immunity as the case deals with a near-identical situation to our own (i.e., where an officer is seeking qualified immunity for an alleged violation of an individual's First Amendment rights). *Sharpe* involved police enforcement of an alleged town policy that prohibited livestreaming interactions with law enforcement and a passenger's livestreaming of a police officers' traffic stop of his vehicle. *Sharpe*, 59 F.4th at 683. Despite finding that the plaintiff sufficiently alleged that the policy restricted protected speech, the *Sharpe* Court determined that there was no such "clearly established" right for purposes of qualified immunity analysis. *See id.* Likewise, as was amply demonstrated within Defendants' initial brief in support of their motion, there is no controlling precedent within this Circuit nor any consensus of persuasive authority from other Circuits that serve to establish that Defendants Brooks or Taylor's actions were in violation of any clearly established right.[3]

### b. Defendants Taylor and Brooks did not violate Plaintiff's Fourth Amendment Rights.

#### i. Given Plaintiff's active resistance, as evidenced by the BWC, it cannot be said that the officers utilized excessive force.

While Plaintiff does cite to *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) within his memorandum, he gives short shrift to *Graham*'s controlling factors, instead focusing his argument upon the faulty premise that Defendants "rely on their own version of the facts, defying the well-known standard for reviewing the sufficiency of a complaint." *See* D.E. 19 at pg. 17-18. Attempting to have his cake and eat it too, the Plaintiff readily cites to the

---

[3] Defendants rely upon and incorporate by reference the arguments and law cited within their original brief in support of their Motion.

BWC footage throughout his complaint in alleged support of his allegations but protests the fact that Defendants may utilize that same footage in support of their motion to dismiss. In no way are Defendants' arguments "premised on [ ] factual distortions . . . which must be disregarded at the motion-to-dismiss stage." *See* DE 19 at pg. 12. Defendants ask the Court to rely upon the BWC footage, rather than upon the Plaintiff's flowery description of the Plaintiff during the incident. Indeed, a court is "not required to accept factual allegations that are 'blatantly contradicted'" by such evidence; rather, it is to view, "the facts in the light depicted by the videotape." *See Buehler v. Dear*, 27 F. 4th 969, 979-980 (5th Cir. 2022).

Given what is captured on the BWC, the inevitable conclusion is that the officers' actions were reasonable in light of *Graham*. Significantly, the Fourth Circuit has further elaborated that "reasonableness" meant the "standard of reasonableness at the moment," and that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Greenidge v. Ruffin*, 927 F.2d 789, 791-792, (4th Cir. 1991). To be sure, in a near-analogous situation to our own, the Fourth Circuit found police officers handcuffing an individual and pulling her into a police vehicle were reasonable "minimal" force where the officer confronted a tense crowd, plaintiff was yelling and disobeying the officer, and the officer reasonably perceived physical resistance. *See Brown v. Gilmore*, 278 F.3d 362, 369-70 (4th Cir. 2002).[4]

The BWC clearly demonstrates continued physical and verbal resistance on the part of Plaintiff as the Defendants attempt to affect the Plaintiff's arrest: The body-worn camera footage

---

[4] Incredibly, within footnote 7 of his memorandum, Plaintiff cites to and summarizes the case's holding as Defendants have above while, at the same time, he contends that the case somehow does not apply as precedent with regards to the use of force utilized in our situation.

shows that Plaintiff did not respond to the Officers' verbal orders (BWC Part One at 14:54); that Plaintiff struggled against the Officers and resisted until he was handcuffed (BWC Part One at 19:26); that no force was used on Plaintiff after he was restrained and that pressure was not applied to Plaintiff's back for a prolonged period of time and only in response to his active resistance (BWC Part One at 20:50); and that Plaintiff was placed in a seated position on the ground almost as soon after he was handcuffed and detained (BWC Part One at 21:11). Plaintiff, at no time, indicated any voluntary compliance with the arrest. It took two officers in order to restrain him and place him in handcuffs. In order to do so, the Officers used verbal commands and their hands. Defendant Brooks and the Plaintiff went to the ground, but only after Plaintiff attempted to escape from Defendant Brooks' hold in further resistance.

