# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:23-CV-00396-RJC-SCR

| | |
|---|---|
| JOSHUA G. ROHRER, | |
| **Plaintiffs,** | |
| v. | **MEMORANDUM AND RECOMMENDATION AND ORDER** |
| CITY OF GASTONIA, RICK GOODALE, CIERRA BROOKS J. DOE, MAURICE TAYLOR III, | |
| **Defendants.** | |

**THIS MATTER** is before the Court on Defendants' Partial Motion to Dismiss (Doc. No. 15) and Defendants' Motion to Strike Portions of Plaintiff's Notice of Supplemental Authority (Doc. No. 23).

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1), and the Motions are now ripe for the Court's consideration.

For the reasons set forth below, the undersigned respectfully recommends that Defendants' Partial Motion to Dismiss be <u>granted in part</u> and <u>denied in part</u>. Further, Defendants' Motion to Strike is <u>denied as moot</u>.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedural Background

Plaintiff filed this action on June 30, 2023.  (Compl., Doc. No. 1).  Plaintiff's Complaint brings claims against (1) the City of Gastonia (the "City") (Doc. No. 1 ¶ 5); (2) Cierra Brooks ("Brooks"), a police officer with the Gastonia Police Department, in her individual capacity only

(Id. ¶ 6); (3) Maurice Taylor III ("Taylor"), a former police officer with the Gastonia Police Department, in his individual capacity only (Id. ¶ 7); (4) Rick Goodale ("Goodale"), an employee of the Gastonia Police Department who, upon information and belief, administered the Department's official Facebook page since August 2021, in his individual and official capacities (Id. ¶ 8); and (5) J. Doe ("Doe"), an employee or employees of the Gastonia Police Department who, upon information and belief, "posts or authorizes posting of statements on behalf of the Department under color of law," in Doe's individual and official capacities (Id. ¶ 9).

Plaintiff's Complaint brings ten claims against these Defendants as follows: Count I – claim under 42 U.S.C. § 1983 for Violation of Free Speech against the City, Brooks, and Taylor (Id. ¶¶ 176-184); Count II – claim under 42 U.S.C. § 1983 for Excessive Force against the City, Brooks, and Taylor (Id. ¶¶ 185-191); Count III – claim under 42 U.S.C. § 1983 for Unreasonable Seizure against the City and Taylor (Id. ¶¶ 192-198); Count IV – Failure to Accommodate under the Americans with Disabilities Act ("ADA") against the City (Id. ¶¶ 199-219); Count V – Failure to Accommodate under the ADA against the City (Id.); Count VI – Disability Based Discrimination under the ADA against the City (Id. ¶¶ 220-228); Count VII – Disability Based Discrimination under the ADA against the City (Id.); Count VIII – claim under 42 U.S.C. § 1983 for Retaliation for Protected Speech and Petitioning against the City, Goodale, and Doe (Id. ¶¶ 229-233); Count IX – Defamation against the City, Goodale, and Doe (Id. ¶¶ 234-241); and Count X – Intentional Infliction of Emotional Distress against the City, Goodale, and Doe (Id. ¶¶ 242-245).

The City, Brooks, and Taylor filed the Partial Motion to Dismiss, requesting that the Court dismiss: (a) Plaintiff's 42 U.S.C. § 1983 against Brooks and Taylor in their individual capacities for Violation of Free Speech (Count I), Excessive Force (Count II), and Unreasonable Seizure

against Taylor (Count III), arguing they are entitled to qualified immunity; (b) Plaintiff's claims under 42 U.S.C. § 1983 against the City for Excessive Force (Count II), Unreasonable Seizure (Count III), and Retaliation for Protected Speech and Petitioning (Count VIII), arguing the Complaint fails to plead a sufficient policy or custom causing the alleged constitutional violations; and (c) any request for emotional distress damages on Plaintiff's ADA claims, arguing they are not recoverable under the statute (Counts IV-VII). (Doc. No. 15 at 1). The Motion has been fully briefed and is now ripe for disposition.

## B. Factual Background

The Court accepts the facts in Plaintiff's Complaint as true for the purposes of considering Defendants' Partial Motion to Dismiss.

### 1. Plaintiff and His Service Dog

Plaintiff is a disabled veteran who has post-traumatic stress disorder ("PTSD"), depression, anxiety, a panic attack disorder, and a hiatal hernia. (Doc. No. 1 ¶¶ 1, 4, 13-15). The U.S. Department of Veterans Affairs ("VA") prescribed Plaintiff a service dog to remain with him at all times to help him manage these conditions. Id. ¶¶ 16, 18-19.

In October 2021, Plaintiff was homeless and living in Gastonia, North Carolina. Id. ¶ 1. Plaintiff's service dog, which he had for almost three years, was Sunshine. Id. ¶¶ 4, 17-19. Sunshine wore a vest indicating that she was a service animal and that she should not be separated from Plaintiff. Id. ¶ 21.

Plaintiff could not work due to his disabilities, but spent time walking around the City with Sunshine and interacting with members of the Gastonia community, including sometimes standing or walking in medians of streets and smiling and waving at drivers. Id. ¶¶ 22-24. Community members on occasion would bring Plaintiff or Sunshine food, water, or money, but Plaintiff did

not ask for money or any other donation during these interactions.  Id. ¶ 23.  Nor did Plaintiff

obstruct traffic or cause any problems.  Id. ¶¶ 24-25.  However, Plaintiff alleges police officers

with the Gastonia Police Department were abusive and cruel to Plaintiff, "viewing him as a

problem, an eyesore, or a blemish on the community, and they routinely harassed and mistreated

him," including during an interaction with Taylor days before the encounter at issue in this action.

Id. ¶¶ 25-32.

### 2. October 13, 2021 Arrest

On October 13, 2021, an anonymous caller contacted 911, reporting that "one or more

people were standing at intersections 'using dog[s] to make people feel sorry for them to give them

money.'"  Id. ¶ 33.  Within minutes of the call, Brooks approached Plaintiff about the call.  Id. ¶

35.  Brooks saw Plaintiff accept a donation from a passing vehicle and wrote him up for violating

the City's anti-panhandling ordinances.  Id. ¶ 36.  Plaintiff disagreed with Brooks' characterization,

arguing he had not solicited donations from anyone, and that someone offered a donation to him

without Plaintiff asking.  Id. ¶ 37.  Brooks called in Taylor who arrived on the scene and told

Plaintiff "if he continued to insist that he did nothing wrong, Taylor would separate [Plaintiff] and

Sunshine and give Sunshine to animal control."  Id. ¶ 39.  Taylor made this threat despite his

knowledge that Plaintiff was a disabled veteran, with severe PTSD, and that he needed his service

dog to function.  Id.