Plaintiff, attempting to circumvent dismissal, couches his behavior as captured on the BWC as "neither actively resisting arrest nor attempting to flee." *See* DE 19 at pg. 13. Even a cursory review of the BWC, as summarized above, reveals this is an inaccurate description of the incident. Moreover, "[a]s the Supreme Court has made clear, this subjective clash of beliefs is not one that we need to resolve." *Brown v. Gilmore*, 278 F.3d 362, 369-70 (4th Cir. 2002). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001). It is clear from the BWC that the officers, whether mistaken or not, were reasonable in their belief that the Plaintiff was actively resisting, thereby warranting the force utilized.

Beyond our own circuit, persuasive precedent also points towards the reasonableness of the officers' conduct. An officer's use of his hands, body, and patrol car in order to secure plaintiff did not constitute excessive force under the Fourth Amendment as the officer's use of force was

objectively reasonable where plaintiff was resisting arrest. *Carpenter v. Gage,* 686 F.3d 644, 649-50 (8th Cir. 2012); *see also Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017); *Buehler*, 27 F. 4th at 988-989. As indicated from the BWC and relevant caselaw, the officers' actions fell within the range of reasonable judgment afforded to police officers in furtherance of their duties and authority. Accordingly, Plaintiff's allegations do not support a cause of action for excessive force.

### ii. Defendant Taylor did not "unreasonably seize" the Plaintiff's service animal.

Plaintiff's argument that Officer Taylor is not entitled to qualified immunity for the alleged unreasonable seizure of Plaintiff's service animal rely upon the same faulty premises found within his arguments regarding the alleged excessive force claims. In his opposition, Plaintiff provides that nothing in the BWC footage "blatantly contradicts the allegation within his Complaint that[Plaintiff's service animal] was nonaggressive throughout the encounter and did not bite Defendant Taylor or anyone else." DE 19 at pg. 15. Review of the BWC as it pertains to Defendant Taylor's interactions with Plaintiff's service animal, as summarized below, reveals that Plaintiff's allegations within his Complaint provide an inaccurate description of the incident that the Court should disregard. Instead, the Court should consider, "the facts in the light depicted by the videotape." *Buehler*, 27 F. 4th at 979-980.

The fact remains that the BWC provides evidence that, as Defendants attempt to affect the arrest by leaning Plaintiff against the hood of Defendant Brooks' patrol vehicle, Plaintiff's unrestrained service animal bites Taylor's boot, which is blatantly contradictory to Plaintiff's painting of the incident. First, the bite is evidenced in real-time by Taylor's cry in response thereto. (BWC Part One at 31:58). Taylor then pulls out his taser and instructs Plaintiff multiple times to "call your dog off." (BWC Part One at 32:00). Perhaps most fatal to Plaintiff's allegations is the

very fact that Defendant Taylor exclaims that "[H]e bit me" in reference to Plaintiff's service animal. (BWC Part One at 32:10). Plaintiff's service animal, thereafter, jumps up onto the hood of Defendant Brooks' vehicle and back down towards Defendant Brooks, at which point he barks. (BWC Part One at 32:14-:18). It is only at that point – after the service animal bit him, he exclaimed as much, and ordered Plaintiff to call his dog off multiple times –that Defendant Taylor was forced to deploy his taser against Plaintiff's service animal. (BWC Part One at 32:55). Later on, following the event, another officer is able to point at the spot on Defendant Taylor's boot where Plaintiff's service animal bit him without any prompting. (BWC Part One at 38:18). As Defendant Taylor explains in the video, after it bit him, he was concerned that Plaintiff's service animal would bite Defendant Brooks. (BWC Part One at 38:18).