Brooks and Taylor demanded that Plaintiff provide his identification, but did not specify

any particular identification.  Id. ¶ 40.  Brooks told Plaintiff if he did not "hand over his

identification he would go to jail" for resisting public officer.  Id.  Plaintiff handed the officers his

federal veteran identification card ("veteran ID"), which identified Plaintiff.  Id. ¶ 41.  Brooks and

Taylor "refused to accept [Plaintiff's] valid veteran ID and demanded that [Plaintiff] produce his

state identification ("state ID") instead." Id. ¶ 43. Plaintiff's state ID was expired and did not contain his correct address, which he tried to communicate of the officers. Id. ¶ 44. Plaintiff attempted to comply with the demand for his state ID by opening his wallet, grabbing his state ID, and started to give it to Brooks and Taylor while explaining that it was not currently valid. Id. ¶ 48. After only a few seconds, and while Plaintiff was attempting to comply, Taylor grabbed Plaintiff, told him he was under arrest for resisting an officer, and, with Brooks, forced Plaintiff against the patrol car. Id. ¶ 49. Brooks then took over the arrest, first pressing Plaintiff into the car and then throwing him onto the pavement. Id. ¶ 50. At no point did Plaintiff physically resist Brooks' and Taylor's restraints, but begged witnesses to help. Id. ¶ 51.

During these events, Sunshine stayed close to Plaintiff, but did not interfere with Brooks and Taylor. Id. ¶ 52. Sunshine paced calmly around Plaintiff's feet and then jumped onto the car to be closer to his face, in keeping with her training. Id. According to Plaintiff, Sunshine did not pose a threat, but Taylor drew his taser gun and pointed it at Sunshine. Id. ¶ 53. At that time, Brooks stated that she did not believe Sunshine would bite her. Id. ¶ 54. Then Taylor said for the first time, "He just bit me," despite Sunshine being several feet away and facing away from Taylor. Id. ¶¶ 55-56. Plaintiff contends that Sunshine did not bite Taylor and his statement was false. Id. While Taylor pointed his taser gun at Sunshine, she jumped off the car and began to walk away from Taylor on the median, but Taylor fired his taser at Sunshine and hit her. Id. ¶¶ 57-58. Sunshine, injured and in distress, ran away. Id. ¶ 59. In response, Plaintiff "howled in terror." Id. ¶ 61. Plaintiff screamed for help, but remained compliant. Id. ¶ 62. Brooks continued to hold Plaintiff's face against the pavement and handcuff him; Taylor kneeled on Plaintiff's body. Id. Plaintiff continually stated that he needed his dog, who was his service dog and medical device. Id. ¶¶ 64-66. Brooks and Taylor ignored Plaintiff's requests for Sunshine. Id. ¶ 67.

During the encounter, more than a dozen police cars arrived on the scene, completely blocking lanes and disrupting the flow of traffic. Id. ¶ 68. Plaintiff continued to "weep, sob for help, and beg for Sunshine as the officers milled around." Id. ¶ 69. "People who witnessed the incident were outraged," and disputed the claims made by Brooks and Taylor that Sunshine bit them or that Plaintiff did anything to justify his arrest. Id. ¶¶ 73-79. Sunshine was nonaggressive throughout the encounter, did not bite Taylor or anybody else, and later in the day Taylor said Sunshine was "a very well-trained dog." Id. ¶ 56. Brooks allegedly later claimed Sunshine was about to bite her before Taylor tased the dog, despite Brooks statements during the interaction in real-time that she did not believe Sunshine was going to bite her. Id. ¶ 79.

Plaintiff was transported to the jail and, upon information and belief, was charged with soliciting alms, soliciting from a highway, and two misdemeanor counts of resisting arrest (the "States Charges"). Id. ¶ 80. A state magistrate (the "State Magistrate") set a $3,000 bond with a condition that Plaintiff could not use a bondsperson or support from the community to pay the bond, and instead was required to pay it himself or with funds from immediate family. Id. ¶ 85. The States Charges were dismissed in July 2022.[1] Id. ¶ 87.

When Plaintiff was released from jail, he and members of the community searched for Sunshine. Id. ¶ 90. Sunshine, who prior to the tasing was trained to cross the street safely on her own, ran into traffic and was struck and killed by a vehicle. Id. ¶ 91. Upon learning of Sunshine's death, Plaintiff experienced a severe mental health episode and ran head-on into traffic, attempting to end his life. Id. ¶ 92. Plaintiff also began seeing a therapist twice a week and taking a range of psychiatric medications for depression and suicidality. Id. ¶ 93. Overall, Plaintiff states that he

---

[1] Plaintiff pled guilty to an unrelated charge of driving with a suspended license that occurred on a different day. (Doc. No. 1 ¶ 88).

sustained multiple physical, mental, and emotional injuries as a result of the encounter on October 13, 2021. Id. ¶¶ 70-72.

### 3. Social Media Posts After October 13, 2021

After the October 13, 2021 encounter, and while the State Charges against Plaintiff remained pending, Brooks and the non-party State Magistrate allegedly disparaged Plaintiff on social media and commented publicly on Facebook about the incident and the State Charges. Id. ¶¶ 94-98.

Plaintiff began sharing his experience, attending rallies, giving press interviews, and petitioning for the body-worn camera footage to be released. Id. ¶¶ 99-103. After the body-worn camera footage was ultimately released, Plaintiff shared the footage and his experience on various social media platforms, including YouTube, his personal Facebook page, and in a Facebook group entitled, "Support Joshua Rohrer and Sunshine Rae." Id. ¶¶ 104, 106-107.

In response to Plaintiff's activities and the public support for Plaintiff, Plaintiff maintains the City used the Gastonia Police Department's official Facebook page to "harass, bully, and defame" him. Id. ¶¶ 109-110. The Gastonia Police Department's Facebook page posted hundreds of statements visible to the public that belittled and disparaged Plaintiff and spread false and misleading information about the incident, often in response to comments by visitors to the page. Id. ¶ 111-146; (Doc. No. 1-1). Plaintiff alleges that the City's "campaign of harassment" was a direct response to Plaintiff's First Amendment activities, including petitioning for release of the body-worn camera footage, speaking with the news media, fundraising to help with his expenses, speaking at rallies, and sharing his own Facebook posts about the incident. (Doc. No. 1 ¶¶ 147-150). These statements were allegedly made or approved by Goodale and/or Doe, employees of the City who, upon information and belief, are authorized to speak on behalf of the City and its

Police Department through the Department's official Facebook page.  Id. ¶¶ 112-113.  Below are examples of the types of social media posts Plaintiff maintains are false, misleading, and disparaging:

> **Gastonia Police Department** ✓
> ████████ then perhaps he shouldn't had agreed to the plea deal involving those charges.

> **Gastonia Police Department** ✓
> ████████ r. Actually a crime was committed, TWICE, by Mr. Rohrer on two separate occasions even after repeated warnings, hence why he was arrested and ultimately agreed to a plea deal related to his charges from that event.

> **Gastonia Police Department** ✓
> ████████ 1) that he wasn't commenting a crime: false 2) that he cooperated: false 3) that GPD killed Sunshine: False 4) That the charges were dropped for a lack of merit: False

> **Gastonia Police Department** ✓
> ████████ the NC law he was charged with, the magistrate who set bond, and two grand juries disagree with your assessment on if he was breaking the law or not. He agreed to a plea deal so as to go to veterans treatment court. He could have had his day in court and maybe get found not guilty on all charges, instead he agreed to accept the offer given to him.