Given the evidence within the police body camera footage, it is clear that Defendant Taylor's actions were reasonable in light of relevant case law. *See Altman v. City of High Point*, 330 F.3d 194 (4th Cir. 2003); *see also Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020). As the Court in *Altman* provided:

> When a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal and preventing the evils mentioned above waxes dramatically, while the private interest correspondingly wanes. Put simply, while we do not denigrate the possessory interest a dog owner has in his pet, we do conclude that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance.

*Altman*, 330 F.3d at 205–06. Perhaps sensing this, Plaintiff attempts to downplay the holdings of these cases and proceeds to assert that while "Taylor may ultimately argue that he reasonably perceived [Plaintiff's service animal] as a threat," the Court cannot accept such arguments for purposes of Defendants' motion to dismiss. DE 19 at pg. 16. This contention is flawed for at least two reasons.

First, given that the BWC makes clear that Taylor did perceive Plaintiff's service animal as a threat to himself and Officer Brooks, the Court may rely upon that fact in review of Defendants' motion. *See Buehler*, 27 F. 4th at 979-980. Secondly, while Plaintiff strenuously disagrees with Taylor's assessment, "the Supreme Court has made clear, this subjective clash of beliefs is not one that [courts] need to resolve." *Gilmore*, 278 F.3d at 369-70. "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001). Whether mistaken or not, as evidenced by the BWC, Defendant Taylor perceived Plaintiff's service animal as a threat to himself and Defendant Brooks. Accordingly, his use of non-deadly force against Plaintiff's service animal cannot constitute an unreasonable seizure thereof.

II.    **Plaintiff has failed to state proper claims against the City pursuant to *Monell*.**

Plaintiff, in his memorandum, argues that he has valid First and Fourth Amendment claims against the City pursuant to the *Monell* Doctrine. *See* DE at pg. 19- 23. To that end, Plaintiff attempts to downplay the Fourth Circuit's recent holding in *Franklin v. City of Charlotte*, 64 F.4th 519, 536 (4th Cir. 2023) "as the complaint alleges not only that the City ratified Brooks's [sic] and Taylor's conduct, but also that the officers acted pursuant to an official policy that caused the constitutional violations." *See* DE at pg. 19. Plaintiff asserts that, given the City's policy to that end, its references to *Franklin* "are wholly irrelevant." *See* DE at pg. 19. *Franklin*, however, is far from irrelevant to the Court's analysis presently, as it directly undercuts Plaintiff's allegations that the City ratified Brooks' and Taylor's conduct, DE 1 at ¶¶ 191, 198, and that such "ratification of the acts of subordinates accords with the purpose of municipal liability under Section 1983." DE

1 at ¶ 191.  Accordingly, this basis for municipal liability – upon which the Plaintiff explicitly relies – is improper and should be dismissed.

Second, Plaintiff has failed to demonstrate within his complaint or his opposition that the incidents in which the Plaintiff was involved were done pursuant to some official or *de facto* policy by the City.   Again, evidence of a custom or practice must establish a "widespread extent of the practices, general knowledge of their existence, or manifest opportunities and official duty of responsible policymakers to be informed."   *Spell*, 824 F.2d at 1391.   A practice must be demonstrated and that practice must be "widespread, pervasive, and so permanent and well settled as to constitute a custom or usage with the force of law." *Greensboro Fire Fighters v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995).

Despite the contentions within his opposition, Plaintiff still has not met the burden of proof for his *Monell* claims against the City.  Simply put, there are no allegations within Plaintiff's complaint with regard to an unconstitutional official policy which promotes either excessive force, unreasonable seizure or retaliation in response to constitutionally protected speech and petitioning on the part of the City, its officials or employees in violation of Plaintiff's "particular constitutional or statutory right[s]". *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Plaintiff, in his opposition, fails to cure this shortcoming, instead reemphasizing the various scattershot allegations within his complaint allegedly related to "Gastonia's longstanding policy, practice, or custom of mistreatment of people experiencing homelessness." DE 1 a ¶¶ 2, 157-75, 232.