> **Gastonia Police Department** ✓
> ████████ the legal system disagrees with your assessment.

(Doc. No. 1 ¶¶ 116-126; Doc. No. 1-1, at 2).

The City, Goodale, and Doe's "campaign of harassment and defamation" have prolonged and exacerbated Plaintiff's emotional distress arising out of the October 13, 2021 incident, and caused him severe emotional distress and psychological injuries.  (Doc. No. 1 ¶ 153).  Plaintiff became unable to sleep for extended periods, and became obsessed with correcting the record and protecting himself and Sunshine.  Id.

## II.    STANDARD OF REVIEW

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. Id. at 678-79. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. at 679; see also Anand v. Ocwen Loan Serv., LLC, 754 F.3d 195, 198 (4th Cir. 2014) (recognizing the court does not accept as true legal conclusions couched as factual allegations). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Although the pleading requirements stated in Rule 8 of the Federal Rules of Civil Procedure mark "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79.

Second, to the extent there are well-pleaded factual allegations, the court assumes their truth and then determines whether they plausibly give rise to an entitlement to relief.  Id. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'– 'that the pleader is entitled to relief,'" and therefore should be dismissed.  Id.  (quoting Fed. R. Civ. P. 8(a)(2)).

The sufficiency of the factual allegations aside, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."  Neitzke v. Williams, 490 U.S. 319, 326 (1989). Indeed, where "it is clear that no relief could be granted under any set of facts that could be prove[n] consistent with the allegations . . . a claim must be dismissed."  Id. at 327 (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

## III.    DISCUSSION

### A.    Section 1983 Claims Against Brooks and Taylor In Individual Capacities

Under 42 U.S.C. § 1983,

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  Mauler v. Arlotto, 777 F. App'x 59, 60 (4th Cir. 2019) (per curiam).

However, "[w]hen a government official is sued in their individual capacity, qualified immunity protects them 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Sharpe v. Winterville Police Dep't, 59 F.4th 674, 682-83 (4th Cir. 2023) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  Thus, "[a]n officer is entitled to qualified immunity unless he (1) 'violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was clearly established at the time.'"  Hulbert v. Pope, 70 F.4th 726, 732 (4th Cir. 2023) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)).  The Court may consider these two prongs in any order.  See Pearson, 555 U.S. at 236.  "A right can be clearly established by cases of controlling authority in this jurisdiction or by a consensus of persuasive authority from other jurisdictions." Sharpe, 59 F.4th at 683 (citing Owens ex rel. Owens v. Lott, 372 F.3d 267, 280 (4th Cir. 2004)).  "Either way, these sources 'must have placed the statutory or constitutional question beyond debate.'" Id. (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018)).  The right must be "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Cannon v. Vill. of Bald Head Island, 891 F.3d 489, 497 (4th Cir. 2018)).  In considering qualified immunity, "the nature of the right allegedly violated must be defined at a high level of particularity." Occupy Columbia v. Haley, 738 F.3d 107, 121 (4th Cir. 2013) (quoting Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001)) (internal quotation marks omitted).

**1. Section 1983 First Amendment Claim Against Brooks and Taylor (Count I)**

Plaintiff brings a § 1983 claim alleging Defendants City, Brooks, and Taylor violated the First Amendment by enforcing two allegedly unconstitutional City ordinances, specifically Gastonia Ordinances §§ 5-17 and 6-228 (the "Ordinances").  (Doc. No. 1 ¶¶ 176-184).  Defendants

seek dismissal of Plaintiff's § 1983 First Amendment claim against Brooks and Taylor only, arguing that they are entitled to qualified immunity. The Court agrees.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" Reed v. Town of Gilbert Ariz., 57 U.S. 155, 163 (2015) (quoting U.S. CONST. amend. I). The First Amendment protects panhandling and solicitation of charitable contributions. Reynolds v. Middleton, 779 F.3d 222, 225 (4th Cir. 2015). Public streets and medians are traditional public forums. Id. The government's authority to regulate speech in a traditional public forum is "limited, though not foreclosed," and such limitations depend on whether speech regulation is content-neutral or content-based. Id.; Reed, 57 U.S. at 162-173.

"Content-neutral time, place, and manner regulations of speech in traditional public forums are subject to intermediate scrutiny—that is, the restrictions must be 'narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.'" Id. at 225-26 (quoting Clatterbuck v. City of Charlottesville, 708 F.3d 549, 555 (4th Cir.2013), abrogated by Reed, 576 U.S. 155); Occupy Columbia, 738 F.3d at 122. On the other hand, content-based restrictions—those that limit speech based on its message, ideas, subject matter, or its content—are presumptively unconstitutional. Reed, 576 U.S. at 163. Content-based restrictions "can only stand if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Id. at 171 (quoting Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734 (2011)) (internal quotation marks omitted). In determining whether a law is content-neutral or content-based, courts must consider the law on its face; a law that is facially content-based is subject to

strict scrutiny.  Id. at 165-66.  A law may also be content-based if the purpose or justification of the law is content-based.  Id. at 166.

In this case, Plaintiff argues that the Ordinances are unconstitutional content-based restrictions on speech and that Brooks and Taylor violated his First Amendment rights in enforcing the allegedly unconstitutional Ordinances.  The Ordinances at issue stated on October 13, 2021:

> **Sec. 5-17. - Begging and solicitation, prohibited conduct.**
> (a) It shall be unlawful for any person to ask, beg, solicit, or offer to work for money or any other thing having value by (i) accosting another, or (ii) forcing oneself upon the company of another.
> (b) For purposes of this section, "ask, beg, solicit, or offer to work for" shall include, without limitation, the spoken, written, or printed word or such other acts as are conducted in furtherance of the permitted activity.
> (c) For purposes of this section, "accosting" shall be defined as approaching or speaking to an individual or individuals in such manner as would cause a reasonable person to fear imminent bodily harm or the commission of a criminal act upon his or her person, or upon property in his or her immediate possession.
> (d) For purposes of this section, "forcing oneself upon the company of another" shall be defined as (i) continuing to request, beg, solicit, or offer to work in close proximity to the individual addressed after the person to whom the request is directed has made a negative response; or (ii) blocking the passage of the individual addressed whether such person be within or without a motor vehicle or upon any other conveyance; or (iii) otherwise engaging in conduct which could reasonably be construed as intended to compel or force a person to accede to such demands.[2]
>
> **Sec. 6-228. - Soliciting from the street or median strip prohibited.**
> (a) It shall be unlawful for any person to stand, sit or loiter in any street or highway, including the shoulders or median strip but excluding sidewalks, and to stop or attempt to stop any vehicle for the purpose of soliciting or accepting contributions from the occupants of any vehicle, or for the purpose of selling or distributing merchandise or literature to the occupants of any vehicle.
> (b) It shall be unlawful for any person to stand, sit or loiter in any street or highway, including the shoulders or median strip but excluding sidewalks, and to solicit or accept contributions from the occupants of any stopped vehicle, or to sell or distribute merchandise or literature to the occupants of any stopped vehicle.[3]

---

[2] Gastonia, N.C. Ordinance § 5-17,
https://library.municode.com/nc/gastonia/codes/code_of_ordinances/388676?nodeId=PTIICOOR_CH5GEOF_S5-17BESOPRCO.
[3] Gastonia, N.C. Ordinance § 6-228,
https://library.municode.com/nc/gastonia/codes/code_of_ordinances/388676?nodeId=PTIICOOR_CH6VETRTR_ARTVIMI_S6-228SOSTMESTPR.