Plaintiff asserts that "[t]hese allegations collectively support the inference that Defendants' Fourth Amendment violation were undertaken pursuant to a City policy to drive out the Gastonia homeless population, including by force." *See* DE 19 at pg. 20.  However, this "inference" – as

Plaintiff phrases it – does not satisfy the standards required to impute liability upon on municipality. *See generally Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999). To be sure, "a Plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation ***of a particular constitutional or statutory right*** will follow that decision." *Id.* at 218 (emphasis added). The Fourth Circuit, within its decision in *Carter*, explained that the requirement of a close fit between the unconstitutional policy alleged and the constitutional violation alleged serves three distinct purposes:

> First, it helps to ensure that a municipality has made "a deliberate choice to follow a course of action . . . from among various alternatives." Second, it assures that this choice was in fact the "moving force" behind a deprivation of federal rights. ***A careful examination of this "affirmative link" is essential to avoid imposing liability on municipal decisionmakers in the absence of fault and causation.*** Third, by requiring litigants to identify the offending municipal policy with precision, ***courts can prevent trials from straying off into collateral accusations of marginally related incidents***. ***Section 1983 does not grant courts a roving commission to root out and correct whatever municipal transgressions they might discover—our role is to decide concrete cases***. ***Unfocused evidence of unrelated constitutional violations is simply not relevant to the question of whether a municipal decisionmaker caused the violation of the specific federal rights of the plaintiff before the court***. Permitting plaintiffs to splatter-paint a picture of scattered violations also squanders scarce judicial and municipal time and resources. As a practical matter, a case involving inquiries into various loosely related incidents can be an unruly one to try.

*Id*. at 218-19. That "[t]he complaint describes a longstanding campaign by the City to drive homeless people out of Gastonia . . . [which] originated in the 1980s and was uncovered in a 1990 federal investigation," is an archetypal example of Plaintiff attempting to "splatter-paint a picture of scattered violations," that would necessarily squander, "scarce judicial and municipal time and resources." *Id.* at 219. In the words of the *Carter* Court, there is simply no "affirmative link" between what is alleged in Plaintiff's complaint and the *Monell* violations he has asserted against the City of Gastonia. Accordingly, Plaintiff has failed to allege actionable claims against the City pursuant to *Monell*.

**III.** ***Cummings v. Premier Rehab Keller*, *P.L.L.C.* does apply to Plaintiff's Disability Discrimination Claims**

As a preliminary matter, the Plaintiff in his opposition readily concedes the point that "any emotional distress damages or related medical expenses sought" by Plaintiff through the Rehabilitation Act are barred by *Cummings v. Premier Rehab Keller*, *P.L.L.C.,* 142 S.Ct. 1562, 212 L.Ed.2d 552 (2022). *See* DE 19 at pg. 23. Nevertheless, Plaintiff requests three circumscriptions to this limitation, to which Defendants now respond: 1) Counts IV-VII will proceed due to the Plaintiff's "physical pain and suffering" and "loss of his service animal;" 2) the exclusion of emotional distress damages "should not extend to damages for the exacerbation of Plaintiff's disability, which in his case is a severe psychiatric illness;" and 3) *Cummings* does not limit Plaintiff's ADA claims.

First, damages regarding the "loss of his service animal" are barred by the *Cummings* decision as related medical expenses. While the term "service animal" is not defined by the FHA or the accompanying regulations, it is understood for purposes of the Americans with Disabilities Act of 1990 ("ADA") to include "any guide dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability." *See Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1256 (D. Haw. 2003), *aff'd sub nom. Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006). Persuasively, IRS Publication 502 makes clear that service dog expenses are tax deductible medical expense.