The parties disagree about whether these Ordinances are content-neutral or content-based restrictions. However, at this time, the Court need not reach this issue or decide whether these Ordinances are unconstitutional. The City does not move to dismiss the First Amendment claim against it, and Brooks and Taylor argue the claim against them individually should be dismissed because they have qualified immunity. The Court agrees after considering the second prong of qualified immunity. Pearson, 555 U.S. at 236 (stating that courts may consider the qualified immunity prongs in any order based on the circumstances of the case).

The Court assumes *arguendo* that the Ordinances are unconstitutional for the purpose of considering the second prong of the qualified immunity analysis.[4] Even assuming the Ordinances are unconstitutional, the issue is whether on October 13, 2021, it was sufficiently clear to give fair warning to a reasonable officer that the enacted Ordinances were unconstitutional restrictions on speech in violation of the First Amendment. The answer here is no.

As the Supreme Court announced in Michigan v. DeFillippo, when there is no controlling precedent that a specific law is or is not constitutional, "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality," with one exception if the law is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." 443 U.S. 31, 38 (1979); Harrison v. Deane, 426 F. App'x 175, 179-181 (4th Cir. 2011). In other words, a prudent officer is not required to anticipate that a court would hold an enacted ordinance is unconstitutional, unless is it so grossly and flagrantly unconstitutional that a reasonable person would know. DeFillippo, 443 U.S. at 37-38. "Th[e] exception has been employed sparingly," and "does not apply merely because a person alleges a violation of his First Amendment rights." Harrison, 426 F. App'x at 179-80. This is because "[s]ociety would be ill-

---

[4] The Court expresses no opinion on the constitutionality of the Ordinances at this time.

served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." DeFillippo, 443 U.S. at 38.

While DeFillippo addresses suppression of evidence, not qualified immunity, courts regularly look to DeFillippo when deciding issues of qualified immunity. See e.g., Villarreal v. City of Laredo, Tex., 94 F.4th 374 (5th Cir. 2024); Cooper v. Dillon, 403 F.3d 1208 (11th Cir. 2005); Citizens in Charge, Inc. v. Husted, 810 F.3d 437 (6th Cir. 2016) ("So far as the parties' research has revealed and so far as our own research has uncovered, the Supreme Court has never denied qualified immunity to a public official who enforced a properly enacted statute that no court had invalidated. This indeed would seem to be the paradigmatic way of showing objectively reasonable conduct by a public official" (emphasis in original)); Elabanjo v. Bellavance, No. 1:11CV349, 2014 WL 222097 (M.D.N.C. Jan. 21, 2024); Hetherington v. Madden, No. 3:21-cv-671-MCR-EMT, 2021 WL 4958094 (N.D. Fla. Aug. 17, 2021); May v. Morgan Cnty., 499 F. Supp. 3d 1294, 1301-06 (M.D. Ga. 2020).

The parties do not direct the Court to any authority declaring these specific Ordinances at issue in this case to be unconstitutional nor is the Court aware of such authority. Since the Ordinances had not previously been declared unconstitutional, Brooks and Taylor were able to presume that the enacted Ordinances were constitutional unless the Ordinances were so grossly and flagrantly unconstitutional that any reasonable officer would know.

Plaintiff points to Clatterbuck,[5] Reynolds,[6] and Reed,[7] for his position that it was clearly established that the Ordinances were unconstitutional content-based restrictions and unable to pass strict scrutiny. However, Clatterbuck, a 2013 decision, applied a "pragmatic rather than formalistic

---

[5] Clatterbuck v. City of Charlottesville, 708 F.3d 549 (4th Cir.2013), abrogated by Reed, 576 U.S. 155.
[6] Reynolds v. Middleton, 779 F.3d 222 (4th Cir. 2015).
[7] Reed v. Town of Gilbert Ariz., 57 U.S. 155 (2015).

approach to evaluating content neutrality" to an anti-panhandling ordinance, which was later, in effect, rejected in Reed. 708 F.3d at 551-58. In Reynolds, a 2015 decision issued before Reed, the Fourth Circuit considered an anti-panhandling ordinance that the district court found was content-neutral, a decision that was not challenged and expressly not considered by the Fourth Circuit, while the Fourth Circuit also noted that the issue was before the Supreme Court in the yet decided Reed. 779 F.3d 222, 226 & n.1 (4th Cir. 2015). Reed laid out the correct standards for determining content-based restrictions, and Reed specifically addressed the constitutionality of an ordinance restricting signage, not panhandling or solicitation. Reed provided clarity on considering whether ordinances are content-based or content-neutral, but did not directly address a similar anti-panhandling ordinance as those at issue in this case such that it would put a reasonable officer on notice that the enacted Ordinances were grossly and flagrantly unconstitutional that they should know of their unconstitutionality.

The Court recognizes that Reed changed the analysis in cases similar to Clatterbuck and Reynolds, and in October 2021, it does not appear that the Fourth Circuit had directly addressed whether such anti-panhandling or solicitation ordinances were content-based or content-neutral or their constitutionality. Indeed, even the represented parties in this case dispute whether the Ordinances are content-neutral or content-based restrictions. In light of the Supreme Court's directive in DeFillippo, a reasonable officer enforcing a presumptively constitutional ordinance should not be required to complete the legal gymnastics needed to determine the constitutionality of these Ordinances.[8]

---

[8] Plaintiff's Complaint alleges that the one of the City's police department's priorities was to enforce its anti-panhandling ordinances and its officers "had 'received directions' and had been 'told' to prohibit homeless people from panhandling." (Doc. No. 1 ¶¶ 169, 174-175). As observed in DeFillippo, a police officer's "lot is not so unhappy that he must choose between being charged with dereliction of duty" if he does not enforce a presumptively constitutional ordinance, or "being mulcted in damages if he does." 443 U.S. at 38 (quoting Pierson v. Ray, 386 U.S. 547, 555 (1967)).