Accordingly, damages Plaintiff seeks to recover for "loss of a service animal" are merely "proxies for impermissible emotional distress damages," properly precluded as a result of the *Cummings* decision. *Fairfax Cnty. Sch. Bd.*, 2023 WL 424265, at *6; *see also A.T. v. Oley Valley Sch. Dist.*, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023) (In light of *Cummings*, the Plaintiff

was precluded from bringing "claims for compensatory emotional distress damages brought under Title IX," including, "Plaintiffs' claims for past, present and future medical expenses based on emotional distress such as bipolar disorder, anxiety, humiliation, embarrassment, frustration and alcohol and drug addiction and past, present and future emotional pain and suffering/mental distress."). Accordingly, the Court should dismiss any claims for medical expenses Plaintiff seeks as they are related to his emotional distress claims, including damages related to the loss of Plaintiff's service animal.

As to his second argument, Plaintiff's unconvincing attempt to rebrand their request for damages for "exacerbation of psychological injuries" and as something other than emotional damages in the wake of the *Cummings* decision has been tried before. *See Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, No. 3:20-CV-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023). The *Pennington* Court succinctly dismissed this line of argument as follows:

> Whether it is labeled like Plaintiffs in the instant case or labeled as "humiliation, frustration, and emotional distress," like in *Cummings*, it's all the same concept. The labels are all variations of the same principal [sic] that the defendant's actions caused the plaintiff a "highly unpleasant mental reaction"—i.e., emotional distress. Emotional Distress, BLACK'S LAW DICTIONARY (11th ed. 2019). See also RESTATEMENT (SECOND) OF TORTS § 46 cmt. j ("Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea."). Additionally, Plaintiffs did not provide citations to any legal authority to support their suggestion that damages for severe emotional responses and diagnosable psychiatric conditions, as opposed to simple "humiliation" or "frustration," are recoverable. . . . and the Court has no reason to believe that is true when the Supreme Court in *Cummings* did not distinguish between degrees of emotional distress.

*Id*. (citations omitted). As was the case in *Peddington*, Plaintiff here has citied to no case that disturbs the *Cummings* decision so as to support their contention that the exclusion of emotional

distress damages pursuant to *Cummings* should not extend to damages for the exacerbation of Plaintiff's psychological injuries.

Plaintiff's reliance on *Barnes* for the propositions that "[i]f Rohrer had a physical disability that required him to use a wheelchair and Defendants removed his wheelchair, causing him to fall and worsening his disability, there would be no question he would be entitled to compensatory damages to remedy the harm," and, "[t]here is no difference simply because Rohrer's disability is psychiatric, and he should be entitled to seek damages for the exacerbation of his disability" willfully ignores the rationale in *Cummings*. Relying upon the precedent set by *Barnes* that requires that a type of damages be generally available in breach of contract suits for that type to also be available under Spending Clause statutes, *see Barnes*, 536 U.S. at 187-88, the *Cummings* Court determined that, because emotional distress damages only result from breach of "highly unusual contracts, which do not fit into the core of contract law . . . emotional distress damages are unavailable in private suits to enforce the ACA and RA. *Cummings*, 142 S. Ct. at 1576. It is impossible to square this holding with Plaintiff's assertion that physical and emotional damages are a distinction without a difference.

The Plaintiff's last argument (i.e., that *Cummings* should not limit his ADA claims) flies in the face of the explicit language within the ADA itself as well as binding Supreme Court precedent. As previously mentioned, the ADA expressly incorporates the remedies set forth in the Rehabilitation Act, providing that "[t]he remedies, procedures, and rights set forth in [§ 505(a)(2) of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133. In the face of this language, Plaintiff strains credulity to the breaking point by asserting that "[t]here is no reason to think Congress in 1990 would have anticipated, much less intended, that a novel contract-based

limitation on Rehabilitation Act damages would subsequently curtail emotional distress damages under the ADA." DE 19 at pg. 25.