Plaintiff also points to cases from other circuits and districts concluding that similar ordinances are content-based and subject to strict scrutiny. (Doc. No. 19 at 15); see also Rodgers v. Bryant, 942 F.3d 451 (8th Cir. 2019); Norton v. City of Springfield, 806 F.3d 411 (7th Cir. 2015); Planet Aid v. City of St. Johns, MI, 782 F.3d 318 (6th Cir. 2015). But these authorities do not constitute a clear "consensus of persuasive authority" placing the question "beyond debate." Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 544-545 (4th Cir. 2017); Sharpe, 59 F.4th at 683. Even if the Ordinances were content-based restrictions subject to strict scrutiny, it would still require further legal analysis on the part of Brooks and Taylor as to whether the Ordinances would pass strict scrutiny. Hetherington v. Madden, No. 3:21-cv-671-MCR-EMT, 2021 WL 4958094 (N.D. Fla. Aug. 17, 2021) (noting that defendants "were not required to speculate as to whether this attempt at tailoring would survive strict scrutiny"). In Reynolds, while based on the evidence before the Fourth Circuit it did not find anti-panhandling ordinances passed intermediate scrutiny, ultimately the Fourth Circuit remanded the case for the county to gather and present evidence on whether an anti-panhandling ordinance would pass intermediate scrutiny. 779 F.3d at 232 ("[W]e believe the County should have an opportunity to gather and present evidence to satisfy McCullen's standard." (citing McCullen v. Coakley, 134 S. Ct. 2518 (2014))).[9]

For these reasons, the Court finds that the enacted Ordinances were not so grossly and flagrantly unconstitutional that any reasonable officer would know their flaws. As such, it was not

---

[9] Plaintiff also cites to cases post-Reed denying qualified immunity to officers enforcing anti-panhandling laws. Dumiak v. Vill. of Downers Grove, 475 F. Supp. 3d 851, 855 (N.D. Ill. 2020); Henagan v. City of Lafayette, No. 21-CV-03946, 2022 WL 4553055, at *10 (W.D. La. Aug. 16, 2022), objections overruled, 2022 WL 4546721 (W.D. La. Sept. 27, 2022). However, those cases are non-binding, and the undersigned has detailed herein the cases that it finds persuasive based on the facts of this case. See also Vaduva v. City of Xenia, 780 F. App'x 331 (6th Cir. 2019) (finding officers entitled to qualified immunity for enforcing an anti-panhandling law when relying on DeFillippo principles, and also recognizing the facts occurred before Reed, but not stating how the court would rule if the events occurred after Reed).

clearly established that the Ordinances were unconstitutional in October 2021, and Brooks and Taylor are entitled to qualified immunity on Plaintiff's violation of free speech claim.

Accordingly, the undersigned respectfully recommends that Defendants' Motion be underlined granted with respect to Plaintiff's First Amendment claim (Count I) as to Brooks and Taylor only.

**2. Section 1983 Excessive Force Claim Against Brooks and Taylor (Count II)**

Plaintiff's second cause of action alleges Defendants City, Brooks, and Taylor violated the Fourth Amendment when they used excessive force during his arrest. (Doc. No. 1 ¶¶ 185-191). Defendants' Motion seeks dismissal of the excessive force claim against Brooks and Taylor, arguing they are entitled to qualified immunity. The Court disagrees at this stage in the litigation.

"The Fourth Amendment prohibits police officers from 'using excessive force to seize a free citizen.'" Hupp v. Cook, 931 F.3d 307, 321 (4th Cir. 2019). "Rather, police officers are constitutionally permitted to use only that force which is reasonable under the circumstances." Id. In considering excessive force, courts ask 'whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.'" Id. at 321-22 (quoting Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996)). "In determining whether excessive force was used, we consider the facts 'from the perspective of a reasonable officer on the scene,' without the '20/20 vision of hindsight,'" and without considering the officer's intent or motivation. Id. (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). "That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." Cnty. Of Los Angeles, Calif. v. Mendez, 581 U.S. 420, 428 (2017).

The inquiry "is guided by the framework of Graham v. Connor, 490 U.S. 386 (1989)." Nazario v. Gutierrez, 103 F.4th 213, 234 (4th Cir. 2024). Under Graham, "there are three

factors central to the inquiry: 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham, 490 U.S. at 396). In the Fourth Circuit, courts also consider a fourth factor, "'the extent of the plaintiff's injuries.'" Id. (quoting Hupp, 931 F.3d at 322)).

Accepting the facts in the Complaint as true, the severity of the crime here was minimal, as Plaintiff was suspected of and charged with violating anti-panhandling ordinances. Plaintiff was also allegedly charged with resisting officer, a misdemeanor. However, the facts surrounding Plaintiff's resistance are disputed, and further development is needed to determine what transpired. For example, Plaintiff contends that he complied with Brooks and Taylor's request for his identification by providing his veteran ID. (Doc. No. 1 ¶ 41). When Brooks and Taylor would not accept Plaintiff's veteran ID, Plaintiff also attempted to comply with their request for his state ID by taking it out of his wallet and explaining that it was not valid, but only seconds later Taylor grabbed Plaintiff and forced him against the patrol car. Id. ¶¶ 43-49. Brooks then pressed Plaintiff into the car and threw him onto the pavement. Id. ¶ 50. Brooks held Plaintiff's face against the pavement and handcuffed him while Taylor kneeled on his body. Id. ¶ 62. According to Plaintiff, at no point did he physically resist Brooks and Taylor, only verbally questioning officers and yelling for help and for his dog. Id. ¶¶ 50-51. Plaintiff alleges several different injuries caused by the force used. Id. ¶¶ 70-72. Defendants may dispute these facts, but the Court cannot engage in factual determination at this early stage.

Thus the Court concludes that Plaintiff has stated a claim for excessive force to overcome qualified immunity at the motion to dismiss stage. Further development is needed to determine whether a reasonable officer in the same circumstances would have concluded that a threat existed

justifying the particular force used and whether the right was clearly established. Defendants'

argument discusses factual disputes erroneously claimed to not be in dispute and which are not

proper for the Court to consider at this stage.[10]  The cases that Defendants cites are also not to the

contrary because they were considered at the summary judgment stage applying a different

standard than the Court is bound to apply at this motion to dismiss stage and turn on the specific

facts of each case.

Accordingly, the undersigned respectfully recommends that Defendants' Motion be <u>denied</u>

with respect to Plaintiff's excessive force claim against Brooks and Taylor individually (Count II)

to be re-raised at a later stage as appropriate.

### 3. Section 1983 Unreasonable Seizure of Sunshine Against Taylor (Count III)

Plaintiff's third cause of action alleges Defendants City and Taylor violated the Fourth

Amendment when Taylor unreasonably seized Plaintiff's service dog Sunshine. Defendants move

to dismiss this claim against Taylor, arguing he is entitled to qualified immunity.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

Privately owned dogs are "effects" under the Fourth Amendment. <u>Ray v. Roane</u>, 948 F.3d 222,

227 (4th Cir. 2020) (citing <u>Altman v. City of High Point, N.C.</u>, 330 F.3d 194, 203-05 (4th Cir.