Congress made clear via statutory language that the remedies under the ADA would be the same as within the RA. The fact that the ADA was not enacted pursuant to the Spending Clause does not alter the result, as "the Supreme Court has previously rejected the theory that the ADA should be interpreted differently from the Rehabilitation Act and Title VI . . . because of this distinction." *Montgomery v. District of Columbia*, No. CV 18-1928 (JDB), 2022 WL 1618741, at *15 (D.D.C. May 23, 2022). "[I]f a certain category of damages is not available under [the Rehabilitation Act], it is not available under Title II either." *Id.* at *24. Per the Supreme Court, while it is not Spending Clause legislation, "the ADA's status as a 'non Spending Clause' tort statute" was "quite irrelevant" because "[t]he ADA could not be clearer that the 'remedies, procedures, and rights . . . this subchapter provides' for violations of § 202 are the same as the 'remedies, procedures, and rights set forth in' § 505(a)(2) of the Rehabilitation Act, which is Spending Clause legislation." *Barne v. Gorman*, 536 U.S. 181, 189 (2002). Accordingly, any and all limitations set forth within the *Cummings* decision relate to and limit Plaintiff's claims under Title II of the ADA.

## <u>CONCLUSION</u>

Plaintiff, in his memorandum, has failed to demonstrate a factual or legal basis to prevent dismissal at this stage as requested by Defendants in their motion. Accordingly, for the aforementioned reasons, as well as the facts and arguments provided within the Defendants' initial memorandum in support thereof, Defendants' partial motion to dismiss Plaintiff's complaint should be **GRANTED**.

This the 1st day of November, 2023.

**CRANFILL SUMNER LLP**

BY:     */s/ John P. Wright*
        John P. Wright, State Bar #55109
        Patrick H. Flanagan, State Bar #17407
        *Attorney for Defendants City of Gastonia,*
        *Maurice Taylor III, and Cierra Brooks*
        Post Office Box 30787
        Charlotte, North Carolina 28230
        Telephone: (704) 332-8300
        Facsimile: (704) 332-9994
        jwright@cshlaw.com
        phf@cshlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I served the foregoing **DEFENDANTS CITY OF GASTONIA, CIERRA BROOKS AND MAURICE TAYLOR III'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' PARTIAL MOTION TO DISMISS,** with the Clerk of Court using the CM/ECF system and served the same on all of the parties to this cause by depositing a copy hereof, postage prepaid, in the United States Mail, addressed as follows:

| | |
|---|---|
| David G. Guidry<br>Guidry Law Firm<br>338 S. Sharon Amity Road, #337<br>Charlotte, NC 28211<br>917-376-6098<br>david@guidrylawfirm.com<br>*Attorney for Plaintiff* | Shelby Calambokidis<br>Elizabeth R. Cruikshank<br>Amy Marshak<br>Joseph W. Mead<br>Seth Wayne<br>Institute for Constitutional Advocacy and Protection<br>Georgetown University Law Center<br>600 New Jersey Avenue, N.W.<br>Washington, DC 20001<br>202-661-6728<br>jm3468@georgetown.edu<br>erc56@georgetown.edu |
| Sean F. Perrin<br>Womble Bond Dickinson LLP<br>301 S. College Street, Ste. 3500<br>Charlotte, North Carolina 28202<br>Telephone: 704-331-4992<br>Facsimile: 704-338-7814<br>Sean.Perrin@wbd-us.com<br>*Attorney for Rick Goodale* | |

This the 1ˢᵗ day of November, 2023.

CRANFILL SUMNER LLP

BY:     */s/ John P. Wright*
            John P. Wright, State Bar #55109
            Patrick H. Flanagan, State Bar #17407
            *Attorney for Defendants City of Gastonia,*
            *Maurice Taylor III, and Cierra Brooks*
            Post Office Box 30787
            Charlotte, North Carolina 28230
            Telephone: (704) 332-8300
            Facsimile: (704) 332-9994
            jwright@cshlaw.com
            phf@cshlaw.com