2003)). Unreasonable force against a dog which interferes with an individual's possessory interest

---

[10] Throughout Plaintiff's Complaint, he cites to and refers to the body-worn camera footage which is available online, including providing the link to the footage. Defendants also discuss the body-worn camera footage throughout their briefing. For purposes of the motion to dismiss, the Court accepts Plaintiff's allegations in the Complaint as true. However, even in viewing the body-worn camera footage, the Court concludes that factual questions remain. The footage does not directly contradict the allegations at issue here nor is the footage entirely consistent with Defendants' version of the facts as argued, leaving clear factual questions for another day and stage of litigation. <u>Lawhon v. Mayes</u>, Nos. 20-1906, 20-1907, 20-1908, 2021 WL 5294931, at *1 (4th Cir. Nov. 15, 2021) (unpublished) ("In addition to the facts as stated in the complaint, the district court correctly considered the body camera footage in deciding whether to grant the motions to dismiss."). The body-worn camera footage is available at: https://gastonianc.gov/index.php?option=com_content&view=article&id=1876.

can be a seizure under the Fourth Amendment. <u>Altman</u>, 330 F.3d at 204-05; <u>Ray I</u>, 948 F.3d at 227-230 ("[P]rivately owned dogs are protected under the Fourth Amendment, and . . . the reasonableness of the seizure of a dog depends on whether the governmental interest in safety outweighs the private interest in a particular case."); <u>Ray v. Roane</u>, 93 F.4th 651, 654-58 (4th Cir. 2024).

"A claim that a law enforcement officer improperly used force to seize a plaintiff's effects—including a dog—is analyzed under the reasonableness standard of the Fourth Amendment." <u>Lee v. Fort Mill</u>, 725 F. App'x 214, 218 (4th Cir. 2018). "Under the basic reasonableness calculus, a court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion." <u>Id.</u> (quoting <u>Altman</u>, 330 F.3d at 205). "[P]rivate interests in dogs—and family pets especially—are highly significant." <u>Ray I</u>, 948 F.3d at 227 (quoting <u>Altman</u>, 330 F.3d at 205). "Likewise, the government undoubtedly has a strong public interest in protecting citizens and officers from dogs that may be dangerous or otherwise a source of public nuisance." <u>Id.</u> (citing <u>Altman</u>, 330 F.3d at 205-06). "In the case of a household pet, 'the use of deadly force . . . is reasonable only if the pet poses an immediate danger and the use of force is unavoidable.'" <u>Lee</u>, 725 F. App'x at 218 (quoting <u>Viilo v. Eyre</u>, 547 F.3d 707, 710 (7th Cir. 2008)) (alterations in original). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." <u>Ray I</u>, 948 F.3d at 227 (quoting <u>Altman</u>, 330 F.3d at 205). In weighing the competing interests, courts must focus on the circumstances confronting the officer at the moment the force is used. <u>Id.</u>

Here, Plaintiff's Complaint alleges, among other things, that Taylor tased Sunshine causing Sunshine to run away and get struck and killed by a vehicle. (Doc. No. 12 ¶¶ 57-60, 91). According to the Complaint, Taylor knew Sunshine was well-trained, Sunshine was nonaggressive throughout the encounter, and did not otherwise behave in a threatening manner. Id. ¶¶ 52-58, 195. Brooks told Taylor that she did not believe Sunshine was going to bite her before Taylor tased Sunshine. Id. ¶¶ 54, 195. Sunshine did not bite Taylor or anyone else, and neither Taylor nor any other officers made any attempt to secure Sunshine after she was tased and ran away toward a populated shopping center. Id. ¶¶ 56-59, 195. Based on these facts, Plaintiff's Complaint alleges sufficient facts to state an unreasonable seizure claim to overcome qualified immunity at this stage.

Defendants' argument that Taylor is entitled to qualified immunity relies entirely on Defendants' version of the facts, which contradict the facts in Plaintiff's Complaint. For example, Defendants contend Sunshine was a threat and allegedly bit Taylor before he tased her. Defendants state, that bite "is evidenced in real-time by Taylor's cry in response thereto" and "most fatal to Plaintiff's allegations is the very fact that Defendant Taylor exclaims that '[H]e bit me' in reference to Plaintiff's service animal." (Doc. No. 21, at 11-12). But Plaintiff's Complaint alleges the opposite, that "Sunshine was nonaggressive throughout the encounter and did not bite Defendant Taylor or anyone else," and that other people that witnessed the incident disputed the claims made by Taylor that Sunshine bit him. (Doc. No. 12 ¶ 56, 73-79). The Court cannot disregard the facts in Plaintiff's Complaint and accept Defendants' version of the facts when considering a motion to dismiss.[11] Ray I, 948 F.3d at 227-30 (reversing district court's dismissal and grant of qualified

---

[11] The body-worn camera footage also does not clearly contradict Plaintiff's version of the facts in the Complaint on this issue. Other than the statements made by Taylor, the body-worn camera footage does not clear up the factual dispute of whether Sunshine actually bit Taylor or was otherwise aggressive. This Court cannot weigh evidence or

immunity, noting "[t]he problem with Roane's argument, and thus with the district court's decision adopting it, is that it requires us to ignore certain factual allegations in Ray's complaint and to draw reasonable inferences against Ray on a motion to dismiss . . . . The district court's extensive reliance on cases decided on summary judgment underscores our conclusion that the district court did not fully credit the allegations in Ray's complaint and the inferences arising therefrom.").

Plaintiff's unreasonable seizure claim and Taylor's request for qualified immunity must be considered under a reasonable analysis, considering competing interests, including what if any threat or danger Sunshine posed during the interaction. Based on the facts alleged in the Complaint, the Court concludes that Plaintiff stated a claim and further development is needed to determine whether the officers are entitled to qualified immunity. For these reasons, the undersigned respectfully recommends that Defendants' Motion be <u>denied</u> with respect to Plaintiff's unreasonable seizure claim against Taylor individually (Count II) to be re-raised at a later stage as appropriate.

**B. <u>Section 1983 Claims Against the City</u>**

Plaintiff brings, among others, claims against the City for excessive force, unreasonable seizure, and First Amendment retaliation. Defendants ask the Court to dismiss these claims against the City, arguing the Complaint fails to allege sufficient facts supporting an official policy or custom attributable to the City causing the constitutional violations.

"Municipalities are 'persons' within the meaning of § 1983." <u>Franklin v. City of Charlotte</u>, 64 F.4th 519, 535 (4th Cir. 2023) (quoting <u>Monell v. Dep't of Soc. Servs. of N.Y.C.</u>, 436 U.S. 658, 690 (1978)). Thus, a suit may be brought against a municipality for a federal constitutional

_____

make a credibility determination as to Taylor's statements made in body-worn camera footage that Sunshine bit him, Plaintiff's allegations, and other witnesses' allegations, at the motion to dismiss stage. <u>Lawhon</u>, 2021 WL 5294931, at *1.

deprivation "when the municipality undertook the allegedly unconstitutional action pursuant to an 'official policy' or 'custom.'" Starbuck v. Williamsburg James Cnty. Sch. Bd., 28 F.4th 529, 532-33 (4th Cir. 2022) (quoting Monell, 436 U.S. at 690-91). Monell liability under § 1983 cannot be predicated upon a respondeat superior theory. Franklin, 64 F.4th at 535. "Liability arises only when the offensive acts are taken in furtherance of municipal policy or custom." Jones v. McComas, No. 1:23-cv-215-KDB, 2023 WL 7174240, at *2 (W.D.N.C. Oct. 31, 2023).

There are three elements for Monell liability. Id. "First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee 'taken in furtherance of some municipal policy or custom.'" Id. (quoting Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir. 1984)). "Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality." Jones, 2023 WL 7174240, at *2; Spell v. McDaniel, 824 F.2d 1380, 1389 (4th Cir. 1987). "Third, the plaintiff must allege an affirmative causal link between the policy or custom, and the particular injury suffered by the plaintiff." Jones, 2023 WL 7174240, at *2; Franklin, 64 F.4th at 536-37.

With respect to the first element,

[A] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

Starbuck, 28 F.4th at 533 (quoting Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003)). "No matter which of these paths [to show a policy or custom that] a plaintiff takes, the 'official policy' itself must 'inflict' the alleged injury for the municipality to be liable under § 1983." Franklin, 64 F.4th at 536 (quoting Monell, 436 U.S. at 694) (alterations in original omitted).

The existence of a custom or usage may be found in persistent and widespread practices,

which although not authorized by written law, are so permanent and well-settled as to have the force of law. Spell, 824 F.2d at 1387 (quoting Monell, 436 U.S. at 690-91). "Custom and usage, in the sense of persistent and widespread . . . practices by municipal agents and employees, may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees" and "their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." Id. at 1387, 1391. "Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body." Id. at 1387. "Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Id. Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these. Id. at 1391. "The inculpating knowledge, whether actual or constructive, may be either that of the municipal governing body itself, or of municipal officials having final policymaking authority in municipal law enforcement matters." Id. Sporadic or isolated violations will not give rise to liability. Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 403 (4th Cir. 2014). "Rather, there must be 'numerous particular instances' of unconstitutional conduct in order to establish a custom or practice." Lytle v. Doyle, 326 F.3d 463, 473 (4th Cir. 2003) (quoting Kopf v. Wing, 942 F.2d 265, 269 (4th Cir.1991)).

Plaintiff's Complaint sufficiently alleges excessive force, unreasonable seizure, and First Amendment retaliation claims attributable to the City with a causal link to the alleged violations, based on the City's alleged custom and usage of hostility towards and unwarranted force during

interactions with people experiencing homelessness and condonation of social media posts. The Complaint points to one of the City's police department's goals for the 2022 fiscal year involving deterring "'homeless from congregating in open areas that are visible' to passing motorists and businesses throughout the city." (Doc. No. 12 ¶ 170). It further alleges the City's police department "aggressively arrests and seeks prolonged detention of people experiencing homelessness for trivial or fabricated offenses," and has successfully advocated for an increase of the criminal penalty for the anti-panhandling ordinance. Id. ¶¶ 29-30, 157-164, 169, 171-175. According to the Complaint, days before the October 13, 2021 incident, Plaintiff interacted with Taylor during which Taylor allegedly told Plaintiff that the City's "officers had 'received directions that we're not supposed to have people in medians, like at the intersections of the highways' and asserted 'I'm doing what I'm being told to do.'" Id. ¶ 29. At that time, Plaintiff "said that other police officers would smile at him or offer him money, Taylor responded, 'We're not even supposed to do that, because that's against policy.'" Id. ¶ 30. In addition, Plaintiff's Complaint points to hundreds of social media posts visible to the public for over many months made by the Gastonia Police Department's official Facebook which Plaintiff contends are belittling, disparaging, and provide false information about Plaintiff and the incident. Id. ¶¶ 109-146, 229-233; (Doc. No. 1-1). These allegations, taken together and as true under the relevant standard, are sufficient to allege a policy or custom attributable to the City and with a causal link to the alleged First and Fourth Amendment constitutional violations to survive a motion to dismiss.

For these reasons, under the Rule 12(b)(6) standard the undersigned is tasked with applying, Plaintiff has alleged sufficient facts to support his claims against the City, including an official policy or custom attributable to the City causally linked to the alleged violations. Accordingly, the undersigned respectfully recommends that Defendants' Motion be denied with

respect to Plaintiff's excessive force (Count II), unreasonable seizure (Count III), and First Amendment retaliation (Count VIII) claims against the City.[12]

**C. <u>ADA Claims For Emotional Distress Damages</u>**

Plaintiff's fourth, fifth, sixth, and seventh causes of action bring claims against the City under Title II of the ADA. Defendants move to dismiss any request for emotional distress damages for these claims. The Court agrees emotional distress damages are unavailable on Plaintiff's ADA claims, but at this stage, the claims should not be dismissed in their entirety because Plaintiff may have other compensable damages.

Defendants rely on <u>Cummings v. Premier Rehab Keller, P.L.L.C.</u>, 596 U.S. 212 (2022). In <u>Cummings</u>, the Supreme Court held that emotional distress damages are not recoverable in private actions to enforce the antidiscrimination provisions of Spending Clause legislation, specifically the Rehabilitation Act or the Affordable Care Act. <u>Id.</u> at 217-30. In so holding, the Supreme Court reasoned that the relationship between the federal government and a recipient of federal funds is analogous to a contractual relationship. <u>Id.</u> As such, in the face of a statute that is silent on the issue of emotional distress damages, federal funding recipients do not have clear notice that they would face emotional distress damages in a private action to enforce Spending Clause statutes because emotional distress damages are not traditionally available in breach of contract actions.

---

[12] To the extent Plaintiff attempts to attribute the excessive force and unreasonable seizure claims to the City by claiming the City ratified the excessive force and unreasonable seizure in social media posts about the October 13, 2021 encounter after the encounter occurred, that theory fails as to those claims only. <u>Franklin</u>, 64 F.4th at 536-37 (concluding city was not liable under § 1983 for officer's shooting of plaintiff where final policymaker's "post-facto approval of an internal shooting investigation cannot possibly have caused the constitutional violation" and observing that reversing the decision "cannot undo what is done."). Plaintiff's Complaint does not allege a causal link between the alleged constitutional violations of excessive force and unreasonable seizure that occurred on October 13, 2021, and social media posts made about the encounter, after the encounter, because those social media posts "cannot possibly have caused" the prior in time alleged excessive force and unreasonable seizure. <u>Id.</u> Plaintiff's reliance on <u>Starbuck</u> does not dictate a different result because <u>Starbuck</u> is factually distinguishable. 28 F.4th at 533-35 (finding school board's approval of student suspension was "the moving force behind the asserted constitutional violation," and caused the suspension to remain on the student's permanent record but could be removed).

Id. at 217-230.  Since Cummings, the Honorable Robert J. Conrad has applied Cummings in the Title IX context when ruling on a motion in limine, wherein the Court excluded evidence of emotional distress damages as it related to the plaintiff's Title IX claim only.  See Doe v. Charlotte Mecklenburg Bd. Of Educ., No. 3:18-cv-586-RJC-SCR (Doc. No 282 at 4) (W.D.N.C. Jan. 11, 2023).

The Cummings decision relied on the reasoning in Barnes v. Gorman, 536 U.S. 181 (2002), for its contract analogy.  The Barnes decision considered whether punitive damages may be awarded under the ADA.  Id. at 183.  In reaching the conclusion that punitive damages may not be awarded, the Supreme Court ultimately looked to the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964 – Spending Clause legislation.  Id. at 185.  It did so because the ADA "declares that the 'remedies . . . set forth in [the Rehabilitation Act] shall be the remedies . . . [ADA] provides,'" and "the Rehabilitation Act, in turn, declares that the 'remedies . . . set forth in title VI of the Civil Rights Act of 1964 . . . shall be available' for violations of [the Rehabilitation Act]."  Id. at 184-85 (quoting 42 U.S.C. § 12133 and 29 U.S.C. § 794a).  "Thus, the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964."  Barnes, 536 U.S. at 185.  The Barnes court then characterized Title VI of the Civil Rights Act, enacted under the Spending Clause, as contractual in nature.  Id. at 185-86.  After considering remedies traditionally available in contract law, the Supreme Court held that "[b]ecause punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act."  Id. at 189.  The Barnes decision found it "quite irrelevant" that the ADA is a non-Spending Clause statute because Congress unequivocally said

the remedies under the Spending Clause statute are the available remedies under the ADA.  Id. at 89 n.3.

Applying Cummings and Barnes, the answer is clear that emotional distress damages are unavailable for Plaintiff's ADA claims.  The ADA expressly incorporates only those remedies available in the Rehabilitation Act, which is Spending Clause legislation.  42 U.S.C. § 12133; 29 U.S.C. § 794a.  Emotional distress damages are not traditional contractual damages and are not appropriate remedies under Spending Clause legislation, including the Rehabilitation Act.  Cummings., 596 U.S. 212;  Barnes, 536 U.S. 181.  In light of Cummings and Barnes, other courts considering this issue have similarly concluded that emotional distress damages are not available under the ADA.  See e.g., Williams v. Colo. Dep't of Corrs., No. 21-CV-02595-NYW-NRN, 2023 WL 3585210, at *4-7 (D. Colo. May 22, 2023) (dismissing plaintiff's claims insofar as they seek emotional distress damages and noting that "district courts substantively addressing this issue have seemingly unanimously concluded that, post-Cummings, emotional distress damages are not recoverable under Title II of the ADA" (collecting cases)); Montgomery v. District of Columbia, No. CV 18-1928 (JDB), 2022 WL 1618741, at *24-28 (D.D.C. May 23, 2022) ("[I]f a certain category of damages is not available under [the Rehabilitation Act], it is not available under Title II either."); Pennington v. Flora Cmty. Unit Sch. Dist. No. 35, No. 3:20-cv-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023) ("Because Title II of the ADA incorporates the remedies set forth in the [Rehabilitation Act] . . . it therefore follows that emotional distress damages are also not available in suits brought under the ADA."); Smith v. Kalamazoo Public Schs., 703 F. Supp. 3d 822, 828-29 (W.D. Mich. 2023) (considering Cummings and Barnes, "the Court concludes that damages for mental anguish and emotional distress are not recoverable in actions brought under Title II of the ADA."); Matagrano v. N.Y. State Dep't of Corrs. & Comm. Supervision, No. 9:19-

cv-763 (BKS/DJS), 2023 WL 5932943, at *7-8 (N.D.N.Y. Sept. 12, 2023) ("[T]he Court holds that Plaintiff may not recover emotional distress damages on his Rehabilitation Act and ADA claims."); Doherty v. Bice, No. 18-cv-10898 (NSR), 2023 WL 5103900, at *6 (S.D.N.Y. Aug. 9, 2023) ("It thereby follows that emotional distress damages are not available under the ADA if, as the Cummings Court established, they are not available under the Rehabilitation Act."); A.T. V. Oley Valley Sch. Distr., No. 17-4983, 2023 WL 1453143, at *2-4 (E.D. Pa. Feb. 1, 2023) (considering Cumming and Barnes to conclude that plaintiffs cannot seek emotional distress damages under the ADA); Cesaire v. Tony, No. 20-CV-61169-RAR, 2023 WL 7291034, at *1-2 (S.D. Fla. Nov. 6, 2023).

For these reasons, the undersigned respectfully recommends Defendants' Motion be granted to the extent it generally seeks dismissal of Plaintiff's request for emotional distress damages on his ADA claims. However, the undersigned respectfully recommends Defendants' Motion be denied without prejudice to the extent it requests dismissal of Plaintiff's ADA claims in their entirety because the parties dispute which damages may or may not be emotional distress damages, which turns on factual issues, and Plaintiff may also have other compensable damages. Pennington, 2023 WL 348320, at *2 (striking request for emotional distress damages but denying request to dismiss ADA claims where plaintiffs alleged they had other types of compensatory damages); Matagrano, 2023 WL 5932943, at *7-8 (concluding that plaintiff could not recover emotional distress damages but denying summary judgment on ADA and Rehabilitation Act claims because other damages may be available).

**D. Defendants' Motion to Strike**

Finally, Defendants filed a Motion to Strike Plaintiff's Notice of Supplemental Authority (Doc. No. 22) to the extent Plaintiff provides arguments and case law that is not pertinent and

significant to the case. Defendants ask the Court to "only review and consider the text of cases cited within Plaintiff's Notice that it determines is 'pertinent and significant' for purpose of Local rule 7.1(j)." (Doc. No. 23-1). The Court has considered the text of the cases cited in Plaintiff's Notice of Supplemental authority and given such cases the appropriate weight based on their precedential value to this Court. Accordingly, the Motion to Strike will be <u>denied as moot</u>.

## IV.   ORDER

**IT IS, THEREFORE, ORDERED** that Defendants' Motion to Strike Portions of Plaintiff's Notice of Supplemental Authority (Doc. No. 23) is **DENIED AS MOOT**.

## V.   RECOMMENDATION

For the foregoing reasons, the undersigned respectfully recommends that Defendants' Partial Motion to Dismiss (Doc. No. 15) be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the undersigned respectfully recommends:

1. Defendants' Motion be **GRANTED** with respect to Plaintiff's First Amendment Free Speech claim (Count I) against Brooks and Taylor in their individual capacities only;

2. Defendants' Motion be **DENIED** without prejudice to be raised at a later stage as appropriate with respect to Plaintiff's Fourth Amendment excessive force (Count II) claim against Brooks and Taylor in their individual capacities only, and also with respect to Plaintiff's Fourth Amendment unreasonable seizure (Count III) claim against Taylor in his individual capacity only;

3. Defendants' Motion be **DENIED** with respect to Plaintiff's Fourth Amendment excessive force (Count II), Fourth Amendment unreasonable seizure (Count III), and First Amendment retaliation (Count VIII) claims against the City;

4. Defendants' Motion be **GRANTED** to the extent it generally seeks dismissal of Plaintiff's request for emotional distress damages on his ADA claims but **DENIED** without prejudice to the extent it requests dismissal of Plaintiff's ADA claims in their entirety.

## VI.    TIME FOR OBJECTIONS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained in this Memorandum must be filed within fourteen days after service of same. Failure to file objections to this Memorandum with the Court constitutes a waiver of the right to de novo review by the District Judge. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

The Clerk is directed to send copies of this Memorandum and Recommendation and Order to the parties' counsel and to the Honorable Robert J. Conrad, Jr.

**SO ORDERED AND RECOMMENDED**.

Signed: August 26, 2024

Susan C. Rodriguez
United States Magistrate Judge